## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Ultra Safe Nuclear Corporation, *et al.*,[1] | Case No. 24-12443 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF KURT A. TERRANI IN SUPPORT OF
## CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Kurt A. Terrani, hereby declare under penalty of perjury:

1. I am the interim chief executive officer (the "**Interim CEO**") and President of Ultra Safe Nuclear Corporation ("**USNC**") and each of the other above-captioned debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**"). I was appointed as the President on January 9, 2024, and as the Interim CEO on August 2, 2024. Before that, I served as the Executive Vice President of the Core Group at USNC since February 5, 2021.

2. I have more than fifteen years of experience developing nuclear fuel materials and I am USNC's nuclear fuels subject matter expert. Before joining USNC, I led the development of advanced nuclear fuel forms and managed the Nuclear Fuels Materials Group at the Oak Ridge National Laboratory ("**ORNL**"). I began my career at ORNL as a Weinberg Fellow Staff Scientist and held positions as Group Leader, Nuclear Fuel Materials and Senior Staff Scientist, and National Technical Director for the U.S. Department of Energy, Office of Nuclear

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Ultra Safe Nuclear Corporation (9774); Ultra Safe Nuclear Corporation – Technologies (9815); USNC-Power Ltd. (6500); and Global First Power Limited (7980).  The Debtors' mailing address is 200 Europia Ave., Oak Ridge, Tennessee 37830.

Energy.  I earned a B.S. in Materials Science and Engineering from Arizona State University and a Ph.D. in Nuclear Engineering from University of California, Berkeley.

3.      In my capacity as the Interim CEO and President, I am generally familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and records.

4.      Concurrently with the filing of this declaration (this "**Declaration**"), on the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief (collectively, the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), in the United States Bankruptcy Court for the District of Delaware (the "**Court**").

5.      To operate effectively, minimize any adverse effects of the commencement of the Chapter 11 Cases, and enhance the Debtors' ability to maximize value, including through a contemplated Court-approved marketing and sale process with a committed stalking horse bidder, the Debtors have requested certain relief in "first day" pleadings filed with the Court (collectively, the "**First Day Pleadings**").  As described below, through the First Day Pleadings, the Debtors seek, among other things, to (i) establish certain administrative procedures to promote a seamless transition into and through the Chapter 11 Cases, (ii) ensure the continuation of their business operations and cash management system without interruption, (iii) obtain debtor-in-possession financing and use cash collateral in the operation of their businesses, and (iv) preserve valuable relationships with trade vendors and service providers.  As further discussed below, I have reviewed and am familiar with the First Day Pleadings and the relief requested therein.  I believe that the Debtors would suffer immediate and irreparable harm in the event that the relief sought in the First Day Pleadings is not granted.

6.      I submit this Declaration to provide an overview of the Debtors, their businesses, and the Chapter 11 Cases, as well as to support the Debtors' chapter 11 petitions and the relief requested through the First Day Pleadings.  Except as otherwise indicated herein, all facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and advisors, my review of relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition.  In making this Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors, and, if called upon to testify, I would testify competently to the facts set forth herein.

7.      Parts I through III of this Declaration provide an overview of the Debtors' businesses, organizational structure, and capital structure.  Part IV provides an overview of the circumstances leading to the commencement of the Chapter 11 Cases and the Debtors' contemplated marketing and sale process.  Part V provides support for the Debtors' proposed debtor-in-possession financing facility, and Part VI affirms and incorporates the facts that support the relief requested in the First Day Pleadings.

## I.      The Debtors' History and Business Operations

8.      The Company is a global leader in developing cutting edge technology and equipment for reliable and safe zero-carbon nuclear power energy used on Earth and in space.  It holds 33 patents[2] and is headquartered in Oak Ridge, Tennessee.

---

[2]      The Company's patents include twenty-two U.S. issued patents (two as co-owner), fifteen pending U.S. utility patents, six pending international Patent Cooperation Treaty (PCT) applications with the World Intellectual Property Organization set for later nationalization in the U.S. and other foreign countries, and forty-nine national

9.     The Company was founded in 2011 by Dr. Francesco Venneri, the Company's former chief executive officer and current chief science officer, to commercialize the technology for Fully Ceramic Micro-encapsulated (FCM®) nuclear fuel ("**FCM Fuel**").[3]  Since its founding, the Company expanded its initiatives to include the development of the Micro Modular Reactor (MMR®) (the "**MMR**") and nuclear power and propulsion technologies for defense applications and space exploration.

10.     Through these initiatives, described more fully below, the Company is developing front-line nuclear technology, including FCM Fuel and the MMR, which have the potential to provide safe, clean, and cost-effective zero-carbon energy. The Company's technology has applications for terrestrial power, space exploration, and defense purposes, and could play a crucial role in addressing global energy needs and climate change concerns.  In recognition of the Company's promising developing technology, the Company has ongoing significant projects and partnerships with notable entities like the National Aeronautics and Space Administration ("**NASA**"), the United States Department of Defense (the "**DOD**"), and the United States Department of Energy (the "**DOE**").

### The Company's Major Initiatives

11.     **Fully Ceramic Micro-encapsulated (FCM®) Nuclear Fuel**.  FCM Fuel is the Company's proprietary fuel form manufactured partly pursuant to an exclusive license from ORNL.  FCM Fuel consists of Tri-structural ISOtropic ("**TRISO**") fuel particles embedded inside a silicon carbide matrix.  (Illustration below)

---

phase applications pending throughout the world outside of the U.S. Additionally, USNC acquired ownership of a patent portfolio from Shale and Sands Oil Recovery LLC. USNC also holds valuable licenses to practice three fuel-related patents (two exclusive and one non-exclusive).

[3]   Dr. Venneri co-invented FCM Fuel at a prior company.  He is also a member of USNC's board of directors (the "**Board**").



TRISO fuel particles are uranium bearing spheres coated with special ceramic layers designed like tiny pressure vessels. (Illustration below)



The layers contain fission products inside and ensure mechanical and chemical stability during irradiation and temperature changes.  TRISO fuel particles are more resistant to radionuclide release, neutron irradiation, corrosion, oxidation, and high temperatures than traditional fuels and do not melt in nuclear reactors like traditional fuels, making them the most common fuel constituent of choice for advanced reactors.  TRISO fuel particles and FCM Fuel are manufactured through a series of highly specialized methods that process basic chemical feedstock constituents (*e.g.* uranium oxide, silicon carbide, various other chemicals, and gases) into fully characterized, particle-based advanced nuclear fuels.  USNC has developed unique and proprietary commercial scale production equipment and know-how to produce TRISO fuel particles and FCM Fuel.  While FCM Fuel is currently designed solely for the MMR, TRISO-based fuels have been selected by

most other developers of advanced reactors and constitute an additional market for offtake from USNC production facilities.

12.     To make FCM Fuel, USNC manufactures silicon carbide shells in whatever shape is required—usually cylinders or annular cylinders—and then pours TRISO particles, along with loose silicon carbide, into the shell.   After that, silicon carbide is deposited via chemical vapor infiltration throughout the shell and between the particles to form a dense matrix.   This manufacturing process results in fuel with extraordinarily high temperature stability and radiation tolerance.  FCM Fuel achieves very high temperatures for terrestrial power and space propulsion applications, well over 1000°C greater than traditional fuels.  FCM Fuel can be utilized across multiple reactor types, offers high heavy metal loading for efficient power generation, and is essentially repository ready once discharged. USNC has used similar manufacturing technologies to produce FCM Fuel with a zirconium carbide matrix for NASA as the agency seeks to develop technologies for nuclear-powered space propulsion.

13.     USNC fully controls the design, development, and testing of FCM Fuel, using in-house and commercial tools—*e.g.*, finite element analysis software and analytical codes—to analyze and model the fuel form and complete the fuel design. The fuel design iterations are then tested inside and outside of nuclear reactors.

14.     USNC owns and operates the largest commercial-scale TRISO production facility anywhere in the United States—its Pilot Fuel Manufacturing Facility in Oak Ridge, Tennessee[4]—which contains full scale production equipment for TRISO particles, FCM Fuel, and novel particle-based fuels and moderators, enabling USNC to produce TRISO with unparalleled

---

[4]     The Pilot Fuel Manufacturing Facility site was previously occupied by the Manhattan Project's K-25 gaseous diffusion plant, which was used to produce enriched uranium for defense purposes.

scale and versatility.  The Pilot Fuel Manufacturing Facility is supported by the Nuclear Quality Assurance-1 (NQA-1) program—the industry-standard for nuclear facilities.  USNC's production equipment design, procedures, operating parameters, and general know-how developed through establishing the Pilot Fuel Manufacturing Facility are extremely valuable assets because TRISO is being utilized by multiple advanced reactor developers.

15.    USNC also rents the Advanced Ceramics Manufacturing Facility in Salt Lake City, Utah.  At the Salt Lake facility, USNC manufactures non-uranium-bearing components used in the production of FCM Fuel along with advanced ceramics and neutron moderators.  USNC's use of proprietary ceramics additive manufacturing techniques for the production of FCM Fuel allows USNC to selectively place fuel particles in the fuel matrix and achieve uranium loading well in excess of traditional carbonaceous matrix fuels.

16.    **Micro Modular Reactor (MMR®)**.  The Micro Modular Reactor ("**MMR**") Energy System is a 4th Generation nuclear energy system, powered by FCM Fuel, that USNC is developing to deliver safe, clean, and cost-effective electricity to a variety of potential users.  (Illustration below)



The MMR is a High-Temperature Gas-Cooled Reactor (HTGR) with a core consisting of several hundred graphite blocks loaded with USNC's FCM Fuel pellets stacked in machined channels within those graphite blocks. The safety basis and energy density of USNC's proprietary FCM Fuel form, as well as other design elements, allows for a design that is exponentially simpler and more modular than other reactors. It also requires significantly less acreage and can be constructed using a high percentage of "off-the-shelf" components that are made in bulk for broader industrial use.

17.    This modular approach in complex industrial projects has numerous benefits, including, most critically, a reduction in the overall project cost, time to deployment, and risk, thereby reducing the associated Levelized Cost of Energy (LCOE) for the customer. Nuclear power generation like the MMR is also "carbon free," making it more desirable to potential customers.

18. The MMR can be conceptualized as a "nuclear battery," with 15.7 billion kilowatt-hours of thermal energy ($kW_{th}$) during its lifetime. The reactor can deliver up to 45 megawatts of thermal power or approximately 15 megawatts of electrical power (MWe). Power can be modulated based on operating requirements to provide between 3.5-15 MWe or 10-45 megawatts of thermal power, and accordingly require core re-fueling every 3.3 to 30 years based on power usage. Additionally, the MMR units can be linked together like batteries to scale to high-power applications, making the MMR a candidate to power large industrial sites such as data centers that require hundreds of MWe. The MMR's ability to provide reliable but variable baseload power also makes it an ideal complement to other forms of renewable energy (such as wind and solar) to create new and more efficient renewable micro grids. The MMRs do not require a water resource or an electrical grid or infrastructure support. They are compatible with the harshest global climates and therefore can be installed anywhere electrical power is required.

19. The MMR was inspired by the Fukushima accident and, as such, it is "walk away safe," meaning that under any possible accident scenario the reactor core will simply dissipate excess heat into the environment without fuel damage or "meltdown" without requiring any intervention. This is enabled by the low power density of the reactor, its passive safety features, and the fundamental physical properties of TRISO and FCM Fuels, as silicon carbide— which comprises the coating layers of TRISO fuel and additional fuel matrix within USNC's FCM Fuel—is robust up to very high temperatures (>1600° C).

20. The MMR plant has no need for active systems to remove heat and does not require any outside services, like electrical power, to operate safely. The reactors are buried underground which provides excellent protection against acts of terrorism. Occurrences that may be high risk or even catastrophic accidents for traditional and other advanced reactors are minor

affairs for the MMR—even when scenarios strike simultaneously.  When the MMR plant fuel cycle is over, the nuclear core containing the fuel will be removed and stored in a commissioned nuclear waste facility and a new core load can be provided until the plant lifetime is reached at which point the site can be decommissioned and returned to greenfield.

21.     **MMR Projects.** The MMR is in the reactor licensing process with the applicable regulatory bodies for deployment in Canada, the United States, and the United Kingdom in support of three projects demonstrating the MMR Energy System: (i) the "**Chalk River Project**" being deployed at the Canadian Nuclear Laboratories' Chalk River Site; (ii) a project at the University of Illinois at Urbana-Champaign Project (the "**UIUC Project**") that involves the construction and operation of a research reactor on UIUC's central campus; and (iii) the Advanced Modular Reactor project supported by the U.K. Government in the United Kingdom.  Additional deployment projects are underway at pre-feasibility stage in the United States, Canada, Asia, and Europe.  Of these projects, approximately four are considered mature project development efforts in active commercial negotiations supported by ongoing development activities such as licensing and detailed feasibility assessments.  Additionally, there are fourteen active customers in the development phase, *i.e.* supported by Memorandums of Understanding (MOUs) or similar commercial agreements, with many of the projects requiring tens or hundreds of the MMRs.

22.     The Company's operations in Canada are performed through Debtors USNC-Power Ltd. ("**USNC-P**") and Global First Power Limited ("**GFP**").  Until recently, GFP was a joint venture 50% owned by USNC-P and 50% owned by Ontario Power Generation Inc. ("**OPG**").  USNC-P and OPG executed a separation agreement on August 30, 2024, and GFP is now wholly-owned by USNC-P.

23.    GFP was formed in connection with the Chalk River Project.  The project is the first commercial deployment of a Small Modular Reactor (SMR) technology in Canada and aims to demonstrate the MMR technology for wider deployment and to provide a local clean energy supply.  The Chalk River Project has been funded with private sector funds, but Canadian government support is expected in the future.

24.    **Nuclear power and propulsion technologies for space exploration**. Debtor Ultra Safe Nuclear Corporation – Technologies ("**USNC-Tech**") develops and consults on a wide range of extraterrestrial and nuclear technology for NASA, the DOD, and the DOE.  The primary product lines of USNC-Tech are nuclear thermal propulsion ("**NTP**") engines, Pylon (compact nuclear reactors for Earth and space), and EmberCores (radioisotope power and heat sources). These product lines are discussed more fully below.

(a)    **Nuclear Thermal Propulsion Engines**.  (Illustration below)



NTP systems work by heating up a gas, usually hydrogen or ammonia, with a nuclear fission reactor and expanding that gas through a nozzle to produce thrust.  USNC-Tech is developing a class of NTP engines with variants for technology demonstrations, Mars missions, and commercial

applications. NTP engines are slightly larger than trash cans but can offer high specific impulse, enabling 2x change in velocity and 3-10x greater payloads than chemical propulsion engines. They have the potential for extensive reuse with in-space refueling and can be used for various applications, including cryocoolers, life support, and electric propulsion/bimodal operations, among other things. NTP engines will be able to complete opposition-class crewed Mars missions significantly faster than chemical propulsion, thereby decreasing astronauts' exposure to cosmic and solar radiation. NTP engines are also designed to withstand water submersion without activation. As a result, explosive launch failures or water submersion scenarios will not lead to nuclear incidents and pose no additional risk compared to ordinary launch failures.

(b)     **Pylon.** (Illustration below)





Pylon is a 10-ton class micro reactor that builds on the MMR and FCM Fuel technologies, but has a lower mass than the MMR, making it more transportable to off-grid locations and space.

A Pylon core can be packaged for terrestrial use and transported by road, rail, sea or air.  A single Pylon system can provide 1.5MWe-5MWe for three years, and additional systems can be interconnected to scale the amount of power produced.  The baseline terrestrial system comprises two modules: the Nuclear Heat Supply System module and the Balance of Plant, each of which fits within a standard 20 ft. CONEX container.  Among its variety of applications, it is a viable solution to provide critical energy to defense applications such as the U.S. military's forward operating bases.

Pylon may also serve as the backbone of a permanent off-planet presence for industrial or human activities.  Pylon can provide on-demand electricity or heat for off-planet bases, satellites, and electric propulsion engines.  It can reliably power resource extraction and processing facilities or space-based factories and farms for decades without refueling and can also be used for efficient cargo transport and deep space missions. Pylon can operate anywhere in the solar system and is designed in a lander-friendly form factor, scalable from 10kWe to 3MWe.

(c)    **EmberCore.**  (Illustration below)



EmberCore is a nuclear chargeable ceramic that produces heat and x-rays without the need for externally applied power.  An EmberCore is composed of individual "embers" made from a family of commercially available, inert isotopes charged with neutrons in a nuclear reactor.  EmberCore units are packaged inside a radiation-absorbing shield, keeping people and electronics safe from harm while simplifying the integration process.  EmberCores are similar to radioisotope heat

sources used for Mars rovers, but they are significantly less expensive, more reliable, and readily available.  EmberCores can be paired with power conversion systems to act as a long duration battery for missions needing long duration operation far from any other energy sources. When combined with electric propulsion technology, EmberCore-powered batteries can enable speeds of up to twenty times that of chemical rockets.

**The Company's Employees and Customers**

25.     As of the Petition Date, the Debtors employed fifty-five employees, including numerous scientists, engineers, and technicians, facility managers, project managers, quality assurance specialists, accountants, human resources staff, and various other specialists and back-office support staff.  The Debtors have offices or facilities in Oak Ridge, Tennessee and Salt Lake City, Utah.  Certain employees work remotely.  The Debtors' employees are uniquely skilled given the nature of the Debtors' business, and many hold specialized knowledge that is essential for the Debtors' operations.

26.     The Debtors' customers consist of multinational technology firms, major industrial and energy providers, and notable defense and government agencies, underscoring the importance of the Debtors' technology to national security interests.  The Debtors' annual revenue in fiscal year 2023 was approximately $5.8 million and its revenue for fiscal year 2024 to date is $7.1 million.  As discussed more fully below, like other companies developing promising and innovative technology, the Debtors are a "start-up" company and primarily rely on investors to fund their operations.

## II.     The Debtors' Corporate Structure

27.     As set forth in the organizational chart attached hereto as **Exhibit 1**, Debtor USNC is a Delaware corporation and wholly owns Debtor USNC-Tech, a Washington corporation,

and Debtor USNC-P, a British Columbian corporation.  USNC-P wholly owns Debtor GFP, a Canadian corporation.

28.    USNC is privately held, primarily by the following four large stockholders:

(a)    Miranda Group, LLC ("**Miranda Group**")—a non-operating special purpose vehicle formed for the sole purpose of holding the shares of USNC stock owned jointly by Dr. Venneri and his wife Giulia De Lorenzi-Venneri. Miranda Group holds an economic interest of approximately 30.82% and a voting interest of approximately 32.57%.[5]

(b)    USNC Investment, LLC (the **"Prepetition Secured Noteholder"**)—a non-operating special purpose vehicle formed to hold the shares of USNC stock owned by Mr. Richard Hollis Helms and now owned by his estate. The Prepetition Secured Noteholder is also USNC's primary secured pre-petition lender, other than the DIP Lender (defined below), as discussed more fully below.  The Prepetition Secured Noteholder holds an economic interest of approximately 15.09% and a voting interest of approximately 15.95%.

(c)    Alexander Helms—a U.S. citizen and resident with an economic interest of approximately 16.96% and a voting interest of approximately 16.87%.

(d)    Lindsay Helms—a U.S. citizen and resident with an economic interest of approximately 16.96% and a voting interest of approximately 16.87%.

There are approximately thirty-three additional stockholders whose individual economic or voting interests in USNC do not rise above five percent (5%).

29.    There are also certain non-debtor affiliates based in the United States, the United Kingdom, France, South Africa, and South Korea.  These entities consist of holding companies and companies with limited operations.

## III.    Prepetition Indebtedness

30.    As of the Petition Date, the Debtors have approximately $72.7 million in outstanding secured and unsecured debt obligations.

---

[5]    The interests disclosed herein are based on the total number of outstanding shares and are not listed on a fully diluted basis.

31.     The Debtors' secured debt obligations primarily consist of the amounts advanced under that certain *Second Amended and Restated Senior Secured Convertible Promissory Note*, dated April 2, 2024 (the "**Prepetition Secured Note**"), issued by Debtor USNC to the Prepetition Secured Noteholder pursuant to that certain *Amended and Restated Note Purchase Agreement*, dated September 29, 2023.  The Prepetition Secured Note was issued in the principal sum of $32,500,000, or such lesser amount advanced, plus all interest accrued thereon. As of the Petition Date, $24,675,000 has been advanced under the Prepetition Secured Note and the total principal and interest due under the Prepetition Secured Note is $28,221,044.60.  The obligations under the Prepetition Secured Note are guaranteed by Debtor USNC-Tech and secured by a lien on substantially all of USNC's and USNC-Tech's assets.

32.     As discussed more fully below, on October 15, 2024, Debtors USNC and USNC-Tech entered into that certain Loan and Security Agreement, dated October 15, 2024 (the "**Prepetition First Lien Loan and Security Agreement**"), with JMB Capital Partners Lending, LLC (in such capacity, the "**Prepetition First Lien Lender**"), pursuant to which the Prepetition First Lien Lender agreed to provide financing in an aggregate principal amount not to exceed $23 million, inclusive of an $8 million pre-petition bridge loan that was funded on October 16, 2024, with the balance funded post-petition as part of a debtor-in-possession financing facility (the "**DIP Facility**").  The DIP Facility includes a roll-up of the amounts advanced under the Prepetition First Lien Loan and Security Agreement (the "**Outstanding Rolled-Up Obligations**").  In connection with USNC and USNC-Tech's entry into the Prepetition First Lien Loan and Security Agreement, the Prepetition Secured Noteholder and the Prepetition First Lien Lender entered into that certain *Subordination and Intercreditor Agreement*, dated October 15, 2024 (the "**Subordination Agreement**"), pursuant to which the Prepetition Secured Noteholder agreed to subordinate its

claims under the Prepetition Secured Note to the Prepetition First Lien Lender's claims under the Prepetition First Lien Loan and Security Agreement.

33. Debtor USNC also owes approximately $650,000 to Austin Building and Design d/b/a The Austin Company ("**Austin Company**") in connection with certain construction work, which amount is secured by a lien Austin Company asserted against USNC on July 16, 2024.[6]

34. The Debtors' unsecured debt obligations primarily consist of (i) certain convertible promissory notes and loan agreements entered into by Debtor USNC and various parties, as set forth in the below chart, in the aggregate principal amount of $7,609,600 (collectively, the "**Convertible Notes**"), (ii) a loan agreement by and between Debtor USNC and Michael Lee-Chin, with an outstanding balance of approximately $750,000, and (iii) amounts owed to third-party trade vendors, landlords, contract counterparties, former employees, and other similar parties in the aggregate amount of approximately $27.5 million.

35. The Convertible Notes are set forth below:

| SUMMARY OF CONVERTIBLE NOTES | | | | | |
|---|---|---|---|---|---|
| Name/Entity | Principal Amount | Description | Maturity Date | Interest Rate | Secured or Unsecured |
| Greg Poe (Director) | $5,000,000 | Convertible Promissory Note, dated September 8, 2023, as amended on March 30, 2024 | 3/31/2024 | 12% | Unsecured |

---

[6] On August 1, 2024, McKamey Electric ("**McKamey**") asserted a mechanic's lien against USNC in the amount of $13,303.29 for certain electrical work McKamey performed for USNC in in Oak Ridge, Tennessee. The Debtors paid off McKamey's claim in full shortly before the Petition Date.

| SUMMARY OF CONVERTIBLE NOTES | | | | | |
|---|---|---|---|---|---|
| Name/Entity | Principal Amount | Description | Maturity Date | Interest Rate | Secured or Unsecured |
| Greg Poe (Director) | $21,000 | Convertible Promissory Note, dated June 20, 2024 | 4/21/2027 | 15% | Unsecured |
| MacLondon Energy, LLC (Director) | $2,000,000 | Convertible Promissory Notes issued pursuant to that certain Note Purchase Agreement, dated October 24, 2023, as amended on May 7, 2024 | 9/30/2024 | 12% | Unsecured |
| MacLondon Energy, LLC (Director) | $21,000 | Convertible Promissory Note, dated June 20, 2024 | 4/21/2027 | 15% | Unsecured |
| Carl Page Trust | $50,000 | Convertible Promissory Note, dated April 28, 2024 | 12/30/2024 | 15% | Unsecured |
| Anne Lindeblad | $300,000 | Loan Agreement, dated February 1, 2024 | 12/30/2024 | 8% | Unsecured |
| Kurt Terrani (Director) | $60,000 | Loan Agreement, dated February 6, 2024 | 12/30/2024 | 8% | Unsecured |
| Kurt Terrani (Director) | $6,000 | Convertible Promissory Note, dated June 20, 2024 | 4/21/2027 | 15% | Unsecured |
| Ritesh Budree (Former Officer) | $21,600 | Loan Agreement, dated April 4, 2024 | 12/30/2024 | 8% | Unsecured |
| Evan Thomas | $75,000 | Loan Agreement, dated March 20, 2024 | 12/30/2024 | 8% | Unsecured |

| SUMMARY OF CONVERTIBLE NOTES | | | | | |
|---|---|---|---|---|---|
| Name/Entity | Principal Amount | Description | Maturity Date | Interest Rate | Secured or Unsecured |
| Paolo Venneri (Former Officer) & Martina Venneri | $10,000 | | 12/30/2024 | 8% | Unsecured |
| Vendell Alliance (owned by Dr. Venneri's children, including Paolo Venneri) | $30,000 | Loan Agreement, dated February 5, 2024 | 12/30/2024 | 8% | Unsecured |
| Francesco Venneri (Director) | $15,000 | Convertible Promissory Note, dated June 20, 2024 | 4/21/2027 | 15% | Unsecured |
| TOTAL: | $7,609,600 | | | | |

## IV.   Circumstances Leading to the Commencement of the Debtors' Chapter 11 Cases

### A.   The Debtors' Liquidity Issues and Efforts to Obtain Funding from Investors

36.   The Debtors remain in the development stages of various nuclear deployment projects, with MMR deliveries planned world-wide.  Prior to the Debtors' liquidity issues, commercial operations at the Chalk River Project and the UIUC Project were projected to commence in 2028.  The Debtors are also actively engaged with NASA, the DOD, and the DOE on various projects.  However, aside from the Pilot Fuel Manufacturing Facility for production of FCM Fuel and TRISO particles, many of the Debtors' products are still being developed, and, as a result, the Debtors' historical revenue is low compared to operating losses.[7]  These losses were further exacerbated by the Debtors' efforts and funding for the deployment of an additional fuel factory that will require additional capital to commence operations in 2026.

---

[7]   In 2023, the Debtors' revenue totaled approximately $6.15 million compared to the Debtors' operating expenses of approximately $81.2 million.  In 2022, the Debtors' revenue totaled approximately $5.75 million compared to operating expenses of approximately $53.9 million.

37.     Historically, the Debtors have primarily relied on equity investments to fund their development efforts and operations.[8]   The Debtors' most significant investor, Mr. Richard Hollis Helms, believed in the Debtors' inventions and their mission to provide reliable and safe zero-carbon energy anywhere.  Since the Company's inception, Mr. Helms and his family invested approximately $100 million in the Company and loaned $24.675 million to the Company through the Prepetition Secured Note.

38.     In 2022, the Debtors engaged a number of investment banks and ultimately primarily worked with CitiBank, N.A. ("**Citibank**") in an effort to raise additional equity capital and close the Company's Series B round.  Over the next two years, Citibank and the Debtors successfully attracted interest from a variety of potential investors, including a large asset management company, pension funds, utilities, family offices, large IT companies, corporate investment funds, and various other private equity funds; however, these investments were largely contingent upon the Debtors securing an "anchor" investor.  While the Debtors attracted the interest of an anchor investor, the investor was not able to raise sufficient funds for the investment. As a result, other than a single investment of approximately $18 million from a Canadian labor pension fund, the Debtors were unable to raise the capital necessary to fund operations.

39.     Mr. Helms passed away in May 2024 and, since then, the Debtors have continued to search for new capital sources to continue funding their research and development efforts pending the full launch of their products and projects.

---

[8]     In 2020, the Company raised approximately $50 million through a Series A funding round.  The Company also raised $107,543,229 through a Series B funding round.  Over the past year and a half, the Company has primarily obtained funding through the convertible notes described in Part III of this Declaration.

**B.**     **The Reconstitution of the Board and My Appointment as Interim CEO**

40.     Until May 2024, USNC's Board consisted of two members—Dr. Venneri and Mr. Helms, with Mr. Helms serving as Chairman.  However, due to Mr. Helms' declining health, the Company was primarily managed by Dr. Venneri, the former chief executive officer.

41.     Following the passing of Mr. Helms, the Board was reconstituted to add three new directors.  The three new directors immediately took action to, among other things, address the Company's liquidity issues and requested Dr. Venneri's resignation as chief executive officer.  Dr. Venneri submitted his resignation on June 26, 2024, effective July 31, 2024, and became the Company's chief science officer.  I was officially appointed as Interim CEO on August 2, 2024.

**C.**     **The Debtors' Efforts to Obtain Funding and Decision to Commence a Sale Process**

42.     In early August 2024, the Debtors engaged Intrepid Investment Bankers LLC ("**Intrepid**") as their investment banker, Ankura as their financial advisor, and Young Conaway Stargatt & Taylor, LLP as their restructuring counsel to evaluate their options to address their liquidity issues.  With the assistance of their advisors, the Debtors immediately began to search for funding to, among other things, continue ordinary course operations, pursue strategic transactions, including a sale of substantially all of the Debtors' assets in or outside of chapter 11, and to prepare for, and ultimately file, these Chapter 11 Cases, if necessary and subject to Board approval.

43.     In furtherance thereof, Intrepid contacted thirty-eight (38) potential third-party lenders across North America with the ability to lend in the nuclear industry.  Fourteen (14) of those parties executed non-disclosure agreements with the Debtors and were provided an information memorandum and access to a data room with extensive diligence information

necessary to facilitate funding. Despite the extensive process to source debtor-in-possession financing, the Company only received one financing proposal in a sufficient amount to fund the Debtors' operations and bankruptcy process, from the Prepetition First Lien Lender (in such capacity, the "**DIP Lender**"), due to the Company's lack of operating history, existing capital structure, and lack of traditional working capital collateral. As discussed more fully in the declaration of Lorie Beers of Intrepid filed contemporaneously herewith, I do not believe the Debtors could have obtained financing on better terms than those proposed by the DIP Lender, and negotiated by the Debtors, due to the lack of offers received.

44. Faced with severe liquidity issues, and considering the benefits of a Court-supervised sale process, the Board concluded that entering into the Prepetition First Lien Loan and Security Agreement, and ultimately the Debtor-in-Possession Term Loan Facility Summary of Terms and Conditions (the "**DIP Term Sheet**"), with the Prepetition First Lien Lender and the DIP Lender, and commencing the Chapter 11 Cases would be in the best interests of the Debtors and their various stakeholders. Through the Chapter 11 Cases, the Debtors intend to continue and conclude a comprehensive, Court-supervised marketing and sale process designed to preserve and maximize the value of the Debtors' assets for the benefit of all stakeholders and to promote the continued development of the Debtors' important clean-energy technology.

45. In furtherance thereof, on October 10, 2024, the Debtors entered into a letter of intent with Standard Nuclear, Inc. (the "**Stalking Horse Bidder**"), an unaffiliated third party, pursuant to which the Stalking Horse Bidder offered to acquire substantially all of the Debtors' assets in exchange for a $28 million cash offer (the "**Purchase Price**"). On October 28, 2024, the Debtors and the Stalking Horse Bidder entered into an Asset Purchase Agreement (the "**Stalking Horse APA**"), subject to higher or better offers to be solicited pursuant to the Debtors' post-

petition sale process.   The Stalking Horse APA contemplates proposed bid protections (the "**Proposed Bid Protections**") for the Stalking Horse Bidder, subject to Court approval, including a break-up fee equal to five percent of the Purchase Price.

46.     The Stalking Horse APA and the DIP Term Sheet each contemplate certain agreed-upon milestones in connection with the Chapter 11 Cases, including:

- the Debtors shall file a motion for approval of bidding procedures within two business days following the Petition Date (Stalking Horse APA);

- the Debtors and the Stalking Horse Bidder shall use their commercially reasonable efforts to cause the Court to enter an order establishing bidding procedures within twenty-five days after the Petition Date (Stalking Horse APA);

- the Court will enter a final order (the "**Final DIP Order**") authorizing the Debtors to enter into the DIP Facility within forty-five days after the Petition Date (DIP Term Sheet); and

- the Debtors and the Stalking Horse Bidder shall use their commercially reasonable efforts to cause the Court to enter an order approving the Stalking Horse APA, subject to higher or better offers, within fifty-five days after the Petition Date (Stalking Horse APA).

These milestones were the product of extensive, arms'-length negotiations with the DIP Lender and the Stalking Horse Bidder, respectively.

47.     I believe that the Court-supervised sale process consistent with the aforementioned milestones, and the designation of the Stalking Horse Bidder, provides the Debtors with the optimal opportunity to obtain the highest or otherwise best offer for their assets.   The Debtors, with the assistance of Intrepid, have been and will continue to actively engage potential bidders to ensure that the sale process is as broad and competitive as possible.   The Debtors anticipate filing a motion to approve bidding procedures, the designation of the Stalking Horse Bidder, and the approval of the Proposed Bid Protections with the Court promptly following the Petition Date, and, subject to Court approval, the Debtors will conduct a value-maximizing marketing and solicitation process in accordance therewith.   At the conclusion of the sale and marketing process, the Debtors intend to sell all or substantially all of their assets to the purchaser

that has submitted the highest or otherwise best offer for the assets, thereby maximizing value for all interested parties.

## V.    The Debtors' DIP Financing Motion[9]

48.    To implement the contemplated sale process and preserve asset value during the pendency of the Chapter 11 Cases, the Debtors require an immediate infusion of new liquidity. Accordingly, the Debtors have negotiated and reached agreement on the terms of debtor-in-possession financing (the "**DIP Financing**") to be provided by the DIP Lender, consisting of a non-amortizing, priming, super-priority senior secured term loan facility in an aggregate principal amount not to exceed $23,000,000, consisting of up to $23,000,000 in term loan commitments (the "**DIP Commitments**").  The DIP Commitments consist of (i) $15 million in respect of new money funding and (ii) a dollar-for-dollar roll-up of the approximately $8 million Outstanding Rolled-Up Obligations provided under the Prepetition First Lien Loan and Security Agreement.  $18 million of the DIP Commitments (which amount includes the Outstanding Rolled-Up Obligations) will be made available to the Debtors on an interim basis, following interim approval of the DIP Motion, and the balance will be made available following entry of the Final DIP Order.  The DIP Financing will be secured by a priming first lien security interest on all property and assets (or interests therein) of the Debtors' estates (whether tangible, intangible, real, personal or mixed and wherever located) as of the Petition Date.  In connection therewith, the Prepetition Secured Noteholder agreed to be consensually primed and to the use of its Cash

---

[9]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Liens and Providing Superpriority Administrative Expense Status; (III) Authorizing Use of Cash Collateral; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (the "**DIP Motion**") filed contemporaneously herewith.

Collateral on the terms set forth in the Subordination Agreement and the proposed interim order approving the DIP Motion.

49.    The DIP Facility is projected to provide the Debtors with the necessary liquidity to transition smoothly into the Chapter 11 Cases and administer their estates and to implement a comprehensive marketing and sale process for their assets.  Based on my experience and knowledge of the Debtors' current capital structure, as well as the Debtors' operations, and efforts to obtain financing, I do not believe that the Debtors could have obtained financing on more favorable terms from sources other than the DIP Lender and are similarly unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.

50.    The Debtors have an immediate need to obtain the DIP Facility on an interim basis to, among other things, (i) permit the orderly continuation of their business; (ii) maintain business relationships with their vendors, suppliers, customers, and other parties; (iii) make payroll; (iv) pay the costs of the administration of the Chapter 11 Cases and the sale process; and (v) satisfy other working capital and general corporate needs.  The Debtors require immediate access to sufficient working capital and liquidity through the incurrence of the new indebtedness for borrowed money and other financial accommodations to avoid irreparable harm by, among other things, preserving and maintaining the value of the Debtors' assets.  The Debtors will not have sufficient sources of working capital and financing to operate their business or maintain their properties in the ordinary course of business throughout the Chapter 11 Cases without the DIP Facility.

51.    I believe that the commercial terms of the DIP Facility are reasonable and provide sufficient liquidity to fund the Chapter 11 Cases, conduct the sale process, and, ultimately,

wind down the Debtors' affairs.  I also believe that approval of the DIP Facility will instill much needed confidence in parties that are critical to the success of the Chapter 11 Cases, including the Debtors' employees, vendors, suppliers, and customers.  In addition, I believe the DIP Facility will increase the opportunity for a robust, competitive postpetition sale process by facilitating the Debtors' efforts to preserve operations and their going-concern value during that process.  Without access to the DIP Facility, the Debtors would be unable to avoid a value-destructive liquidation—which would result in irreparable harm to the Debtors and their stakeholders.

52.    The Debtors, with the assistance of their advisors, have determined that the DIP Facility will be sufficient to support the Debtors' operations through the pendency of the Chapter 11 Cases and adequate, considering all available assets, to pay administrative expenses due or accruing during the period covered by the Budget.

53.    The Debtors believe that the stay modifications set forth in the DIP Motion are ordinary and standard features of postpetition debtor financing facilities and are reasonable and fair under the present circumstances.

54.    Absent authority from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtors will suffer immediate and irreparable harm and would likely be forced to liquidate.  Accordingly, I believe that the interim relief requested is critical to preserving and maintaining the going concern value of the Debtors and facilitating their sale efforts.

**VI.    First Day Pleadings**

55.    Contemporaneously herewith, the Debtors filed a number of First Day Pleadings, in addition to the DIP Motion, seeking orders granting various forms of relief intended to facilitate the efficient administration of the Chapter 11 Cases and otherwise maximize and preserve the value of the estates.  The First Day Pleadings include:

- *Debtors' Motion for an Order, Pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1, Authorizing the Joint Administration of the Debtors' Chapter 11 Cases*

- *Debtors' Application for Appointment of Stretto, Inc. as Claims and Noticing Agent Effective as of the Petition Date*

- *Debtors' Motion for Entry of Order (I) Restating and Enforcing Protections of 11 U.S.C §§ 362, 365, 525, and 541(c) and (II) Granting Related Relief*

- *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363, and 364 of the Bankruptcy Code, (I) Authorizing (A) Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with the Debtors' Insurance Programs, Including Payment of Policy Premiums and Broker Fees, and (B) Continuation of Premium Finance Agreement; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Scheduling a Final Hearing*

- *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(8), 541, 1107(a), and 1108 of the Bankruptcy Code, (A) Authorizing the Debtors to Pay Certain Prepetition Taxes and Fees and Related Obligations, (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto, and (C) Scheduling a Final Hearing*

- *Debtors' Motion for Interim and Final Orders, Pursuant to Sections 105(a) and 366 of the Bankruptcy Code, (A) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Utility Services, (B) Deeming Utility Companies Adequately Assured of Future Payment, (C) Establishing Procedures for Determining Additional Adequate Assurance of Payment, and (D) Setting a Final Hearing Related Thereto*

- *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 507(a)(4), and 507(a)(5) of the Bankruptcy Code, (A) Authorizing (I) Payment of Accrued Prepetition Employee Wages, Salaries, and Other Compensation; (II) Payment of Prepetition Employee Business Expenses; (III) Contributions to Prepetition Employee Benefit Programs and Continuation of Such Programs in the Ordinary Course; (IV) Payment of Workers' Compensation Obligations; (V) Payments for Which Prepetition Payroll Deductions Were Made; (VI) Payment of All Costs and Expenses Incident to the Foregoing Payments and Contributions; and (VII) Payment to Third Parties of All Amounts Incident to the Foregoing Payments and Contributions; and (B) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto*

- *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 363(b), 503(b), 1107(a), and 1108 of the Bankruptcy Code, (I) Authorizing the Debtors to Pay Certain Prepetition Claims of (A) Foreign Vendors; (B) Domestic Critical Vendors; and (C) Lienholders; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Certain Related Relief*

- *Debtors' Motion for Entry of Interim and Final Orders, Pursuant to Sections 105(a), 345(b), 363, 503(b), 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rule 2015, and Local Rule 2015-2, (A) Authorizing and Approving Continued Use of Cash Management System, (B) Authorizing Use of Prepetition Bank Accounts and Business Forms, (C) Authorizing Performance of Intercompany Transactions in the Ordinary Course of Business and Granting Administrative Expense Status for Postpetition Intercompany Claims, (D) Granting an Interim Suspension of the Section 345(b) Deposit and Investment Requirements, and (E) Granting Certain Related Relief*

56.     I am familiar with each First Day Pleading, and I believe that the relief sought in each First Day Pleading (i) is necessary to minimize disruption due to the commencement of the Chapter 11 Cases and to permit the Debtors to administer the Chapter 11 Cases smoothly, (ii) constitutes a critical element in the Debtors' achievement of their goals in this chapter 11 process, and (iii) best serves the Debtors' estates and their stakeholders' interests.  I have reviewed each First Day Pleading, and the facts and descriptions of the relief set forth therein are true and correct to the best of my information and belief with appropriate reliance on the Debtors' relevant advisors and are incorporated herein in their entirety by reference.  If asked to testify as to the facts supporting each of the First Day Pleadings, I would testify as to such facts.

57.     It is my belief that the relief sought in each of the First Day Pleadings is necessary to the success of the Debtors' chapter 11 efforts and the maximization of the value of the Debtors' estates through a sale process. It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay specific prepetition claims, the relief requested is

28

essential to the Debtors' chapter 11 efforts and necessary to avoid immediate and irreparable harm to the Debtors' estates.

58.   I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information, and belief, and respectfully request that all of the relief requested in the First Day Pleadings be granted, together with such other and further relief as is just and proper.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated: October 29, 2024

/s/ *Kurt A. Terrani*
Kurt A. Terrani
Interim Chief Executive Officer and
President
Ultra Safe Nuclear Corporation, *et al.*

# <u>EXHIBIT 1</u>

**Organizational Chart**

## Ultra Safe Nuclear Corporation Organizational Chart

