**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Ultra Safe Nuclear Corporation, *et al.*,[1] | Case No. 24-12443 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date: November 22, 2024 at 1:00 p.m. (ET)**<br>**Objection Deadline: November 13, 2024 at 4:00 p.m. (ET)** |

**DEBTORS' MOTION FOR ENTRY OF (A) AN ORDER**
**(I) APPROVING BIDDING PROCEDURES IN CONNECTION WITH**
**THE SALE OF THE DEBTORS' ASSETS AND RELATED BID PROTECTIONS,**
**(II) APPROVING FORM AND MANNER OF NOTICE, (III) SCHEDULING AUCTION**
**AND SALE HEARING, (IV) AUTHORIZING PROCEDURES GOVERNING**
**ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND**
**UNEXPIRED LEASES, AND (V) GRANTING RELATED RELIEF; AND**
**(B) AN ORDER (I) APPROVING PURCHASE AGREEMENTS, AND**
**(II) AUTHORIZING A SALE FREE AND CLEAR OF ALL LIENS,**
**<u>CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS</u>**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**")
hereby submit this motion (this "**Motion**") for entry of: (a) an order, substantially in the form
attached hereto as **<u>Exhibit A</u>** (the "**Bidding Procedures Order**"), (i) approving bidding
procedures, substantially in the form attached as <u>Annex 1</u> to the Bidding Procedures Order (the
"**Bidding Procedures**"), to govern the marketing and sale of all or substantially all of the
Debtors' assets (the "**Assets**"), and approving bid protections in connection therewith,
(ii) authorizing the Debtors to schedule an auction to sell the Assets (the "**Auction**") and
scheduling the hearing to approve a sale of the Assets (the "**Sale Hearing**"), (iii) approving the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: Ultra Safe Nuclear Corporation (9774); Ultra Safe Nuclear Corporation – Technologies (9815); USNC-Power Ltd. (6500); and Global First Power Limited (7980). The Debtors' mailing address is 200 Europia Ave., Oak Ridge, Tennessee 37830.

form and manner of notice of the proposed sale transactions, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines, (iv) authorizing procedures governing the assumption and assignment of certain executory contracts and unexpired leases (including Government Contracts (as defined below)) (the "**Assumed Contracts**") to the prevailing bidder(s) acquiring the Assets (a "**Successful Bidder**"), and (v) granting related relief; and (b) one or more orders (collectively, the "**Sale Order**") (i) approving the applicable form(s) of purchase agreement between the Debtors and the Stalking Horse Bidder (as defined below) or any other Successful Bidder(s), and (ii) authorizing the sale(s) (collectively, the "**Sale**") of the Assets and the assumption and assignment of the Assumed Contracts (subject to the satisfaction of certain requirements related to Government Contracts) to the Stalking Horse Bidder or such other Successful Bidder free and clear of all liens, claims, encumbrances, and other interests (collectively, the "**Liens**"), other than any permitted Liens as set forth in the applicable form(s) of purchase agreement.

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "**Court**") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as of February 29, 2012 (the "**Amended Standing Order**").  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final judgment or order with respect to this Motion if it is

determined that the Court would lack Article III jurisdiction to enter such final judgment or order absent consent of the parties.

2. The statutory and legal predicates for the relief requested herein are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Local Rules 2002-1 and 6004-1.

## GENERAL BACKGROUND

3. On October 29, 2024 (the "**Petition Date**"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors are authorized to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No official committees have been appointed in these chapter 11 cases and no request has been made for the appointment of a trustee or an examiner.

4. Additional information regarding the Debtors' businesses, their capital structure, and the circumstances leading to the filing of these chapter 11 cases is set forth in the *Declaration of Kurt A. Terrani in Support of Chapter 11 Petitions and First Day Pleadings* [Docket No. 2] (the "**First Day Declaration**").[2]

## THE DEBTORS' MARKETING PROCESS

5. In 2022, the Debtors engaged Citibank, N.A. ("**Citibank**") to raise additional equity capital and pursue strategic investments to continue funding their ongoing developments and innovations. Over the next two years, Citibank and the Debtors attracted interest from a variety of potential investors, but, ultimately, those efforts were not successful, and the Debtors were unable to raise the capital necessary to fund their operations in the long-term. As set forth

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the First Day Declaration, Bidding Procedures, or Stalking Horse Agreement (as defined below), as applicable.

in the First Day Declaration, the Debtors historically relied on equity investments to fund their ongoing operations, primarily from Mr. Helms. When Mr. Helms passed away in 2024, the Debtors lost access to the capital provided to them by their largest supporter. In light of these circumstances, in the spring of 2024, considering the Debtors' liquidity issues–*i.e.,* their inability to continue operating without funding in light of their operating losses in comparison to their annual revenue–the Debtors determined that they needed to immediately raise additional capital or secure additional funding, restructure their debt, or pursue strategic alternatives in order to continue their operations as a going concern.

6.      As part of those efforts, in early August 2024, the Debtors engaged Intrepid Investment Bankers LLC ("**Intrepid**"), as their investment banker to explore a potential sale of the Debtors' assets. At around the same time, the Debtors engaged Ankura Consulting Group LLC ("**Ankura**") as their financial and restructuring advisor.

7.      As part of the consideration of potential strategic alternatives, Intrepid undertook a prepetition marketing effort,[3] and began soliciting interest for the sale of the Debtors' assets, both on an integrated basis as well as on a piecemeal basis. In particular, Intrepid crafted detailed marketing materials and assembled related diligence information for a confidential electronic data room (the "**Data Room**") and a preliminary confidential information presentation with the assistance of the Debtors and their other professional advisors. Intrepid worked with management to develop an initial list of prospective purchasers and received inbound inquiries regarding the Debtors' assets, resulting in expressions of interest from approximately twenty-two (22) strategic and financial prospective purchasers. Intrepid circulated, via email, a description of the opportunity to acquire the Debtors' assets to all of the prospective purchasers.

---

[3]      As discussed in the First Day Declaration, as part of Intrepid's mandate, Intrepid also scoured the market for lenders in the nuclear industry interested in providing the Debtors with debtor-in-possession financing.

8.     Thereafter, Intrepid worked with approximately seventeen (17) interested parties to execute non-disclosure agreements (each, an "**NDA**").  Parties who executed an NDA were provided with access to the Data Room, which contained diligence information about the Debtors and their assets, a confidential information presentation, and a process letter detailing the requirements and timing for delivery of indications of interest.  Four (4) parties met with members of the Debtors' management to ask questions about the Assets and the Debtors' operations.

9.     Intrepid responded to various inquiries and, throughout the summer and fall of 2024, three (3) parties submitted indications of interest for the Assets.  The Debtors conducted good faith, arms' length negotiations with these prospective buyers simultaneously, and they conducted deeper diligence into the Debtors' businesses.  Ultimately, only one party—Standard Nuclear, Inc. (the "**Stalking Horse Bidder**")—submitted an actionable bid for certain of the Assets.[4]

10.     The Stalking Horse Bidder's proposal provides for an all-cash $28,000,000 offer for the Assets, minus the aggregate amount of any adjustments made for Cure Costs actually incurred in respect of the Initial Designated Contracts, and the assumption of the Assumed Liabilities, as provided for in the Stalking Horse Agreement.  After significant, months'-long, arms'-length negotiations, on October 10, 2024, the Debtors entered into a letter of intent with the Stalking Horse Bidder while negotiating and finalizing definitive documentation.   On October 28, 2024, the Debtors and the Stalking Horse Bidder agreed on the terms of a stalking horse bid, and executed the asset purchase agreement, attached hereto as **Exhibit B** (the "**Stalking Horse Agreement**").

---

[4]     As set forth in the Stalking Horse Agreement (as defined below), the Stalking Horse Bidder is purchasing certain of the Assets (referred to in the Stalking Horse Agreement as the "Purchased Assets").

11.     To maximize the value of the Assets subject to the Stalking Horse Bid for the benefit of the Debtors' estates and stakeholders, the Debtors seek to continue their competitive marketing process by implementing a process for soliciting higher or otherwise better bids than the bids set forth in the Stalking Horse Agreement, as well as bids for the Assets that are not subject to the Stalking Horse Bid. The Bidding Procedures provide for in excess of forty (40) days between the filing of this Motion and the Bid Deadline, which the Debtors believe will be sufficient to allow potential bidders to conduct diligence and formulate competing bids. To that end, Intrepid continues to market the Assets to ensure that the Debtors are able to obtain the highest and otherwise best value for the Assets and, on or around the Petition Date, will begin or have begun a broad outreach to dozens of strategic, financial and distressed investors.

12.     The Debtors now seek to promptly effectuate a Sale of their Assets, subject to a competitive bidding process that is consistent with both the timing of these chapter 11 cases and the Debtors' fiduciary duties to maximize value for their estates, stakeholders, and parties in interest. Upon the Court's entry of the Bidding Procedures Order, the Debtors intend to provide notice of the Bidding Procedures, the Auction date, the deadline to object to the proposed Sale, and the Sale Hearing to all prospective buyers of the Assets that have contacted, or been contacted by, the Debtors or their advisors during the marketing process to date.

## THE ASSETS AND THE STALKING HORSE AGREEMENT

### A.     The Assets

13.     The Assets consist of, without limitation, certain intellectual property, inventory, machinery, equipment, cash, accounts receivable, executory contracts and unexpired leases, permits, licenses, customer lists, books and records, claims and causes of action, and other related personal property. Subject to the terms of the Bidding Procedures, interested parties may bid on the Assets (i) in individual lots; (ii) as a collective whole; or (iii) in any combination.

## B.    The Stalking Horse Agreement

14.    The following table sets forth a summary of the material terms and conditions of the Stalking Horse Agreement, including required disclosures under Local Rule 6004-1(b)(iv):[5]

| Term (Agreement Citation) | Detail |
|---|---|
| **Sellers** <br> **(Recitals)** | Ultra Safe Nuclear Corporation, Ultra Safe Nuclear Corporation – Technologies, and USNC Holdings, LLC[6] |
| **Stalking Horse Bidder** <br> **(Recitals)** <br> **Local Bankr. R. 6004-1(b)(iv)(A)** | Standard Nuclear, Inc. <br><br> The Stalking Horse Bidder is not an insider, as defined in section 101(31) of the Bankruptcy Code. |
| **Consideration** <br> **Local Bankr. R. 6004-1(b)(iv)(N)** <br> **Art. 4, § 4.6** | The Stalking Horse Bidder is purchasing the Purchased Assets for $28,000,000, minus the aggregate amount of any adjustments made for Cure Costs actually incurred in respect of the Initial Designated Contracts and the assumption of the Assumed Liabilities. |
| **Agreements with Management** <br> **Local Bankr. R. 6004-1(b)(iv)(B)** <br><br> **Art. 4, § 4.2** | The Stalking Horse Agreement contemplates the Stalking Horse Bidder entering into Employment Contracts with at least seventy-five percent (75%) of the Designated Employees; provided, however, if prior to the Closing any Designated Employee ceased to be employed by the Debtors as set forth in the Stalking Horse Agreement, then such Designated Employee is excluded from the determination of the seventy-five percent (75%) threshold. |
| **Releases** <br> **Local Bankr. R. 6004-1(b)(iv)(C)** | N/A |
| **Private Sale/No Competitive Bidding** <br> **Local Bankr. R. 6004-1(b)(iv)(D)** | The Stalking Horse Agreement does not contemplate a private sale, nor does it restrict competitive bidding.  If the Debtors receive two or more Qualified Bids for the Assets subject to the Stalking Horse Agreement, an Auction will be held in accordance with the Bidding Procedures, subject to the Court's approval. |

---

[5]    If there are any inconsistencies between the summary set forth herein and the Stalking Horse Agreement, the terms and conditions of the Stalking Horse Agreement shall govern.

[6]    USNC Holdings, LLC is a non-Debtor.

| Term (Agreement Citation) | Detail |
|---|---|
| **Closing Deadlines**<br><br>**Local Bankr. R. 6004-1(b)(iv)(E)**<br><br>**Art. 4, §§ 4.1, 4.4** | The Closing Date shall occur upon the full satisfaction of the conditions set forth in Article 4, §§ 4.2, 4.3, and 4.4, and shall be December 27, 2024. |
| **Good Faith Deposit**<br><br>**Local Bankr. R. 6004-1(b)(iv)(F)**<br><br>**Art. 4, § 4.7** | The Stalking Horse Bidder shall pay as a deposit a portion of the Cash Consideration in an amount equal to $2,800,000, or 10% of the Cash Consideration. |
| **Interim Arrangements**<br><br>**Local Bankr. R. 6004-1(b)(iv)(G)** | The Stalking Horse Agreement does not contemplate the Debtors' entry into any interim agreements or arrangements with the Stalking Horse Bidder. |
| **Use of Proceeds**<br><br>**Local Bankr. R. 6004-1(b)(iv)(H)**<br><br>**Art. 4, § 4.8** | The Stalking Horse Agreement does not contemplate for the release of sale proceeds after the Closing without further Court order.<br><br>The Stalking Horse Bidder is required to allocate the Purchase Price and Assumed Liabilities and to produce an Allocation Schedule, which will be non-binding. |
| **Tax Exemptions**<br><br>**Local Bankr. R. 6004-1(b)(iv)(I)** | The Stalking Horse Agreement does not contain any provision seeking to have the sale declared exempt from taxes. |
| **Record Retention**<br><br>**Local Bankr. R. 6004-1(b)(iv)(J)**<br><br>**Art. 2, § 2.3** | The Debtors shall retain their right, title, and interest in all assets, properties, and rights of the Debtors other than the Purchased Assets, including:  (a) all cash, cash equivalents, marketable securities, bank accounts, and other funds; (b) all right, title, and interest in any Retained Contracts; (c) all corporate books and records that relate solely to the Retained Assets; (d) rights that accrue to the Debtors under the Stalking Horse Agreement or other Transaction Documents; (e) tax returns in respect of any tax payments made prior to the Closing Date; and (f) insurance policies and prepaid premiums not otherwise related to Designated Contracts. |

| Term<br>(Agreement Citation) | Detail |
|---|---|
| **Sale of Avoidance Actions**<br><br>**Local Bankr. R. 6004-1(b)(iv)(K)** | N/A |
| **No Successor Liability**<br><br>**Local Bankr. R. 6004-1(b)(iv)(L)** | The Sale Order will request a finding that the Stalking Horse Bidder is not a successor to the Debtors and that the transfer of the Assets does not and will not subject the Stalking Horse Bidder to any liability by reason of such transfer under theories of successor liability, among other things. |
| **Free and Clear of Unexpired Leases or Other Rights**<br><br>**Local Bankr. R. 6004-1(b)(iv)(M)**<br><br>**Art. 4, § 4.1** | The Stalking Horse Bidder is agreeing to purchase the subject Assets free and clear of any and all Liens and Encumbrances. |
| **Relief from Bankruptcy Rule 6004(h)**<br><br>**Local Bankr. R. 6004-1(b)(iv)(O)** | The Sale Order will request that the terms of the Sale Order be effective and enforceable immediately upon its entry. |

## THE PROPOSED SALE TIMELINE AND BIDDING PROCEDURES

15.    To ensure that the highest or otherwise best offer is received for the Assets, the Debtors crafted the proposed Bidding Procedures to govern the submission of competing bids at an Auction, all of which are contemplated and expressly permitted under the Stalking Horse Agreement.  Accordingly, the Debtors seek the Court's approval of the Bidding Procedures set forth as Annex 1 to the Bidding Procedures Order and incorporated herein in their entirety by this reference.

16.     The Debtors' proposed timeline with respect to the Bidding Procedures, the Auction, the Sale Hearing, and the Sale is as follows:[7]

| Event | Date |
|---|---|
| Hearing to Consider Approval of Bidding Procedures | **November 22, 2024 at 1:00 p.m. (ET)** |
| Service of Sale Notice (as defined below) | **Three (3) business days after the entry of the Bidding Procedures Order** |
| Bid Deadline | **December 9, 2024 at 4:00 p.m. (ET)** |
| Sale Objection Deadline (as defined below) | **December 11, 2024 at 4:00 p.m. (ET)** |
| Auction (if applicable) | **December 12, 2024 at 10:00 a.m. (ET)** |
| Sale Hearing | **December 17, 2024, subject to the Court's availability** |
| Sale Closing | **No later than December 27, 2024** |

17.     The Debtors propose the following notice and objection timeline as it relates to the Sale, the Auction, and the Sale Hearing (the "**Sale Notice Procedures**"), and request notice of the Sale, the Auction, the Sale Hearing, and the Bidding Procedures Order be deemed adequate and sufficient if:

No later than three (3) business days after the entry of the Bidding Procedures Order, the Debtors (or their agent) shall serve by email or, if email is unavailable, by first class mail, a notice regarding the Sale (the "**Sale Notice**"), substantially in the form attached hereto as **Exhibit C**, on the following entities; *provided*, *however*, that the Debtors need not serve the Sale Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or physical address as of the entry of the Bidding Procedures Order; *provided, further* that the Debtors shall not be obligated to provide supplemental service of the Sale Notice with respect to any Sale Notice that is returned to the Debtors as undeliverable so long as the Debtors have confirmed that any such Sale Notice was sent to the applicable email or physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence:

(a)     the Office of the United States Trustee for the District of Delaware (the "**U.S. Trustee**");

---

[7]     The dates in this timeline are subject to the terms of the Bidding Procedures Order and the Bidding Procedures.

(b)    proposed counsel for any official committee (the "**Committee**") appointed in these chapter 11 cases;

(c)    counsel to the DIP Lender and Prepetition First Lien Lender, (a) Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, New York 10019-6022, Attn: Robert M. Hirsh, Esq. (robert.hirsh@nortonrosefulbright.com) and Francisco Vazquez, Esq. (francisco.vazquez@nortonrosefulbright.com), and (b) Morris James LLP, 500 Delaware Avenue, Suite 1500, Wilmington, Delaware 19801, Attn: Eric J. Monzo, Esq. (emonzo@morrisjames.com);

(d)    counsel to the Prepetition Secured Noteholder, Greenberg Traurig, One Vanderbilt Avenue, New York, New York 10017, Attn: Nathan A. Haynes, Esq. (haynesn@gtlaw.com);

(e)    counsel to the Stalking Horse Bidder, (a) Nelson Mullins Riley & Scarborough LLP, One Financial Center, Suite 3500, Boston, Massachusetts 02111, Attn: Peter J. Hayley, Esq. (peter.haley@nelsonmullins.com), and (b) Sullivan Hazeltine Allinson LLC, 919 North Market Street, Suite 420, Wilmington Delaware 19801, Attn: William D. Sullivan, Esq. (bsullivan@sha-llc.com);

(f)    the United States Attorney for the District of Delaware;

(g)    the attorneys general for each of the states in which the Debtors conduct business operations;

(h)    the Internal Revenue Service;

(i)    all known taxing authorities for the jurisdictions to which the Debtors are subject;

(j)    all environmental authorities having jurisdiction over any of the Assets;

(k)    all entities known or reasonably believed to have asserted a Lien on any of the Assets;

(l)    counterparties to the Debtors' executory contracts and unexpired leases;

(m)    all persons that have expressed to the Debtors an interest in a transaction with respect to the Assets during the past six (6) months;

(n)    all of the Debtors' other known creditors and equity security holders;

(o)    the office of unclaimed property for each state in which the Debtors conduct business; and

(p)     those parties who have formally filed a request for notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002.

18.     In addition, the Debtors will upload an electronic copy of the Sale Notice and the Bidding Procedures Order (which will include the Bidding Procedures) to the Data Room maintained by Intrepid.  The Debtors will also post the Sale Notice and the Bidding Procedures Order on the website of the Debtors' claims and noticing agent:  **https://cases.stretto.com/usnc.**

19.     The Debtors also request the establishment of an objection deadline prior to the Sale Hearing such that any objections related to the proposed Sale be served upon (so as to be <u>actually received</u> by) the following parties (the "**Objection Notice Parties**") on or before **4:00 p.m. (prevailing Eastern time) on December 11, 2024** (the "**Sale Objection Deadline**"):

(a)     proposed counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Matthew B. Lunn, Esq. (mlunn@ycst.com), and Elizabeth S. Justison, Esq. (ejustison@ycst.com);

(b)     the U.S. Trustee, 844 King Street, Room 2207, Wilmington, Delaware 19801, Attn: Malcolm M. Bates, Esq. (malcolm.m.bates@usdoj.gov);

(c)     counsel to the DIP Lender and Prepetition First Lien Lender, (a) Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, New York 10019-6022, Attn: Robert M. Hirsh, Esq. (robert.hirsh@nortonrosefulbright.com) and Francisco Vazquez, Esq. (francisco.vazquez@nortonrosefulbright.com), and (b) Morris James LLP, 500 Delaware Ave., Suite 1500, Wilmington, Delaware 19801, Attn:  Eric J. Monzo, Esq. (emonzo@morrisjames.com);

(d)     counsel to the Prepetition Secured Noteholder, Greenberg Traurig, One Vanderbilt Avenue, New York, New York 10017, Attn:  Nathan A. Haynes, Esq. (haynesn@gtlaw.com); and

(e)     proposed counsel to any Committee appointed in these chapter 11 cases.

20. Certain of the key terms of the Bidding Procedures are highlighted below, in accordance with Local Rule 6004-1(c)[8]:

| Term | Detail |
|---|---|
| **Qualification of Bidders**<br><br>**Local Bankr. R. 6004-1(c)(i)(A)** | To participate in the bidding process or otherwise be considered for any purpose under the Bidding Procedures, a person or entity (other than any Stalking Horse Bidder) interested in consummating a Sale (a "**Potential Bidder**") must deliver or have previously delivered:<br><br>• an executed confidentiality agreement on terms acceptable to the Debtors to the extent not already executed;<br><br>• information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capability to consummate the applicable Sale, including, but not limited to, the most current audited and latest unaudited financial statements (the "**Financials**") of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtors in their discretion) (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors, in consultation with: (a) the DIP Lender and Prepetition First Lien Lender, and (b) the advisors to the Committee (collectively, the "<u>Consultation Parties</u>"), and (y) a written funding commitment acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale); and<br><br>A "**Qualified Bidder**" is a Potential Bidder whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the applicable Sale and whose Bid is a Qualified Bid (as defined below), that the Debtors, in consultation with the Consultation Parties, determine should be considered a Qualified Bidder. Prior to the commencement of the Auction, the Debtors' advisors will (i) notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder; and (ii) provide to the Qualified Bidders for such Assets copies of all Qualified Bids with respect to such Assets. The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times and for all purposes with respect to the Assets to which its Bid (the "**Stalking Horse Bid**") relates. |

---

[8] If there are any inconsistencies between the summary set forth herein and the Bidding Procedures, the terms and conditions of the Bidding Procedures shall govern. Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures.

| Term | Detail |
|---|---|
| **Qualification of Bids**<br><br>**Local Bankr. R. 6004-1(c)(i)(B)** | A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (the "**Bid Requirements**") as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a "**Qualified Bid**"). The Stalking Horse Bid will be deemed a Qualified Bid for all purposes without any further action required by the Stalking Horse Bidder.<br><br>(a) **Identification of Bidder**. Each Bid must fully disclose the following: (i) the legal identity of each person or entity bidding for the Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid) or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such Bid) the Auction in connection with such Bid and the complete terms of any such participation; and (ii) any past or present connections or agreements with the Debtors, any Stalking Horse Bidder, any other known Potential Bidder or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtors.<br><br>(b) **Assets**. Each Bid must clearly state which Assets (including any executory contracts and unexpired leases) and liabilities of the Debtors the Qualified Bidders are agreeing to purchase and assume. For the avoidance of doubt, a Bid may be on the Assets in either (i) individual lots, (ii) as a collective whole, or (iii) in any combination.<br><br>(c) **Purchase Price**. Each Bid must clearly set forth the cash purchase price to be paid for the applicable Asset Category (the "**Purchase Price**"), *provided, however,* that the DIP Lender shall be entitled to credit bid any portion of their outstanding secured obligations pursuant to section 363(k) of the Bankruptcy Code with respect to any assets on which they hold liens in accordance with an order approving the Debtors postpetition financing. Each Bid must also specify how the Purchase Price is allocated among the Assets.<br><br>(d) **Minimum Bid**. The Minimum Bid for the Assets subject to the Stalking Horse Bid is $29,650,000, equal to the Staking Horse Bid amount of $28,000,000 plus (i) the Break-Up Fee of $1,400,000 and (ii) the Minimum Overbid Increment of $250,000.<br><br>(e) **Deposit**. Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the Purchase Price of the Bid, to be held in a segregated account to be identified and established by the Debtors (the "**Deposit**"). The Debtors reserve the right to increase the Deposit requirement.<br><br>(f) **Assumption of Obligation**. Each Bid must identify the obligations contemplated to be assumed by such Bid, and be on |

| Term | Detail |
|---|---|
| | terms in the aggregate (together with the other consideration contemplated in such Bid) no less favorable to the Debtors than the Stalking Horse Agreement (if any), as determined in the Debtors' business judgment, and after consultation with the Consultation Parties. Other than the obligations to be assumed, the Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "**Encumbrances**"), and any Encumbrances shall attach to the net proceeds of the Sales after payment of any applicable Break-Up Fee. |
| | (g) **The Same or Better Terms**. In addition to meeting or exceeding the applicable Minimum Bid, each Bid must be on terms that are no less favorable in the aggregate (together with the other consideration contemplated in such Bid), in the Debtors' business judgment and after consultation with the Consultation Parties, than the terms of the Stalking Horse Agreement. Each Bid must include duly executed, non-contingent purchase agreement and other transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid. Each Bid should be based on the form of the Stalking Horse Agreement and must include a copy of the Stalking Horse Agreement clearly marked to show all changes requested by the Qualified Bidder, including those relating to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid, including a form of sale order marked against the applicable sale order (collectively, the "**Qualified Bid Documents**"). |
| | (h) **Committed Financing / Adequate Assurance Information**. To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing documents to the satisfaction of the Debtors (in consultation with the Consultation Parties) that demonstrate that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions. |
| | In addition to evidence of financial wherewithal to timely consummate the transaction, a Bid must include adequate assurance information with respect to any executory contracts or unexpired leases included or that may be included in the Bid in a form that allows the Debtors to serve such information on any counterparties to any contracts or leases being assumed and assigned in connection with the Sale that have requested, in |

| Term | Detail |
|------|--------|
| | writing, such information. |
| | (i) **Contingencies; No Financing or Diligence Outs**.  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtors' business judgment, and after consultation with the Consultation Parties, than those set forth in the Stalking Horse Agreement (if any). |
| | (j) **Demonstrated Financial Capacity**.  A Qualified Bidder must have, in the Debtors' business judgment (in consultation with the Consultation Parties) the necessary financial capacity to consummate the proposed transactions required by its Bid (including, if necessary, to obtain transfer of any of the Debtors' licenses, permits and to obtain any necessary surety bonds or other financial assurances) and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid. |
| | (k) **Time Frame for Closing**.  Closing of the Sale as to any Asset related to a Bid by a Qualified Bidder (a "<u>Closing</u>") must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, on or before December 27, 2024. |
| | (l) **Binding and Irrevocable**.   Except as provided herein, a Qualified Bidder's Bid for the Assets shall be irrevocable unless and until the Debtors (in consultation with the Consultation Parties) accept a higher Bid for such Assets and such Qualified Bidder is not selected as the Backup Bidder for such Assets.  If selected as Backup Bidder, such Bid shall be irrevocable until the Closing of a Successful Bid for such Assets. |
| | (m) **Expenses; Disclaimer of Fees**.  Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. |
| | (n) **Authorization**.   Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid. |
| | (o) **As-Is, Where-Is**.   Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or |

| Term | Detail |
|---|---|
| | inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid or accompanying asset purchase agreement. |
| | (p) **Adherence to Bid Procedures**. By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction. |
| | (q) **Regulatory Approvals and Covenants**. A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the applicable Sale, if any, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible) and any undertakings that will be required by the Debtors in connection with such regulatory and third party approvals. For the avoidance of doubt, each Bid must acknowledge that consummation of such Bid shall not be contingent on obtaining government, regulatory, or other third-party approvals for novation of the Government Contracts or any necessary security clearances. |
| | (r) **Consent to Jurisdiction**. The Qualified Bidder must submit to the jurisdiction of and entry of final orders by the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the transaction documents related to the Sale, and the Closing, as applicable. |
| | (s) **Bid Deadline**. Each Bid must be transmitted via email (in .pdf or similar format) so as to be <u>actually received</u> on or before 4:00 p.m. (prevailing Eastern Time) on December 9, 2024 (the "**Bid Deadline**") by the Objection Notice Parties. |
| **No-Shop or No-Solicitation Provisions**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(1)** | N/A |
| **Breakup Fee**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(2)** | The Debtors have agreed to pay the Stalking Horse Bidder, under the conditions and in the amount set forth in the Bidding Procedures Order, a break-up fee in the amount of 5% of the purchase price (i.e., $1,400,000) (the "**Break-Up Fee**"), payable pursuant to the terms of |

| Term | Detail |
|---|---|
| | the Stalking Horse Agreement. |
| **Bidding Increments**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(3)** | The initial Overbid for the Assets subject to the Stalking Horse Bid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid for the Assets, giving effect to the credit for the Break-Up Fee for the Stalking Horse Bid that is a Baseline Bid, by an incremental amount that is not less than $250,000 (the "**Minimum Overbid Increment**"). |
| **Treatment of Break-Up and Topping Fees at Auction**<br><br>**Local Bankr. R. 6004-1(c)(i)(C)(4)** | If any Overbid is made as to the Assets subject to the Stalking Horse Agreement, the Stalking Horse Bidder shall be entitled to a dollar-for-dollar credit against the Minimum Overbid equal to the amount of the Stalking Horse Bidder's Break-Up Fee pursuant to the Stalking Horse Agreement to take into account that, if the Stalking Horse Bidder is the Successful Bidder (as defined below), no payment of the Stalking Horse Bidder's Break-Up Fee will be required. Conversely, if a Bidder other than the Stalking Horse Bidder is the Successful Bidder as to the Assets subject to the Stalking Horse Agreement, the net proceeds available to the Debtors for any such Assets will be reduced by the amount of the Break-Up Fee of the Stalking Horse Bidder under the Stalking Horse Agreement and paid to the Stalking Horse Bidder at closing of such Bidder's Bid. |
| **Modifications of Bidding Procedures**<br><br>**Local Bankr. R. 6004-1(c)(i)(D)** | The Debtors reserve their rights to modify the Bidding Procedures in their reasonable business judgment, and in consultation with the Consultation Parties and with the consent of the Stalking Horse Bidder, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Assets. |
| **Back-Up Bidder**<br><br>**Local Bankr. R. 6004-1(c)(i)(E)** | If an Auction is conducted for the Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Assets, as determined by the Debtors in the exercise of their reasonable business judgment, and in consultation with the Consultation Parties (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**") for such Assets, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.<br><br>The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement. |

| Term | Detail |
|---|---|
| | If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. The defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all remedies available against the defaulting Successful Bidder, including specific performance, if applicable, unless otherwise provided in the Stalking Horse Agreement should the Stalking Horse Bidder be the Successful Bidder. For the avoidance of doubt, if the Deposit becomes property of the Debtors' estates, the Deposit shall be subject to the liens and super-priority claims granted in favor of the DIP Lender under the interim order authorizing the Debtors to obtain postpetition financing and related relief and the final order thereon. |

## THE PROPOSED ASSUMPTION PROCEDURES

21. To facilitate and effect the Sale of the Assets, the Debtors seek authority to assume and assign the Assumed Contracts, consistent with the procedures established in the Bidding Procedures Order and the Stalking Horse Agreement (the "**Assumption Procedures**"). The Debtors propose that the Assumption Procedures apply whether the Stalking Horse Bidder or any other party or parties are the Successful Bidders.

22. The proposed Assumption Procedures are as follows:

(a) <u>Notice</u>. Within three (3) business days from the entry of the Bidding Procedures Order, or as soon as practicable thereafter, the Debtors shall file and serve by email or, if email is unavailable, by first class mail, on all counterparties (the "**Counterparties**") to their executory contracts and unexpired leases (the "**Contracts**") a notice, substantially in the form attached hereto as **<u>Exhibit D</u>** (the "**Cure Notice**"); *provided*, *however*, that the Debtors need not serve the Cure Notice on any party for whom the Debtors are unable to obtain, after reasonable diligence, an email or address as of the entry of the Bidding Procedures Order; *provided*, *further* that the Debtors shall not be obligated to provide supplemental service of the Cure Notice with respect to any Cure Notice that is returned to the Debtors as undeliverable so long as the Debtors have confirmed that any such Cure Notice was sent to the applicable email or physical address on file in the Debtors' books and records and no other email or physical address could be obtained after reasonable diligence.

(b)     Content of the Cure Notice.  The Cure Notice will include the following information on a schedule attached thereto (the "**Executory Contracts Schedule**"): (a) the potential assumption by the Debtors and assignment to the Successful Bidder(s) of the Contracts, and (b) the proposed amount necessary, under section 365(b)(1) of the Bankruptcy Code, to cure any outstanding monetary defaults and compensate the Counterparties for any pecuniary losses in connection with such assumption and assignment (the "**Proposed Cure Amounts**").

(c)     Previously Omitted Contracts.  If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts Schedule but was not (any such Contract, a "**Previously Omitted Contract**"), the Debtors shall (in consultation with the Consultation Parties), promptly following discovery thereof (but in no event later than two (2) Business Days following discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted Contract notifying such counterparties of the Debtors' intention to assume and assign such Previously Omitted Contract to the Successful Bidder, including the Proposed Cure Amounts relating thereto (the "**Previously Omitted Contract Notice**").

(d)     Objections.  Each Counterparty shall have until 4:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable) (the "**Contract Objection Deadline**") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, the amount of the Proposed Cure Amounts, but excluding any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code, other than the Stalking Horse Bidder, or on the basis of the identity of the Successful Bidder.  Any unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; provided that the Debtors shall have the right to adjourn any Sale Hearing without the consent of any objecting party.  If any objections to the amount of Proposed Cure Amounts remain unresolved as of the date of the Closing of the Sale, the Debtors may (but are not required to) deposit the disputed amount of Proposed Cure Amounts in a segregated account to hold pending resolution of such objections.

Each Counterparty may raise objections as to adequate assurance of future performance or on the basis of the identity of the Successful Bidder until 4:00 p.m. (prevailing Eastern time) on the date that is five (5) days after the filing and service by the Debtors to the Counterparty of a notice identifying the applicable Successful Bidder, which, for the avoidance of doubt, may be provided with the Cure Notice or the Previously Omitted Contract Notice or at any time thereafter with respect to the Stalking Horse Bidder; *provided, however*, that objections, if any, on the basis of the identity of the Successful Bidder shall not, in any event, be raised later than one (1) hour prior to the commencement of the Sale Hearing (the "**Buyer Specific Objection Deadline**").  Any such objection must be filed and served on the Debtors and their counsel, the Committee and its counsel, and

the applicable Successful Bidder or Stalking Horse Bidder (if any), as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline. Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

## RELIEF REQUESTED

23. By this Motion, the Debtors request entry of: (a) the proposed Bidding Procedures Order, (i) approving Bidding Procedures to govern the marketing and sale of the Assets, and approving bid protections in connection therewith, (ii) authorizing the Debtors to schedule the Auction and scheduling the Sale Hearing, (iii) approving the form and manner of notice of the proposed sale transactions, the Bidding Procedures, the Auction, the Sale Hearing, and related dates and deadlines, (iv) authorizing procedures governing the assumption and assignment of the Contracts to the Successful Bidder(s), and (v) granting related relief; and (b) the Sale Order (i) approving the applicable form(s) of purchase agreement between the Debtors and the Stalking Horse Bidder or any other Successful Bidder(s), and (ii) authorizing the Sale of the Assets and the assumption and assignment of the Assumed Contracts to the Stalking Horse Bidder or such other Successful Bidder free and clear of all Liens, other than any permitted Liens as set forth in the applicable form(s) of purchase agreement.

## BASIS FOR RELIEF

### I.    The Sale of the Assets Reflects a Sound Exercise of the Debtors' Business Judgment.

24. Selling the Assets as proposed herein is critical to maximizing value in these chapter 11 cases and, therefore, should be approved as reflecting a sound exercise of the Debtors' business judgment. Section 363(b) of the Bankruptcy Code provides, in relevant part, that a debtor "may use, sell, or lease, other than in the ordinary course of business, property of the estate" after notice and a hearing. 11 U.S.C. § 363(b)(1). Generally, the debtor is only required to "show that a sound business purpose" justifies the proposed use of property. *In re*

*Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phoenix Steel Corp.*, 82 B.R. 334, 335–36 (Bankr. D. Del. 1987) (requiring "good business reason" for use under section 363(b) of the Bankruptcy Code).  This standard prohibits other parties from second-guessing the debtor's business judgment if the debtor has shown that the proposed use will benefit the debtor's estate.  *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

25.     The Debtors determined to undertake a sale of substantially all of their Assets after careful consideration of all potential alternatives.  Of the available alternatives, the Sale was and remains the most efficient means to obtaining the greatest value for the Assets and distributing that value to the Debtors' stakeholders in accordance with their legal priorities.  The Debtors already have a baseline Stalking Horse Bid and now seek to continue the marketing process with the added benefits of a Court-approved section 363 sale process.  As discussed above, Intrepid continues to scour the market for potentially interested bidders.  After this market check, coupled with the Debtors' prepetition marketing efforts, the Debtors, their creditors, and other parties in interest can be confident that the Debtors will have obtained the highest and best value for the Assets.

II.     **Approval of the Sale Notice Procedures and Bidding Procedures Is Appropriate and in the Best Interests of the Debtors' Estates.**

   A.     **The Proposed Notice of Sale, Bidding Procedures, Auction and Sale Hearing, and the Sale Objection Deadline Are Appropriate.**

26.     As described above, the Debtors submit that the Sale Notice Procedures and the Sale Objection Deadline comply with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction, the Sale Hearing, and the Sale to the Debtors' creditors and other parties in interest, and, if the Debtors believe that additional entities have a legitimate interest, then also to those who have expressed an interest, or may express an interest, in bidding on the Assets. Based upon the foregoing, the Debtors respectfully request that this Court approve the Sale Notice Procedures and the Sale Objection Deadline proposed above.

   B.     **The Bidding Procedures Are Appropriate and Will Maximize the Value of the Assets.**

27.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. *See, e.g.*, *In re Efoora, Inc.*, 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012) ("A trustee has considerable discretion when it comes to the sale of estate assets, and that discretion is entitled to great judicial deference as long as a sound business reason is given.") (internal quotations and citations omitted).

28.     The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g.*, *Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 765 (7th Cir. 2004) (in a bankruptcy sale, the "governing principle . . . is to secure the highest price for the benefit of the estate and creditors").

29.     To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate

and, therefore, are appropriate in the context of bankruptcy sales. *See, e.g.*, *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that bidding procedures "encourage bidding and . . . maximize the value of the debtor's assets.").

30.     The Debtors believe that the Bidding Procedures will establish sound parameters by which the proffered sale price of the Assets under the Stalking Horse Agreement may be tested and evaluated as described herein. Such procedures will increase the likelihood that the Debtors will receive the greatest possible consideration for the Assets because they will ensure a competitive and fair bidding process. The Bidding Procedures will also allow the Debtors to undertake the Auction process in an orderly fashion, which the Debtors believe is essential to maintaining and maximizing the value of its estate.

31.     The Debtors believe that the Auction and proposed Bidding Procedures will allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtors also believe that the Bidding Procedures will encourage active bidding for the Assets, are consistent with other procedures previously approved by courts in this and other circuits, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

32.     Thus, the proposed Bidding Procedures are reasonable, appropriate, and within the Debtors' sound business judgment under the circumstances because they will serve to maximize the value that the Debtors will obtain on account of the Sale of the Assets.

### III.   The Initial and Subsequent Overbid Amounts are Appropriate.

33.     The Debtors submit that the proposed requirements for a Minimum Bid and Overbid are appropriate and should be approved.  Courts frequently authorize debtors to require bidders to submit minimum initial bids to ensure that the debtors receive the highest and best offers possible in asset sales.  In addition, the Debtors intend to conduct the Auction such that each bid at the Auction is higher or otherwise better than the previous bid.  To this end, incorporating the concept of overbids in the Bidding Procedures is reasonable under the circumstances and will enable the Debtors to maximize the value for the sale of their assets while limiting any chilling effect on the Sale process.  *See, e.g.*, *In re Phasebio Pharm., Inc.*, Case No. 22-10995 (LSS) (Bankr. D. Del. Nov. 28, 2022) (authorizing bidding procedures with an initial overbid increment of $1,000,000 or 2.5% of purchase price, plus break-up fees and expense reimbursements in the amount of $2,750,000); *In re Avadim Health, Inc.*, Case No. 21-10883 (CTG) (Bankr. D. Del. June 23, 2021) (authorizing bidding procedures with an initial overbid increment of $250,000;  *In re Ruby Pipeline*, Case No. 22-10278 (CTG) (Bankr D. Del. Sept. 8, 2022) (authorizing bidding procedures requiring minimum overbid amount to be announced by the debtor at auction); *In re Sequential Brands Grp., Inc.*, Case No. 21-11194 (JTD) (Bankr. D. Del. Sept. 24, 2021) (same).

### IV.   The Break-Up Fee Has a Sound Business Purpose and Should Be Approved.

34.     The Debtors submit that the proposed Break-Up Fee for the Stalking Horse Bidder is appropriate in the circumstances of these chapter 11 cases and consistent with market practice and should be approved as administrative obligations of the Debtors' estates.  The use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is a customary practice in chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value in an auction process by "establish[ing] a

framework for competitive bidding and facilitat[ing] a realization of that value." *Official Comm. of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, No. 11-219, *1 (E.D. Wis. July 7, 2011). As a result, stalking horse bidders typically require break-up fees and, in many cases, other forms of bid protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into an asset purchase agreement." *Id.* (internal citations omitted).

35. Thus, the use of bid protections has become an established practice in chapter 11 cases, and break-up fees and other forms of bid protections are a normal and, in many cases, necessary component of sale processes conducted under section 363 of the Bankruptcy Code. *See In re Integrated Res., Inc.*, 147 B.R. at 659–60 ("Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the . . . corporation has a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value."). Courts generally recognize that bid protections may be necessary to convince a bidder to make a public bid and set a floor, in that they provide compensation for the risks that the bidder is undertaking. *In re Hupp Int'l Indus., Inc.*, 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("[W]ithout such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's . . . due diligence.").

36. After the extensive marketing process that the Debtors undertook prior to the Petition Date, the bidder with the highest and best proposal ultimately insisted that they receive the Break-Up Fee as contemplated by the Stalking Horse Agreement if they were going to provide a floor for the Debtors' postpetition auction. Without the promise of the Break-Up Fee, the Stalking Horse Bidder's participation in the diligence, bidding, and negotiation processes

would likely have been significantly reduced and could have left the Debtors without the benefit of a stalking horse bid.

37.     Thus, the Break-Up Fee enabled the Debtors to secure an adequate floor for the Assets, thereby ensuring that competing bids will be materially higher or otherwise better than consideration provided for in the Stalking Horse Agreement—a clear benefit to the Debtors' estates.  In addition, payment of the Break-Up Fee will not diminish the Debtors' estates to the extent the Break-Up Fee becomes payable as a result of the Debtors' consummation of a competing bid, as the Bidding Procedures require that any initial Qualified Bid exceed the bid of the applicable Stalking Horse Bidder by an amount in excess of the Break-Up Fee.

38.     Moreover, the Break-Up Fee, which is $1,400,000, or 5% of the total purchase price, is consistent with bid protections that have been previously approved by courts in this District.  *See In re iSun Inc.*, Case No. 24-11144, Docket No. 183 (TMH) (Bankr. D. Del. July 10, 2024) (approving 5% break-up fee), *In re Renovate America, Inc.*, Case No. 20-13172, Docket No. 95 (LSS) (Bankr. D. Del. Jan. 8, 2021) (approving 8% break-up fee); *In re Lucky's Market Parent Co., LLC*, Case No. 20-10166 (JTD) (Bankr. D. Del. Feb. 26, 2020) (approving break-up fee of 3% of the purchase price, an expense reimbursement of $250,000, and a perpetual topping fee of $250,000 at each bid increment); *In re Celadon Grp., Inc.*, Case No. 19-12606, Docket No. 219 (KBO) (Bankr. D. Del. Jan. 6, 2020) (approving break-up fee of up to 3% of the purchase price plus an expense reimbursement of 1.5% of the purchase price).  The Stalking Horse Bidder has not sought an expense reimbursement, which are oftentimes sought as part of a bid protections package. The Break-Up Fee falls squarely within the range of bid protections customarily approved by the Court and should be approved.

39.     The Stalking Horse Bidder requires the Break-Up Fee as a precondition to entering into the Stalking Horse Agreement, and the Debtors believe offering the Break-Up Fee to the Stalking Horse Bidder will maximize the realizable value of the Assets for the benefit of the Debtors' estate, their creditors, and other parties in interest.  Accordingly, the Debtors believe that the Break-Up Fee is fair and appropriate under the circumstances and should be approved.

**V.     The Proposed Assumption Procedures are Appropriate.**

40.     In connection with the Sale, the Debtors believe it is necessary to establish a process by which:  (a) the Debtors and Counterparties can reconcile the Proposed Cure Costs, if any, in accordance with section 365 of the Bankruptcy Code; and (b) Counterparties can object to the assumption and assignment of the Contracts or related Proposed Cure Costs.  As described above, the proposed Assumption Procedures comply with Bankruptcy Rule 2002 and provide all Counterparties with due and adequate notice of the potential assumption and assignment of their Contracts, the Contract Objection Deadline and the Buyer Specific Objection Deadline, and the time and place for the Sale Hearing.

41.     However, and for the avoidance of doubt, notwithstanding the general prohibition that the Bankruptcy Code places on contractual provisions that attempt to restrict assignment of such contracts, the Debtors recognize that such Bankruptcy Code prohibitions may be inapplicable with respect to the Government Contracts as section 365(c) of the Bankruptcy Code recognizes the applicability of statutes, such as the Anti-Assignment Act (41 U.S.C. § 6305) that excuses the non-debtor from accepting performance from an entity other than the debtor.  The Debtors intend to expeditiously interface with the appropriate points of contact within the Government in an effort to obtain the Government's consent to the assignment of the Government Contracts to the Stalking Horse Bidder or the Successful Bidder, as applicable.  To effectuate the assumption and assignment of the Government Contracts, if necessary, the Debtors

and the Successful Bidder will work with the Government to enter into one or more novation or similar agreements, and such other documents as the applicable Government may require.

42.    Therefore, the Debtors respectfully request the Court to (a) approve the Assumption Procedures; and (b) find that all anti-assignment provisions of such contracts be unenforceable under section 365(f) of the Bankruptcy Code.  However, for the avoidance of doubt, nothing in the Sale Order, or any other sale documents, shall affect the validity or enforceability of any anti-assignment provision in any Government Contracts.

**VI.    Approval of the Proposed Sale Transaction Is Appropriate and in the Best Interests of the Debtors' Estates.**

43.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtors determined that a public Auction of the Assets will enable the Debtors to obtain the highest or otherwise best offer in a Sale of their Assets at this time and is in the best interests of the Debtors, their estate, and their creditors.  However, if after the Bid Deadline, the Debtors have not received a Bid that is actionable or exceeds the value of the Stalking Horse Agreement, the Debtors will file a certification of counsel or notice with the Court indicating that the Debtors have not received a bid that is higher or otherwise better than the Stalking Horse Agreement, and the Debtors will request that the Court schedule a hearing to approve the Stalking Horse Agreement without further delay.  The Debtors believe that, given the Debtors' extensive (nearly 2-year) marketing process, potential bidders have had ample time to engage with the Debtors, conduct diligence, and secure financing, and that a process that provides the Debtors the opportunity to test the market for the Assets postpetition, but also maintains optionality to pivot from a public auction process to a private sale with the Stalking Horse Bidder will best achieve value for all stakeholders and eliminate unnecessary administrative expenses.

**A.** **The Sale of Assets and Assumed Contracts Free and Clear of Liens Is Authorized by Section 363(f) of the Bankruptcy Code.**

44.     The Debtors further submit that it is appropriate to sell the Assets and to assign the Assumed Contracts free and clear of all Liens, other than Assumed Liabilities, as set forth in the Stalking Horse Agreement or in the purchase agreement with the Successful Bidder(s) pursuant to section 363(f) of the Bankruptcy Code, with any such Liens attaching to the net sale proceeds of the Assets, as and to the extent applicable.

45.     Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

> (a) applicable nonbankruptcy law permits sale of such property free and clear of such interests;
>
> (b) such entity consents;
>
> (c) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (d) such interest is in *bona fide* dispute; or
>
> (e) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

46.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Assets and the assignment of the Assumed Contracts pursuant to the Stalking Horse Agreement or an applicable purchase agreement of another Successful Bidder.  In particular, the Debtors believe that at least section 363(f)(2) and (3) of the Bankruptcy Code will be met in connection with the transactions proposed under the Stalking Horse Agreement because the Debtors expect that the DIP Lender and Prepetition First Lien Lender, the Prepetition Secured Noteholder, and any other party asserting a Lien over the Assets will consent to the Sale, or, alternatively, that the purchase price for the Assets will exceed the value of any such Liens.  Moreover, with respect to any other parties asserting a lien, claim, or

encumbrance against the Assets, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f) of the Bankruptcy Code. In particular, known lienholders will receive notice and will be given sufficient opportunity to object to the relief requested. Such lienholders that do not object to the Sale should be deemed to have consented.[9] Furthermore, the Debtors propose that any Liens asserted against the Assets be transferred to and attach to the proceeds of the Sale.

**B.    The Stalking Horse Bidder is a Good Faith Purchaser and Is Entitled to the Full Protections of the Bankruptcy Code.**

47.    The Debtors believe that the Stalking Horse Agreement has been submitted in good faith and has been, and will continue to be, negotiated in good faith and at arm's-length. Thus, the Stalking Horse Bidder is entitled to the full protections of section 363(m) of Bankruptcy Code, which provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

48.    While the Bankruptcy Code does not define "good faith," several Circuit Courts have determined that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the

---

[9]    *See FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("[L]ack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Twp. of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (holding that creditor's failure to object to sale free and clear of liens, claims and encumbrances satisfies section 363(f)(2)); *In re Elliot*, 94 B.R. at 345 (same).

> purchaser and other bidders or the trustee, or an attempt to take
> grossly unfair advantage of other bidders.

*In re Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (quoting *In re Rock Indus.*

*Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Abbotts Dairies of Pa., Inc.*, 788

F.2d 143, 147 (3d Cir. 1986). There has been no fraud, improper insider dealing, or collusion in

connection with the negotiation or submission of the Stalking Horse Agreement.

49.     The Stalking Horse Bidder or other Successful Bidder(s) should receive the

protections afforded good faith purchasers by section 363(m) of the Bankruptcy Code.

Accordingly, the Debtors request that the Court make a finding at the Sale Hearing and in the

Sale Order that the purchase agreement reached with the Stalking Horse Bidder or any other

Successful Bidder(s) was at arm's-length and is entitled to the full protections of section 363(m)

of the Bankruptcy Code.

## C.     Credit Bidding Should Be Authorized Under Section 363(k) of the Bankruptcy Code.

50.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale.

Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause

orders otherwise, the holder of a claim secured by property that is the subject of the sale "may

bid at such sale, and, if the holder of such claim purchases such property, such holder may offset

such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured

creditor is undersecured as determined in accordance with section 506(a) of the Bankruptcy

Code, section 363(k) allows such secured creditor to bid the total face value of its claim and does

not limit the credit bid to the claim's economic value.

51.     The Bidding Procedures preserve the DIP Lenders' right to credit bid as required

under section 363(k) of the Bankruptcy Code, and this aspect of the Bidding Procedures should

therefore be approved.

### D. Assumption and Assignment of the Assumed Contracts Is Authorized by the Bankruptcy Code.

52. Sections 365(a) and (b) of the Bankruptcy Code authorize a debtor-in-possession to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor. Under section 365(a) of the Bankruptcy Code, a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee —
>
> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and
>
> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

53. The standard applied by courts to determine whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. *See ReGen Capital I, Inc. v. UAL Corp. (In re UAL Corp.)*, 635 F.3d 312, 319 (7th Cir. 2011) ("The bankruptcy court reviews the debtor's business judgment with respect to the proposed assumption to determine if it would be beneficial or burdensome to assume the executory contract by evaluating whether assumption would serve the reorganization or whether it would take away funds available to other creditors.") (citing *Orion Pictures Corp. v. Showtime*

*Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir. 1993)); *In re Network Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005).

54.     As set forth above, the Sale will yield the maximum value for the Debtors' estates and the Debtors expect that value may be achieved through the assumption, assignment, and sale of the Assumed Contracts.  In addition, under section 365(k) of the Bankruptcy Code, a debtor's assignment of a contract or lease "relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment."  11 U.S.C. § 365(k).  Thus, following an assignment to a Successful Bidder of an Assumed Contract, the Debtors will be relieved from any liability for any subsequent breach associated therewith.

55.     Furthermore, section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Contracts be cured or that adequate assurance be provided that such defaults will be promptly cured.  11 U.S.C. § 365(b)(1).  The Debtors propose to file with the Court, and serve on each Counterparty to a Contract, a Cure Notice that indicates the Proposed Cure Amount for each such contract.  As such, each Counterparty will have the opportunity to object to the proposed assumption and assignment to the Successful Bidder and to the Proposed Cure Amount, if applicable.  Moreover, the payment or reserve of the applicable Proposed Cure Amounts, as provided for in the Bidding Procedures, will be a condition to the Debtors' assumption and assignment of any Assumed Contracts.

56.     Relatedly, section 365(f)(2) of the Bankruptcy Code provides that a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided."  11 U.S.C. § 365(f)(2).  The words "adequate assurance of future performance" must be given a "practical, pragmatic construction" in light of the facts and circumstances of the proposed

assumption.[10]  Specifically, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.[11]

57.    Here, any Successful Bidder will have provided adequate assurance of future performance with respect to any Assumed Contract.  For a bid to be deemed a Qualifying Bid, each Qualifying Bidder will be required to provide evidence supporting its ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) and, if applicable, section 365(b)(3) of the Bankruptcy Code.  Furthermore, given that the Debtors will submit evidence at the Sale Hearing that all requirements for the assumption and assignment of the Contracts have been satisfied, the Court and other interested parties will have the opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of future performance.

58.    Therefore, the Debtors respectfully request that the Court approve the proposed assumption and assignment of the Assumed Contracts.

59.    In addition, to assist in the assumption, assignment, and sale of the Assumed Contracts, the Debtors also request that the Sale Order provide that anti-assignment provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.  Notwithstanding the

---

[10]    *See In re Fleming Cos., Inc.*, 499 F.3d 300, 307 (3d Cir. 2007) (internal citation omitted); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (same*); see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (finding that adequate assurance of future performance does not mean absolute assurance that debtor will thrive and profit); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

[11]    *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (holding that adequate assurance of future performance is given where the assignee of lease has financial resources and expressed a willingness to devote sufficient funding to the business to ensure its success, and that in the leasing context, the chief determinant of adequate assurance is whether rent will be paid).

foregoing, because the Debtors are party to a number of contracts (collectively, the "**Government Contracts**") with the United States, its agencies, departments, or agents (collectively, the "**Government**"), the Sale Order will provide that, notwithstanding anything to the contrary in this Motion, the Bidding Procedures Order, the Stalking Horse Agreement, or any other document in connection with the Sale, no Government Contract may be assumed and assigned without: (i) express written consent of the Government; (ii) the execution of a novation agreement applicable to the Government Contract; and (iii) the payment of all outstanding obligations and cure amounts arising under or related to such Government Contract.

## REQUEST FOR WAIVER OF STAY UNDER BANKRUPTCY RULE 6004(h)

60. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As provided herein, and to implement the foregoing successfully, the relief that the Debtors seek in this Motion is immediately necessary for the Debtors to conduct an efficient sale process to preserve the value of their estates.

61. The Debtors thus submit that the requested waiver of the notice requirements of Bankruptcy Rule 6004(a) and of the fourteen-day stay imposed by Bankruptcy Rule 6004(h) is appropriate.

## RESERVATION OF RIGHTS

62. Nothing in the proposed Bidding Procedures Order or this Motion (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors and their estates; (b) shall impair, prejudice, waive, or otherwise affect the rights of the Debtors and their estates with respect to the validity, priority, or amount of any claim against the Debtors and their

estates; or (c) shall be construed as a promise to pay a claim. Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Proposed Orders is not intended and should not be construed as an admission as to the validity of any particular claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## NOTICE

63.     Notice of this Motion has been or will be provided to: (a) the U.S. Trustee; (b) holders of the thirty (30) largest unsecured claims on a consolidated basis against the Debtors; (c) counsel to the DIP Lender and Prepetition First Lien Lender; (d) counsel to the Prepetition Secured Noteholder; (e) counsel to the Stalking Horse Bidder; (f) the Internal Revenue Service; (g) the Office of the United States Attorney for the District of Delaware; (h) all persons known or reasonably believed to have asserted an interest in the Assets within the last six months; (i) all parties who have asserted liens against the Assets; (j) the Government Counterparties to the Government Contracts; and (k) all parties who have filed a notice of appearance and request for service of papers pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors request that the Court enter the Bidding Procedures Order and the Sale Order, granting the relief requested herein and such other and further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: October 30, 2024
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*

Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Elizabeth S. Justison (No. 5911)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253
Email: mnestor@ycst.com
         mlunn@ycst.com
         ejustison@ycst.com
         sborovinskaya@ycst.com

*Proposed Counsel to the Debtors and Debtors in Possession*