## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| Ultra Safe Nuclear Corporation, *et al.*,[1] | Case No. 24-12443 (KBO) |
| Debtors. | (Jointly Administered) |
|  | **Ref. Docket Nos. 33 & 112** |

## NOTICE OF FILING OF EXECUTED REVISED STALKING HORSE AGREEMENT

      **PLEASE TAKE NOTICE** that, on October 30, 2024, the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") filed the *Debtors' Motion for Entry of (A) an Order (I) Approving Bidding Procedures in Connection With the Sale of the Debtors' Assets and Related Bid Protections, (II) Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief; and (B) an Order (I) Approving Purchase Agreements, and (II) Authorizing a Sale Free and Clear of All Liens, Claims, Encumbrances, and Other Interests* [Docket No. 33] (the "**Motion**")[2] with the United States Bankruptcy Court for the District of Delaware (the "**Court**").

      **PLEASE TAKE FURTHER NOTICE** that attached as Exhibit B to the Motion was the Stalking Horse Agreement.  After filing the Stalking Horse Agreement, the Debtors made certain revisions thereto, as reflected in the *Notice of Filing of Revised Stalking Horse Agreement* [Docket No. 112] (the "**Revised Stalking Horse Agreement**"), filed on November 20, 2024.

      **PLEASE TAKE FURTHER NOTICE** that attached hereto as **Exhibit 1** is an executed version of the Revised Stalking Horse Agreement.

      **PLEASE TAKE FURTHER NOTICE** that the Debtors reserve all rights to further modify the Revised Stalking Horse Agreement

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Ultra Safe Nuclear Corporation (9774); Ultra Safe Nuclear Corporation – Technologies (9815); USNC-Power Ltd. (6500); and Global First Power Limited (7980).  The Debtors' mailing address is 200 Europia Ave., Oak Ridge, Tennessee 37830.

[2]    Capitalized terms used but not defined herein have the meaning given to such terms in the Motion.

Dated: November 21, 2024
Wilmington, Delaware

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**

*/s/ Shella Borovinskaya*

Michael R. Nestor (No. 3526)
Matthew B. Lunn (No. 4119)
Elizabeth S. Justison (No. 5911)
Shella Borovinskaya (No. 6758)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone:  (302) 571-6600
Facsimile:  (302) 571-1253
Email:  mnestor@ycst.com
          mlunn@ycst.com
          ejustison@ycst.com
          sborovinskaya@ycst.com

*Proposed Counsel to the Debtors and Debtors in Possession*

## EXHIBIT 1

**Revised Stalking Horse Agreement**

*Execution Version*

---

**ASSET PURCHASE AGREEMENT**

BY AND AMONG

**ULTRA SAFE NUCLEAR CORPORATION,**
A DELAWARE CORPORATION,

**ULTRA SAFE NUCLEAR CORPORATION - TECHNOLOGIES,**
A WASHINGTON CORPORATION,

**USNC HOLDINGS, LLC,**
A WASHINGTON LIMITED LIABILITY COMPANY,

COLLECTIVELY AS SELLER

AND

**STANDARD NUCLEAR, INC.,**
A DELAWARE CORPORATION, AS BUYER

DATED AS OF: **November 21, 2024**

---

**ASSET PURCHASE AGREEMENT**

This Asset Purchase Agreement (this "***Agreement***") is made and entered into as of November 21, 2024 (the "***Effective Date***"), by and among Ultra Safe Nuclear Corporation, a Delaware corporation, Ultra Safe Nuclear Corporation – Technologies, a Washington corporation, USNC Holdings, LLC, a Washington limited liability company (collectively, "***Seller***"), and Standard Nuclear, Inc., a Delaware corporation (including all designee(s), assignee(s), or nominee(s) of Buyer (if any), collectively, "***Buyer***"). Buyer and Seller may each, individually, be hereinafter referred to as a "***Party***" and, collectively, as the "***Parties***".

**RECITALS:**

**WHEREAS,** Seller is engaged in the business of developing and selling nuclear fuel energy projects (the "***Business***");

**WHEREAS,** on October 29, 2024 (the "***Petition Date***"), Seller will file voluntary petitions for relief (the "***Bankruptcy Case***") under Chapter 11, Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the District of Delaware (the "***Bankruptcy Court***"); and

**WHEREAS,** subject to approval of the Bankruptcy Court and on the terms and subject to the conditions set forth herein and pursuant to a Sale Order (as hereafter defined), the parties desire to enter into this Agreement pursuant to which, among other things, Seller shall sell to Buyer, and Buyer shall purchase from Seller all of Seller's right, title and interest in and to the Purchased Assets (as hereafter defined), and Buyer shall assume from Seller and thereafter pay, discharge and perform the Assumed Obligations (as hereafter defined).

**NOW, THEREFORE,** in consideration of the respective representations, warranties, covenants, and agreements of the Parties hereinafter set forth, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## SECTION 1

## DEFINITIONS

For purposes of this Agreement, the following capitalized terms have the meanings specified or referred to in this <u>Section 1</u>:

"***Action***" means any claim, action, cause of action, demand, lawsuit, arbitration, hearing, inquiry, audit, notice of violation, proceeding, litigation, citation, summons, subpoena, or investigation of any nature, civil, criminal, administrative, regulatory, or otherwise, whether at law or in equity.

"***Affiliate***" of a Person means any other Person that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Person. The term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"***Agreement***" has the meaning set forth in the Preamble.

"***Alternative Transaction***" has the meaning set forth in <u>Section 8.1(f)(i)</u>.

"***Assignable Contracts***" has the meaning set forth in <u>Section 2.2(a)</u>.

"***Assignment and Assumption Agreement***" means the Assignment and Assumption Agreement between Seller and Buyer, in the form attached hereto as Exhibit C, to be executed and delivered at the Closing.

"***Assumed Liabilities***" has the meaning set forth in Section 3.1(a).

"***Auction***" has the meaning set forth in Section 8.1(a).

"***Avoidance Action***" means any claim, right, or cause of action of Seller arising under Chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Purchased Assets or the Business.

"***Backup Bidder***" has the meaning set forth in the Bid Procedures.

"***Bankruptcy Case***" has the meaning set forth in the Recitals.

"***Bankruptcy Code***" has the meaning set forth in the Recitals.

"***Bankruptcy Court***" has the meaning set forth in the Recitals.

"***Bidding Procedures Order***" has the meaning set forth in Section 8.1(b)(i).

"***Bidding Protections***" has the meaning set forth in Section 8.1(f)(i).

"***Bid Procedures***" has the meaning set forth in Section 8.1(f)(i).

"***Bill of Sale***" means the Bill of Sale from Seller, in the form attached hereto as Exhibit D, to be executed and delivered at the Closing.

"***Break-Up Fee***" has the meaning set forth in Section 8.1(f)(i).

"***Business***" has the meaning set forth in the Recitals.

"***Business Day***" means any day except Saturday, Sunday or any other day on which commercial banks located in New York, New York, are authorized or required by Law to be closed for business.

"***Business Records***" has the meaning set forth in Section 2.1(f).

"***Buyer***" has the meaning set forth in the Preamble.

"***Buyer's Closing Certificate***" has the meaning set forth in Section 4.5(b)(iii).

"***Cash Consideration***" has the meaning set forth in Section 4.6.

"***Claim***" means a claim as defined in Section 101 of the Bankruptcy Code.

"***Closing***" has the meaning set forth in Section 4.4.

"***Closing Date***" has the meaning set forth in Section 4.4.

"***Code***" means the Internal Revenue Code of 1986, as amended.

"***Contracts***" means all contracts, leases, subleases, deeds, mortgages, licenses, instruments, notes, commitments, purchase orders, customer orders, undertakings, indentures, joint ventures, and all other

agreements, commitments, and legally binding arrangements, whether written or oral, and with respect to any of the foregoing, all amendments, supplements, extensions, addenda, or restatements relating thereto.

"***Cure Costs***" means all monetary Liabilities that must be paid or otherwise satisfied in order to cure any monetary defaults required to be cured under section 365(b)(1) of the Bankruptcy Code or otherwise to effectuate, pursuant to the Bankruptcy Code, the assumption of the Designated Contracts.

"***Designated Contracts***" has the meaning set forth in Section 2.2(a).

"***Designated Employees***" means those employees identified by Buyer as necessary to the post-closing operation of the Business, as listed collectively on Schedule 4.2(c) and Schedule 4.2(d) prepared and delivered by Buyer to Seller and the Committee (as defined in the Bidding Procedures Order) on or before December 4, 2024.

"***Disclosure Schedules***" collectively means the Disclosure Schedules delivered by Seller to Buyer concurrently with the execution and delivery of this Agreement, composed of the Schedules referenced throughout this Agreement.

"***Effective Date***" has the meaning set forth in the Preamble.

"***Employee Benefit Plans***" means (i) a bonus, deferred compensation, incentive compensation, stock purchase, stock option, profits interest, severance or termination pay, hospitalization or other medical, life or other insurance, fringe benefit, supplemental unemployment benefits, profit-sharing, 401(k) pension, or retirement plan, program, agreement, or arrangement; and (ii) each other employee benefit plan, program, agreement, or arrangement, sponsored, maintained, or contributed to or required to be contributed to by Seller or by any trade or business, whether or not incorporated, that together with Seller would be deemed a "single employer" within the meaning of Section 414 of the Code or Section 4001(b)(l) of ERISA (each, individually, an "***ERISA Affiliate***"), for the benefit of any employee or former employee of Seller, whether formal or informal, oral or written, and whether legally binding or not, or in connection with which Seller or any ERISA Affiliate has any Liability.

"***Employment Contract***" means each employment Contract entered into by Buyer and a Designated Employee effective upon the entry of the Sale Order; provided, however, each such Employment Contract shall provide each Designated Employee with: (i) base salary or hourly wages and target bonus opportunities that are individually no less favorable than each such employee's base salary or hourly wages and target bonus opportunities provided immediately prior to the Closing; and (ii) employee benefits that are generally offered by Buyer to its other employees.

"***Encumbrance***" means any charge, Lien, Claim, right, demand, mortgage, lease, debt, losses, damage, demand, fine, judgment, penalty, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, rights of others, easement, restrictive covenant, right of way, preemptive right, conditional sale, servitude, conditional sale agreement, or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), encroachment, encumbrance, third party interest, or other restriction or limitation of any kind, whether imposed by contract, Law, equity, or otherwise.

"***Escrow Account***" has the meaning set forth in Section 4.7(a).

"***Escrow Agent***" has the meaning set forth in Section 4.7(a).

"***Escrow Amount***" has the meaning set forth in Section 4.7(a).

"***Excluded Liabilities***" has the meaning set forth in Section 3.2.

"*Expense Reimbursement*" has the meaning set forth in <u>Section 8.1(f)(i)</u>.

"*Final Order*" means an order or judgment of the Bankruptcy Court, the operation or effect of which has not been reversed, stayed, modified, or amended and which is in full force and effect, and as to which the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending.

"*Framatome*" means Framatome, Inc.

"*Governmental Authority*" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization, or other non-governmental regulatory authority, or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of Law), or any arbitrator, court, or tribunal of competent jurisdiction.

"*Initial Designated Contracts*" has the meaning set forth in <u>Section 2.2(a)</u>.

"*Intellectual Property Assignments*" has the meaning set forth in <u>Section 4.5(a)(v)</u>.

"*Intellectual Property*" means all copyrightable works, all registered and unregistered copyrights and applications therefor, registered and unregistered trademarks and applications therefor, registered and unregistered service marks and applications therefor, trade secrets, patent or invention disclosures, patent rights, inventions, research and development, ideas, discoveries, trade names and trade name rights used in connection with and/or otherwise relating to the Business and/or the Purchased Assets, trade dress, websites, including website code, content, functionality, graphics, domain names, URLs, e-mail addresses, computer software, and all related source code and object code, all architectural drawings, designs, templates, and sketches and related library resources available to Seller and any excel or software templates used by Seller in the Business, all goodwill of the Business as a going concern, including lists of customers, prospective customers, suppliers, correspondence, purchase orders, market surveys, marketing plans, marketing research, and marketing know-how; and all general intangibles of the Business, including techniques, processes, inventions, designs, logos, databases, including databases of historical designs, formulae, and know-how that pertain to the Business. Notwithstanding anything to the contrary contained herein, the term "Intellectual Property" shall not include any items constituting a Retained Asset.

"*Intellectual Property Licenses*" means any grant to Sellers of a right to use a third Person's Intellectual Property rights on a royalty-free basis, including, without limitation, any Intellectual Property Licenses for the use of Intellectual Property embedded or included in any Purchased Assets by the seller or manufacturer of such Purchased Assets.

"*Joint Venture*" means the entity governed by and pursuant to the JV Agreement, if any.

"*Joint Venture Conditions*" means, collectively: (i) Seller and Framatome shall have entered into a National Security Agreement in accordance with their application for approval from the Committee on Foreign Investment in the United States ("*CFIUS*"); (ii) on or prior to the bid deadline set forth in the Bidding Procedures Order, Buyer and Framatome, subject to the entry of the Sale Order by the Bankruptcy Court, shall have entered into a non-binding memorandum of understanding in a form and manner acceptable to Buyer; and (iii) in the event Seller and Framatome shall have entered into a written joint venture agreement (the "*JV Agreement*") before or upon the entry of the Sale Order, then Seller shall assign to Buyer, and Buyer shall assume from Seller, the JV Agreement and all right, title, and interest of Seller therein, thereto, and arising thereunder, together with the written authorization and assent of Framatome and all required approvals of Governmental Authorities and other Persons therefor (including, without limitation, CFIUS), all in a form and manner acceptable to Buyer.

"***Law***" means any statute, law, ordinance, regulation, rule, code, constitution, treaty, common law, Order, or other requirement or rule of law of any Governmental Authority.

"***Liabilities***" means liabilities, claims, obligations, or commitments of any nature whatsoever, asserted or unasserted, known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, or otherwise.

"***Liens***" means any "interest" as that term is used in Section 363(f) of the Bankruptcy Code, mortgage, deed of trust, pledge, assignment, security interest, encumbrance, easement, condition, covenant, reservation, lien, mechanics lien, claim, charge, hypothecation, deemed trust, action, easement, charge, or otherwise, or claim of any kind or nature whatsoever in respect of any property other than any Intellectual Property License, including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code or any comparable Law in any other jurisdiction.

"***Material Adverse Effect***" means any event, occurrence, fact, condition, prospect, or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the Business or Seller; (b) the value of any one or more of the Purchased Assets; or (c) the ability of Seller or any Affiliate(s) thereof to consummate the Transactions, or to fully perform, satisfy, and discharge all obligations, covenants, and agreements of Seller contemplated under this Agreement or any of the other Transaction Documents, on a timely basis; provided, however, the following shall not constitute a Material Adverse Effect and shall not be taken into account in determining whether or not there has been or would reasonably be expected to be a Material Adverse Effect: (i) changes in general economic conditions or securities or financial markets in general; (ii) any changes in law applicable to Seller or any of Seller's properties or assets or interpretations thereof by any Governmental Authority; (iii) any outbreak or escalation of hostilities or war (whether declared or not declared) or any act of terrorism; (iv) any changes to the extent resulting from the announcement or the existence of, or Seller's compliance with, this Agreement and the transactions contemplated hereby; (v) any changes in accounting practices or policies that Seller is required to adopt after the date of this Agreement; (vi) matters occurring in, or arising from the Bankruptcy Case, including any events, occurrences, or other actions required to be taken as a result thereof; and (vii) any event, circumstance, development, change, occurrence, or effect to the extent resulting from, arising out of, or relating to any epidemic, pandemic or disease outbreak; provided further, in the case of clauses (i), (ii), (iii), (v), and (vii) such effects shall be taken into account in determining whether a Material Adverse Effect has occurred to the extent that any such effects have a disproportionate adverse effect on Seller, the Business, the Purchased Assets, or the Assumed Liabilities as compared to other similarly situated businesses.

"***Occupancy Costs***" has the meaning set forth in Section 7.8.

"***Order***" means any order, injunction, judgment, decree, ruling, writ, temporary or permanent restraining order, assessment, stipulation, determination, or award of any Governmental Authority.

"***Organizational Documents***" means, individually or collectively (as applicable), with respect to any Person: (i) the certificate of formation or incorporation, articles of organization, or similar formation and charter documents; (ii) any and all joint venture, limited liability company agreement, operating agreement, and other similar documents adopted or filed in connection with the creation, formation, incorporation, governance, operations, management, and/or organization of such Person; and (iii) all side letters, side agreements, regulations, voting agreements, and similar documents, instruments, or agreements relating to the governance, operations, management, and/or organization of such Person, in each case, as amended, restated, supplemented, and/or otherwise modified.

"***Outside Date***" has the meaning set forth in <u>Section 4.2(a)</u>.

"***Party***" and "***Parties***" have the respective meanings set forth in the Preamble.

"***Permitted Encumbrances***" collectively means (i) the Encumbrances set forth on <u>Schedule 1</u>; (ii) Encumbrances for Taxes, assessments and similar charges related to the Purchased Assets that are not yet due or are being contested in good faith by appropriate proceedings and for which appropriate reserves have been established in accordance with GAAP; and (iii) that are mechanic's, materialman's, carrier's, supplier's, vendor's, repairer's, or other similar Encumbrances arising in the ordinary course of business and securing amounts that are not delinquent or are being contested in good faith.

"***Permits***" has the meaning set forth in <u>Section 5.8</u>.

"***Person***" means any individual, corporation, partnership, limited liability company, association, trust, joint stock company, unincorporated organization, labor union, collective bargaining unit, joint venture, Governmental Authority, or other similar entity, whether or not a legal entity.

"***Petition Date***" has the meaning set forth in the Recitals.

"***Proceeding***" means any pending Action or other pending of any kind involving any Governmental Authority or any other Person.

"***Purchased Assets***" has the meaning set forth in <u>Section 2.1</u>.

"***Purchase Price***" collectively means the amount of (i) the Cash Consideration, *minus* (ii) the aggregate amount of any adjustments made for Cure Costs actually incurred in respect of the Initial Designated Contracts.

"***Real Estate Transfer***" means the conveyance(s) required by the RPA.

"***Real Property***" means the real property and improvements thereon owned by Seller and located 200 Europia Avenue, Oak Ridge, Tennessee, that is more fully described in, and to be acquired in accordance with the terms of, the RPA.

"***Representative***" means, with respect to any Person, any director, manager, officer, agent, independent contractor, consultant, advisor, Affiliate, employee, or similar Person acting in a representative capacity for such Person.

"***Retained Assets***" has the meaning set forth in <u>Section 2.3</u>.

"***Retained Contracts***" has the meaning set forth in <u>Section 2.3(b)</u>.

"***Retained Records***" has the meaning set forth in <u>Section 2.3(c)</u>.

"***RPA***" means a real estate purchase and sale agreement between Buyer and Seller, dated as of even date herewith, conveying all right, title, and interest in and to the Real Property in the form attached hereto as <u>Exhibit E</u>, to be executed and delivered at the Closing.

"***Sale Motion***" has the meaning set forth in <u>Section 8.1(b)</u>.

"***Sale Order***" has the meaning set forth in <u>Section 8.1(b)(ii)</u>.

"***Seller***" has the meaning set forth in the Preamble.

"***Seller's Closing Certificate***" has the meaning set forth in Section 4.5(a)(viii).

"***Seller's Knowledge***" or any other similar knowledge qualification in respect of Seller, means the actual knowledge of Kurt Terrani after reasonable inquiry.

"***Tax Return***" means any return, declaration, report, claim for refund, information return or statement, or other document relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"***Taxes***" means all federal, state, local, foreign, and other income, commercial activity, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever, together with any interest, additions, or penalties with respect thereto, and any interest in respect of such additions or penalties.

"***Transfer Taxes***" means, to the extent not exempt under Section 1146(a) of the Bankruptcy Code in connection with the Bankruptcy Case, all excise, sales, use, value added, registration stamp, recording, documentary, conveyance, franchise, property, transfer, and similar Taxes, levies, charges and fees, including any interest and penalties incurred in connection with any of the Transactions.

"***Transaction Documents***" means this Agreement, the Assignment and Assumption Agreement, the Bill of Sale, the Bidding Procedures Order, the Sale Order, the Intellectual Property Assignments, all deliverables required to satisfy the Joint Venture Conditions in full, the Seller's Closing Certificate, the RPA, and all other agreements, instruments, certificates, and other documents required to be executed and/or delivered by Seller pursuant to any of the foregoing documents, or otherwise in connection with any of the contemplated Transactions.

"***Transactions***" means the transactions contemplated by the Transaction Documents.

## SECTION 2

## TRANSFER OF ASSETS

**2.1    Transfer of Assets.**  Subject to the terms and conditions hereof, at the Closing, Seller shall sell, assign, transfer, and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title, and interest in and to the following assets, properties, and rights of Seller described under this Section 2.1, wherever located (collectively, the "***Purchased Assets***"):

(a)    the prepaid expenses, prepaid deposits, retainers, customer deposits, security deposits, and utility deposits of Seller related to any of the Designated Contracts;

(b)    the inventory, machinery, personal property, furniture, fixtures, assets, and equipment (i) located at the Real Property, (ii) located at Seller's facility located at 1930 North 2200 West, Suite #5, Salt Lake City, UT 84116, and/or (iii) otherwise primarily used in connection with and are material to the operations of the Business (as presently conducted), in each case, together with all transferable warranties and guaranties with respect to the foregoing, including those items listed on Schedule 2.1(b);

(c)    all right, title, and interest of Seller in the Designated Contracts listed on Schedule 2.2(a)-3 (as determined by Buyer in accordance with Section 2.2);

(d)      to the extent assignable, all right, title, and interest of Seller in the Permits (as hereinafter defined);

(e)      the Intellectual Property set forth on Schedule 2.1(e);

(f)      the books, papers, records, advertising materials, studies, existing customer lists (including the names and addresses of current, past, and prospective customers related to the Purchased Assets and/or the operation of the Business in connection therewith, together with copies of all records, compilations, and files relating to such customers), price lists, supplier lists, drawings, designs, quality control specifications, cost analyses, flow sheets, equipment and parts lists, depreciation schedules, process sheets, instruction manuals, employee and accounting records, and other records of Seller relating to the Purchased Assets, the Assumed Liabilities, the Designated Contracts, or the operation of the Business, other than the Retained Records (collectively, the "***Business Records***");

(g)      the telephone, fax, and pager numbers and e-mail addresses assigned to Seller set forth on Schedule 2.1(g);

(h)      all right, title and interest in and to the Real Property, pursuant to the Real Estate Transfer in accordance with the RPA; and

(i)      all deliverables, to the extent existing at closing,  set forth in clauses (i) and (iii) of the definition of Joint Venture Conditions.

**2.2**     **Assignable Contracts; Designated Contracts.**

(a)      Schedule 2.2(a)-1 lists all assignable Contracts that are primarily related to the operation of the Business (as presently conducted), and/or the use, ownership, maintenance, and operation of any of the Purchased Assets (collectively, the "***Assignable Contracts***"), each of which Buyer may (but shall in no event be required to) elect to assume and have Seller assign to Buyer. Buyer shall have until that date that is one (1) Business Day prior to the deadline to submit bids in accordance with the Bid Procedures (such date being referred to herein as the "***Contract Designation Date***") to designate which of such Assignable Contracts Buyer wishes to assume and have Seller assign to Buyer at the Closing (collectively, the "***Designated Contracts***"). Schedule 2.2(a)-2 sets forth a list of the initial Designated Contracts that Buyer has designated be assumed by and assigned to Buyer at Closing as of the date of this Agreement (collectively, the "***Initial Designated Contracts***"). Schedule 2.2(a)-3 contains a list of all of the Designated Contracts, which shall be prepared by Buyer and delivered to Seller on or before the Contract Designation Date. In all cases, appropriate additions and deletions to Schedule 2.2(a)-3 shall be made to reflect such elections made by Buyer with respect to the Designated Contracts. Any amendment to Schedule 2.2(a)-3 pursuant to the foregoing provisions of this Section 2.2(a) shall be served by Seller on the parties to the Assignable Contracts that have been added to or deleted from Schedule 2.2(a)-3. For the avoidance of doubt, Buyer shall be responsible for all Cure Costs with respect to any Designated Contracts, other than Cure Costs in respect of Initial Designated Contracts which shall be and remain obligations of Seller.

(b)      Seller and Buyer shall continue to pursue, diligently and in good faith, the full satisfaction of the Joint Venture Conditions.

(c)      Subject to Buyer providing adequate assurance of future performance to the counterparty to each Designated Contract (to the extent required by the Bankruptcy Court), on the Closing Date Seller shall assign to Buyer (or cause the assignment to Buyer of, as applicable), and

Buyer shall assume, the Designated Contracts, all pursuant to an Order of the Bankruptcy Court (which may be the Sale Order).

(d)    The Sale Order shall provide that, as of the Closing, Seller (as applicable) shall assign to Buyer the Designated Contracts and the Designated Contracts shall be identified by (i) the name and date of the Designated Contracts (if available), (ii) the counterparty or counterparties to the Designated Contract, and (iii) the address of such party for notice purposes, all included on an exhibit attached to either the motion filed in connection with the Sale Order or a motion for authority to assume and assign such Designated Contracts or a notice filed pursuant to the Bidding Procedures Order. Such exhibit shall also (A) set forth the amounts necessary to cure any defaults under each of the Designated Contracts, as determined by the Bankruptcy Court, and (B) provide that Buyer is entitled to the benefit of and rights to any security deposits in the form of cash on deposit with the counterparty or counterparties to any Designated Contract.

(e)    Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Designated Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof or in any way adversely affect any of the rights of Buyer, as the assignee or transferee of such Designated Contract or Permit (as the case may be) thereunder. Notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the commercially reasonable efforts of Seller, if such consent or approval is required but not obtained with respect to a Designated Contract or a Permit, Buyer may (in Buyer's sole and absolute discretion) but shall not be required to elect to proceed with the Closing, and in the event Buyer elects to proceed with the Closing then with respect to any Designated Contract or Permit for which consent or approval is required but not obtained, Seller shall cooperate diligently and in good faith, without further consideration, with Buyer in any commercially reasonable arrangement Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Designated Contract or applicable Permit, including enforcement for the benefit of Buyer of any and all rights of Seller against any party to the applicable Designated Contract or applicable Permit arising out of the breach or cancellation thereof by such party; provided further, to the extent that any such arrangement has been made to provide Buyer with the benefits of, or under, the applicable Designated Contract or applicable Permit, from and after Closing, Buyer shall be responsible for, and shall promptly pay all payment and other Liabilities under such Designated Contract or Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Designated Contract or such Permit had been assigned or transferred at Closing (excluding Cure Costs in respect of Initial Designated Contracts, which shall be and remain obligations of Seller); and provided further that with respect to contracts with the United States of America ("US Contracts") or any Permit which cannot be assigned as a matter of law, the failure of the Seller to assign such US Contract or Permit shall not constitute a breach of this Agreement or otherwise relieve the Buyer from its obligation to perform hereunder. Any assignment to Buyer of any Designated Contract or Permit that shall, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained.

**2.3    Retained Assets.** Seller shall retain Seller's right, title, and interest in all assets, properties, and rights of Seller other than the Purchased Assets, including, without limitation, each of the following (collectively, the "***Retained Assets***"):

(a)    all cash, cash equivalents, marketable securities, bank accounts, and other funds of Seller;

(b)     any Contracts that are not specifically included in the Designated Contracts (collectively, the "***Retained Contracts***");

(c)     all corporate books and records that are solely and directly related to the Retained Assets, such as organizational and financial documents, minutes, stock ledgers, Tax Returns, all personnel and other records relating to Seller's employees who do not become employees of Buyer upon the Closing or that Seller is otherwise required by Law to retain, all records of Seller which specifically and exclusively pertain to the Retained Assets or Excluded Liabilities, and all attorney-client privileged materials, including those related to any of the contemplated Transactions (collectively, the "***Retained Records***");

(d)     any shares of capital stock or other equity interest in or issued by Seller or any securities convertible into, exchangeable, or exercisable for shares of capital stock or other equity interest in or issued by Seller or any records regarding same (including minute books or stock or membership interest certificates) and shares of capital stock or equity interest of Seller in any subsidiaries or Affiliates (other than those relating to the Joint Venture, if any);

(e)     the rights that accrue or will accrue to Seller under this Agreement or any of the other Transaction Documents;

(f)     all Tax refunds due Seller in respect of any payment of Taxes made by, or on behalf of, Seller prior to the Closing Date, including, for the avoidance of doubt, all employee retention tax refunds or credits arising as a result of the pre-Closing operation of the Business;

(g)     all current and prior director and officer insurance policies of Seller and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(h)     any security deposits or pre-paid expenses paid prior to the Closing Date and not associated with the Purchased Assets;

(i)     prepaid insurance;

(j)     all insurance policies and binders, all claims, refunds, and credits from insurance claims, insurance policies, or binders due or to become due with respect to such policies or binders and all rights to proceeds thereof;

(k)     all Avoidance Actions; and

(l)     all litigation claims, rights, or causes of action of Seller, including, but not limited to, commercial tort claims.

## <u>SECTION 3</u>

### ASSUMPTION OF CERTAIN LIABILITIES OF SELLER

**3.1     <u>Assumption of Certain Liabilities</u>.**

(a)     In consideration for the transfer of the Purchased Assets by Seller, Buyer shall assume only (i) those Liabilities of Seller relating solely to the Purchased Assets (other than the Cure Costs in respect of any Designated Contracts that are Initial Designated Contracts and the Transfer Taxes) which first arise and relate to, or become due and payable in the ordinary course of business at, any time after the Closing, (ii) any Cure Costs in respect of Designated Contracts

that are not Initial Designated Contracts, and (iii) any Occupancy Costs as provided in <u>Section 7.8</u> (collectively, the "***Assumed Liabilities***").

(b)    ANYTHING CONTAINED HEREIN TO THE CONTRARY NOTWITHSTANDING, EXCEPT FOR THE ASSUMED LIABILITIES SPECIFICALLY DESCRIBED IN <u>SECTION 3.1(a)</u> AND AS PROVIDED IN <u>SECTION 4.7(c)</u> AND <u>SECTION 7.6</u>, BUYER DOES NOT AND SHALL NOT ASSUME, AND BUYER EXPRESSLY DISCLAIMS THE ASSUMPTION OF, ANY AND ALL LIABILITIES, TAXES, OR OBLIGATIONS (FIXED OR CONTINGENT, KNOWN OR UNKNOWN, MATURED OR UNMATURED, OR OTHERWISE) OF SELLER OR ANY OTHER PERSON(S), WHETHER OR NOT ARISING OUT OF OR RELATING TO ANY OF THE PURCHASED ASSETS, THE BUSINESS, THE DESIGNATED CONTRACTS, OR ANY OTHER BUSINESS OF SELLER OR ANY OTHER PERSON(S), ALL OF WHICH LIABILITIES, TAXES, AND OBLIGATIONS SHALL, AT AND AFTER THE CLOSING, REMAIN THE EXCLUSIVE RESPONSIBILITY OF SELLER.

**3.2**    <u>**Excluded Liabilities.**</u>    All of the Excluded Liabilities will remain the sole responsibility of Seller. The term "***Excluded Liabilities***" collectively means each and every Liability of Seller and/or any Affiliate(s) of Seller (other than the Assumed Liabilities), including, without limitation:

(a)    all Liabilities under any of the Transaction Documents;

(b)    all Liabilities for federal, state, local, or foreign Taxes, including Taxes incurred in respect of or measured by (i) the income of Seller earned on or realized prior to the Closing Date, or (ii) any gain and income from the sale of the Purchased Assets and any of the other Transactions;

(c)    all Liabilities under any Employee Benefit Plans or relating to payroll, vacation, sick leave, workers' compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans, health care plans or benefits, or any other employee plans or benefits of any kind for Seller's employees, former employees, or both (including, without limitation, any of the Plant Employees);

(d)    all Liabilities to indemnify any Person by reason of the fact that such Person was an officer, employee, member, manager, or other Representative of Seller;

(e)    all Liabilities or other obligations resulting from any Proceeding relating to Seller, the Business, any of the Purchased Assets, and/or any of the Assumed Liabilities arising out of applicable Law, transactions, actions, or omissions occurring prior to the Closing (for the avoidance of doubt, any obligations to Governmental Authorities relating to the manufacture, distribution and sale of products by Seller prior to the Closing shall remain the sole responsibility of Seller and any obligations to Governmental Authorities relating to the manufacture, distribution and sale of products by Buyer after the Closing, shall be the sole responsibility of Buyer);

(f)    all Liabilities for the payment of the Cure Costs in respect of Initial Designated Contracts;

(g)    all Liabilities for the payment of the Transfer Taxes; and

(h)    all other Liabilities not set forth in <u>Section 3.1(a)</u>.

## SECTION 4

## PURCHASE PRICE

**4.1**   **The Asset Purchase.**   Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, Buyer hereby agrees to purchase from Seller all of the Purchased Assets and assume all of the Assumed Liabilities and Seller hereby agrees to sell to Buyer all of the Purchased Assets, free clear of any and all Encumbrances other than Assumed Liabilities and Permitted Encumbrances, for the Purchase Price.

**4.2**   **Conditions to Buyer's Obligations.**   Buyer's obligation to make the deliveries required of Buyer at the Closing and otherwise consummate the contemplated Transactions shall be subject to the satisfaction of each of the following conditions (unless such condition is waived by Buyer):

(a)   the Sale Order shall become a Final Order on or before January 21, 2025 (the "**Outside Date**");

(b)   all of the representations and warranties of Seller contained herein shall continue to be true, correct, and complete when made and at the Closing (except to the extent expressly made with respect to another date or period, in which case it shall be true, correct, and complete as of such other date) in all material respects, and Seller shall have substantially performed or tendered performance of each and every covenant on Seller's part to be performed which, by its terms, is required to be performed at or before the Closing (including, without limitation, Seller's performance, in all respects, of its covenants hereunder to sell, assign, transfer, convey, and deliver to Buyer all of Seller's right, title, and interest in and to all Purchased Assets free and clear of all Encumbrances);

(c)   Buyer shall have entered into Employment Contracts with at least seventy-five percent (75.00%) of the Designated Employees listed on Schedule 4.2(c), each in form and substance acceptable to Buyer;

(d)   Buyer shall have entered into Employment Contracts with at least seventy-five percent (75.00%) of the Designated Employees listed on Schedule 4.2(d), each in form and substance acceptable to Buyer; provided, however, if prior to the Closing any Designated Employee listed on Schedule 4.2(d) ceases to be employed by Seller as a result of such Designated Employee's death or disability, then such Designated Employee shall be excluded from the determination of whether the seventy-five percent (75%) threshold has been satisfied;

(e)   the Real Estate Transfer and all other transactions contemplated under and pursuant to the RPA shall have been consummated prior to or contemporaneously with the Closing of the Transactions;

(f)   subject to Section 2.2(e), all of the Permits shall have been assigned or issued to Buyer;

(g)   the Joint Venture Conditions shall have been satisfied in full;

(h)   Seller shall have tendered delivery of all items required to be delivered by Seller under Section 4.5(a);

(i)   the Critical Vendor Order shall have been entered by the Bankruptcy Court;

(j)   subject to Section 2.2(e), the Designated Contracts shall have been assigned to Buyer; and

12

(k)     no Proceeding that is not stayed by the Bankruptcy Court shall be pending before any Governmental Authority seeking to restrain or prohibit the contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Law of any Governmental Authority having appropriate jurisdiction.

**4.3     Conditions to Seller's Obligations.**   Seller's obligation to make the deliveries required of Seller at the Closing and otherwise consummate the contemplated Transactions shall be subject to the satisfaction of each of the following conditions (unless such condition is waived by Seller):

(a)     all of the representations and warranties of Buyer contained herein shall continue to be true, correct, and complete when made and at the Closing (except to the extent expressly made with respect to another date or period, in which case it shall be true, correct, and complete as of such other date) in all material respects, and Buyer shall have substantially performed or tendered performance of each and every covenant on Buyer's part to be performed which, by its terms, is required to be performed at or before the Closing;

(b)     no Proceeding that is not stayed by the Bankruptcy Court shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the contemplated Transactions, or seeking to obtain substantial damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Law of any Governmental Authority having appropriate jurisdiction; and

(c)     Buyer shall have tendered delivery of all items required to be delivered by Buyer under Section 4.5(b).

**4.4     Closing.**   The closing of the Transactions (the "***Closing***") shall take place via the electronic exchange of documents upon the full satisfaction of the conditions set forth under Section 4.2, Section 4.3 and Section 4.5 (the date upon which the Closing actually occurs is herein referred to as the "***Closing Date***"), and the Closing shall be effective as of 12:01 a.m. Eastern Time on the Closing Date. Notwithstanding any other provision contained in this Agreement to the contrary, in the event the Closing does not occur on or before the Outside Date, Buyer shall have the right to elect to terminate this Agreement, which Buyer may exercise by delivering written notice of such election to Seller at any time after the Outside Date (but prior to the Closing).

**4.5     Closing Deliveries.**   At the Closing:

(a)     Seller will deliver to Buyer:

(i)     the Bill of Sale, duly executed by Seller, transferring the Purchased Assets to Buyer;

(ii)     all deeds, instruments of transfer and any and all other documents required by the terms of the Real Estate Transfer;

(iii)     the Assignment and Assumption Agreement, duly executed by Seller, effecting the assignment to and assumption by Buyer of the Designated Contracts and the Assumed Liabilities;

(iv)     all deliverables required to satisfy the Joint Venture Conditions in full;

(v)     one or more assignments, each in the form attached hereto as Exhibit F and duly executed by Seller, to effectuate and evidence the transfer of all of Seller's right, title, and interest in and to the Intellectual Property (including, without limitation, the

trademark registrations and applications and domain name registrations included in the Intellectual Property) to Buyer (collectively, the "***Intellectual Property Assignments***");

(vi)      subject to <u>Section 2.2(e)</u>, all written consents required to be obtained or given by any Person in order to consummate any of the contemplated Transactions, and a waiver of any claims on the Business or the Purchased Assets, in such form and substance reasonably acceptable to Buyer;

(vii)     a completed certification of non-foreign status pursuant to Section 1.1445-2(b)(2) of the Treasury Regulations, duly executed by Seller, and if applicable, any certificate, affidavit or other documentation required to establish that no Tax withholding is required under applicable Law;

(viii)    a certificate from a duly-authorized and appointed manager or other officer of Seller, certifying that attached to such certificate are true, correct, and complete copies of (A) Seller's Organizational Documents (including, to the extent applicable, certified copies from each applicable Governmental Authority, and each dated as of a recent date reasonably acceptable to Buyer), (B) the duly and validly adopted resolutions of Seller's members and sole manager, being in full force and effect, authorizing the execution and delivery by Seller of all of the Transaction Documents to which it is a party, all of the contemplated Transactions, and the performance by Seller of its obligations under the Transaction Documents, and (C) a certificate of status, certificate of good standing, or similar certificate for Seller issued by each applicable Governmental Authority (each dated as of a recent date reasonably acceptable to Buyer) (the "***Seller's Closing Certificate***");

(ix)      all deliverables required to assign or issue the Permits to Buyer; and

(x)       such other documents or instruments, in form and substance reasonably acceptable to Buyer, as Buyer may deem reasonably necessary, or as may be required to consummate any of the contemplated Transactions.

(b)       At the Closing, Buyer shall deliver or cause to be delivered to Seller:

(i)       evidence reasonably satisfactory to Seller that Buyer has made the Cash Consideration payment required by <u>Section 4.6</u>;

(ii)      the Assignment and Assumption Agreement duly executed by Buyer;

(iii)     a certificate from a duly-authorized and appointed manager or other officer of Buyer, certifying that attached to such certificate are true, correct, and complete copies of (A) Buyer's Organizational Documents (including, to the extent applicable, certified copies from each applicable Governmental Authority, and each dated as of a recent date reasonably acceptable to Seller), (B) the duly and validly adopted resolutions of Buyer's authorized governing body, being in full force and effect, authorizing the execution and delivery by Buyer of all of the Transaction Documents to which it is a party, all of the contemplated Transactions, and the performance by Buyer of its obligations under the Transaction Documents, and (C) a certificate of status, certificate of good standing, or similar certificate for Buyer issued by each applicable Governmental Authority (each dated as of a recent date reasonably acceptable to Seller) (the "***Buyer's Closing Certificate***"); and

(iv)      such other documents or instruments, in form and substance reasonably acceptable to Buyer, as Buyer may deem reasonably necessary, or as may be required to consummate any of the contemplated Transactions.

**4.6    Purchase Price.** The cash consideration payable at Closing by Buyer to Seller for the transfer of the Purchased Assets shall equal $28,000,000.00 (as adjusted pursuant to Section 4.7, the "**Cash Consideration**").

**4.7    Payment of Purchase Price; Escrow Deposit.**

(a)    Seller shall establish and maintain a separate escrow account (the "**Escrow Account**") with Stretto, Inc. (the "**Escrow Agent**"), pursuant to an escrow agreement in form and substance reasonably satisfactory to the Parties. Seller shall provide notice in writing to Buyer with the account information for such Escrow Account, and within ten (10) Business Days after receiving such notice, Buyer shall pay as a deposit a portion of the Cash Consideration in an amount equal to $2,800,000.00 (the "**Escrow Amount**") into the Escrow Account by wire transfer in immediately available funds. The Escrow Amount shall be held in escrow in the Escrow Account and shall be released as follows: (i) if the Closing occurs, the Escrow Amount and shall be applied towards the Cash Consideration payable by Buyer pursuant to Section 4.6; (ii) if the Closing does not occur due to the termination of this Agreement pursuant to Section 8.4(c)(i), then Seller, upon notice to Buyer shall promptly submit written instructions to the Escrow Agent to release the Escrow Amount to Seller (and such Escrow Amount will be deemed fully earned by Seller as compensation and consideration for entering into this Agreement) and Escrow Agent shall be required to disburse the Deposit to Seller ten (10) days thereafter unless Buyer objects, in good faith, to such disbursement prior to the expiration of such ten-day period; or (iii) if the Closing does not occur due to the termination of this Agreement for any reason other than pursuant to Section 8.4(c)(i), then Buyer, upon notice to Seller, shall submit written instructions to the Escrow Agent to release the Escrow Amount to Buyer and Escrow Agent shall be required to disburse the Deposit to Buyer ten (10) days thereafter unless Seller objects, in good faith, to such disbursement prior to the expiration of such ten-day period. The Escrow Amount shall only constitute property of Seller's bankruptcy estate in the event that the Deposit Amount is required to be released to Seller by the Escrow Agent in accordance with the terms of this Agreement.

(b)    At the Closing, Buyer shall pay to Seller an amount equal to the difference of (x) the Cash Consideration *less* (y) the Escrow Amount, in immediately available funds in accordance with the wire instructions delivered by Seller to Buyer in writing prior to the Closing.

(c)    Taxes (other than Taxes imposed or assessed on income) shall be prorated between Seller and Buyer as of the Closing Date based upon the number of days elapsed in the applicable taxable period as of the Closing Date. All ad valorem property and personal taxes payable upon the Purchased Assets will be prorated between Seller and Buyer for the tax year in which the Closing is held, on the basis of the tax statements for such year; provided, however, if tax statements for the current year are not available as of the Closing Date, the tax proration between Seller and Buyer will be made on the basis of 106% of the taxes for the immediately prior tax year. Notwithstanding anything to the contrary, the tax proration made at Closing will be a final proration between Buyer and Seller.

**4.8    Allocation of Purchase Price.**  Within ninety (90) days after the Closing Date, Buyer shall prepare and deliver to Seller a schedule showing the allocation of the Purchase Price and Assumed Liabilities (together with other items properly treated as purchase price for federal income Tax purposes, including Liabilities deemed to be assumed by Buyer) (the "**Allocation Schedule**"). Buyer shall provide to Seller a preliminary, non-binding Allocation Schedule based on Seller's balance sheet dated as of August 31, 2024 (a true, complete, and accurate copy of which is attached as Schedule 4.8) no later than three (3) days prior to Closing, and Buyer agrees to utilize the same methodologies and proportionate allocation in the final Allocation Schedule as it did in preparing the preliminary, non-binding Allocation Schedule. Seller shall promptly adopt such Allocation Schedule as reasonably proposed by Buyer, and both Parties shall utilize such allocations for all Tax reporting purposes and shall defend any examination or audit relating

thereto in a manner consistent with such allocation. Such allocation shall be reflected, as well, on Form 8594 (Asset Acquisition Statement under Section 1060), which Seller and Buyer shall each file separately with the Internal Revenue Service pursuant to the requirements of Section 1060 of the Code. Any adjustment to the Purchase Price shall be allocated as provided by Treasury Regulation Section 1.1060-1(c).

**SECTION 5**

**REPRESENTATIONS AND WARRANTIES OF SELLER**

Seller hereby represents and warrants to Buyer that the following statements are correct and complete as of both the Effective Date and as of the Closing:

**5.1**    **Existence, Good Standing, and Enforceability.**

(a)    Seller is a corporation duly formed, validly existing, and in good standing under the Law of the State of Delaware and has all requisite power and authority to own and operate the Purchased Assets and to conduct the Business as presently conducted. Schedule 5.1 sets forth Seller's jurisdiction of organization, the other jurisdictions in which Seller is qualified to do business. Seller is duly licensed or qualified to do business as a foreign corporation, and is in good standing under the Law of each other jurisdiction under which such licensing or qualification is necessary pursuant to applicable Law, except where the failure to be so licensed, qualified or in good standing would not reasonably be expected to result in a Material Adverse Effect.

(b)    Seller has the requisite corporate power and authority to execute and deliver this Agreement and the other Transaction Documents to which it is a party, to perform Seller's obligations hereunder and thereunder, and, subject to entry of the Sale Order, to consummate each of the Transactions. The execution and delivery of this Agreement and the other Transaction Documents to which Seller is a party, the performance by Seller of Seller's obligations hereunder and thereunder, and the consummation of each of the Transactions have been duly authorized by all requisite corporate action on the part of Seller, and, subject to entry of the Sale Order, no other authorization or proceedings on the part of Seller is required therefor.

(c)    This Agreement has been, and each of the other Transaction Documents to which Seller is a party will be at or prior to the Closing, duly and validly executed and delivered by Seller and (assuming due authorization, execution, and delivery by Buyer and entry of the Sale Order) this Agreement constitutes, and each of the other Transaction Documents to which Seller is a party when so executed and delivered will constitute, legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their respective terms. The Person(s) signing this Agreement and the other Transaction Documents on behalf of Seller has been duly authorized to execute and deliver this Agreement and the other Transaction Documents.

**5.2**    **Capitalization; Subsidiaries.**    Schedule 5.2-1 sets forth the capitalization of Seller, including a list of all officers and managers of Seller. Except as set forth on Schedule 5.2-2, Seller does not own or control any equity security or other interest of any other Person.

**5.3**    **No Conflict.**    The consummation of the Transactions contemplated by this Agreement and the other Transaction Documents, or compliance by Seller with any of the provisions thereof, after giving effect to the Sale Order, will not conflict with, or result in any violation or breach of, or default (with or without notice or lapse of time, or both) under, or give rise to a right of termination, cancellation, or acceleration of any obligation or to loss of a monetary, economic, or other material benefit under, or give rise to any obligation of Seller to make any payment under, or to the increased, additional, accelerated, or guaranteed rights or entitlements of any Person under, or result in the creation of any Liens upon any of the Purchased Assets under any provision of (a) the Organizational Documents of Seller, (b) any Contract or Permit, (c) any Order, or (d) any applicable Law, except, in each case, where such violation, breach or

16

default would not reasonably be expected to result in a Material Adverse Effect. Except for entry of the Sale Order and as set forth on Schedule 5.3, no consent, waiver, approval, Order, Permit, or authorization of, or declaration or filing with, or notification to, any Governmental Authority or other Person is required on the part of Seller in connection with (i) the execution and delivery of this Agreement and the other Transaction Documents, the compliance by Seller with any of the provisions hereof and thereof, or the consummation of any of the Transactions, (ii) the transfer of the Purchased Assets, or (iii) the continuing validity and effectiveness, immediately following the Closing, of all Designated Contracts.

5.4     **Litigation.** Except as set forth on Schedule 5.4-1, there has not been in the last three (3) years, and currently is no, Proceeding pending or threatened in writing against Seller or any of the Purchased Assets. To Seller's Knowledge, there are no existing facts or circumstances that would reasonably be expected to result in such a Proceeding. Except as set forth on Schedule 5.4-2, Seller is not subject to any outstanding Order. Seller does not hold or possess any commercial tort claims as of the Effective Date with respect to the Purchased Assets.

5.5     **Title to Assets.**  Seller has good, valid, and marketable title to all the Purchased Assets, and at the Closing will deliver the Purchased Assets free and clear of all Encumbrances other than Permitted Encumbrances. The transfer of the Purchased Assets hereunder will convey to Buyer good, valid, and indefeasible title to the Purchased Assets, free and clear of all Encumbrances other than Permitted Encumbrances.

5.6     **Brokers.**  Other than Intrepid Investment Bankers LLC ("***Intrepid***"), no broker, finder, investment banker, or other Person is entitled to any brokerage, finder's, or other fee or commission from Seller in connection with any of the contemplated Transactions. The obligations and Liabilities for the payment of all amounts due to Intrepid hereunder shall be borne solely by Seller.

5.7     **[Intentionally Omitted].**

5.8     **Permits.**  All permits, approvals, licenses, franchises, and other authorizations from any Governmental Authority or other Persons maintained by Seller under applicable Law (i) to operate the Business, (ii) to use, own, maintain, and/or operate any of the Purchased Assets, and/or (iii) in connection with the Designated Contracts and the Assumed Liabilities are set forth on Schedule 5.8 (collectively, the "***Permits***"). At all times from and after its formation, Seller has obtained and maintained in good standing all necessary Permits as required under applicable Law, except where the failure to maintain such Permits would not reasonably be expected to result in a Material Adverse Effect. Seller has not received any written notice regarding the pending, threatened, or anticipated suspension, revocation, impairment, forfeiture, cancellation, invalidation, termination, denial, or nonrenewal of any Permit and, to Seller's Knowledge there are no existing facts, events, or circumstances that would reasonably be expected to result in such any such actions.

5.9     **Customers, Vendors, and Suppliers.** Schedule 5.9 sets forth a list of each of (i) Seller's top ten (10) customers, and (ii) top ten (10) vendors and suppliers, in each case, as measured by total consideration received or paid for each of the last two (2) fiscal years and the eight (8) month period ending as of August 31, 2024.

5.10    **Compliance.**  Seller, for the immediately preceding three (3) years, (a) is and has been in compliance with all Laws, Permits, and Orders applicable to Seller, the Business, and the Purchased Assets (including, without limitation, with respect to its employees and independent contractors), except where any noncompliance by Seller would not reasonably be expected to result in a Material Adverse Effect, and (b) has not been charged with, received any notice of, or to Seller's Knowledge been under investigation or audit with respect to any alleged default under, breach or violation of, or nonconformity with any such applicable Laws, Permits, and Orders.

**5.11** **Employees.** Seller has delivered a true, accurate, and complete list of all persons presently employed by Seller at the facility located on the Real Property and/or who otherwise dedicate all or substantially all of their time to the operation of the Business and/or the use, operation, or maintenance of any of the Purchased Assets (including any such person who is absent from employment due to illness, vacation, injury, military service, or other authorized absence) (such persons, together with any additional employees hired by Seller in connection with the foregoing prior to the Closing, the "***Plant Employees***") indicating their: (i) employer; (ii) job title or position; (iii) principal place of employment; (iv) date of commencement of service and seniority or service date if different than the date of commencement of service; (v) status as full-time or part-time; (vi) status as exempt or non-exempt; (vii) base wages or salary; (viii) other remuneration, including any bonus received or earned by any of them during the present and immediately preceding calendar year and a description of all perquisites, bonuses, and benefits (including vacation, severance, and fringe benefits) they receive or are eligible to receive; (ix) benefit elections in effect; and (x) leave status if absent from active employment.

(a)     With respect to the Plant Employees, except as set forth on Schedule 5.11-2: (i) all Plant Employees are retained "at will"; (ii) to Seller's Knowledge, no Plant Employees intends to terminate their employment with Seller and/or its Affiliates prior to the Closing, or not accept employment with Buyer at the Closing; (iii) to Seller's Knowledge, there is not in existence any pending or threatened strike, slowdown, work stoppage, picketing, interruption of work, lockout or any other similar dispute or controversy, labor-related organizational effort, formal claim or charge of unfair labor practice, other union- or labor-related action or other claim, or other employment dispute against Seller and/or any of its Affiliates; and (iv) none of the Plant Employees are subject to or covered by any collective bargaining agreement, arrangement, or understanding, work rules or practice, or arbitration award, or is represented by any labor organization.

(b)     With respect to each Plant Employees, Seller has copies of such Plant Employee's Form I-9 (Employment Eligibility Verification Form) and all other records, documents, or other papers which are required to be retained with the Form I-9 by the employer pursuant to applicable Laws.

(c)     To Seller's Knowledge, all Plant Employees are properly treated as "exempt" or "non-exempt" from overtime requirements under applicable Law.

**5.12** **Insurance.** Schedule 5.12 sets forth a true, accurate, and complete list of all current insurance policies maintained by Seller relating to the Real Property, the conduct of the Business thereupon, and/or any of the Purchased Assets or Assumed Liabilities. All such policies are in full force and effect (and all premiums due and payable thereon have been or will be paid in full on a timely basis), and no written notice of cancellation, termination, nonrenewal, or other notice that any such policy is no longer in full force or effect or that the issuer of any such policy is not willing or able to perform its obligations thereunder has been received by Seller.

**DISCLAIMER; NO OTHER WARRANTIES. EXCEPT FOR THE REPRESENTATIONS OF SELLER EXPRESSLY SET FORTH IN THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENTS TO WHICH SELLER IS PARTY, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY CONCERNING ANY OF THE PURCHASED ASSETS (INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE). EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 5, THE PURCHASED ASSETS ARE PROVIDED "AS IS," "WHERE IS," AND IN "WITH ALL FAULTS" CONDITION.**

## SECTION 6

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller that the following statements are correct and complete as of the Closing:

**6.1** **Organization; Authority.** Buyer is a corporation duly organized, validly existing, and in good standing under the Law of the State of Delaware, and has all requisite power and authority to acquire the Purchased Assets, to enter into this Agreement and the other Transaction Documents, and to perform its obligations hereunder and thereunder.

**6.2** **Enforceability.** The execution and delivery of this Agreement and the other Transaction Documents by Buyer, and the performance of its obligations hereunder and thereunder, have been duly authorized by Buyer. Assuming due authorization, execution, and delivery by Seller and entry of the Sale Order, this Agreement and the other Transaction Documents constitute the valid and binding obligations of Buyer enforceable in accordance with their terms. The Person(s) signing this Agreement and the other Transaction Documents on behalf of Buyer has been duly authorized to execute and deliver this Agreement and the other Transaction Documents.

**6.3** **Acknowledgement by Buyer.** BUYER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT OR IN THE RPA, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS INCLUDING EXPENSES TO BE INCURRED IN CONNECTION WITH THE PURCHASED ASSETS, THE PHYSICAL CONDITION OF ANY PERSONAL PROPERTY COMPRISING A PART OF THE PURCHASED ASSETS, THE ENVIRONMENTAL CONDITION OR OTHER MATTER RELATING TO THE PHYSICAL CONDITION OF THE REAL PROPERTY OR IMPROVEMENTS THEREUPON, THE ZONING OF THE REAL PROPERTY OR IMPROVEMENTS THEREUPON, THE VALUE OF THE PURCHASED ASSETS (OR ANY PORTION THEREOF), THE TERMS, AMOUNT, VALIDITY OR ENFORCEABILITY OF ANY ASSUMED LIABILITIES, THE MERCHANTABILITY OR FITNESS OF THE PERSONAL PROPERTY OR ANY OTHER PORTION OF THE PURCHASED ASSETS FOR ANY PARTICULAR PURPOSE, OR ANY OTHER MATTER OR THING RELATING TO THE PURCHASED ASSETS OR ANY PORTION THEREOF. EXCEPT TO THE EXTENT OTHERWISE PROVIDED IN THIS AGREEMENT AND/OR IN THE RPA, BUYER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

**6.4** **Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's, or other fee or commission in connection with the transactions contemplated by this Agreement or any Transaction Document based upon arrangements made by or on behalf of Buyer.

**6.5** **Legal Proceedings.** There are no Actions pending or, to Buyer's Knowledge, threatened against or by Buyer or any Affiliate of Buyer that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred or circumstances exist that may give rise or serve as a basis for any such Action.

**6.6** **Sufficiency of Funds.** Buyer has or will have sufficient cash on hand or other sources of immediately available funds to enable it to make payment of the Cash Consideration and consummate the Transactions.

## SECTION 7

## COVENANTS

**7.1**  **Purchased Assets**.  Seller will promptly (but in no event later than five (5) Business Days after its receipt thereof) deliver to Buyer the original of any mail or other communication received by Seller that relates to any of the Purchased Assets or any of the Assumed Liabilities. Seller will promptly (but in no event later than seven (7) Business Days after its receipt thereof) remit to Buyer any payment relating any of the Purchased Assets that Seller, any Affiliate of Seller, or any Representative of Seller receives or is entitled to receive, together with current, accurate, and complete records relating to such payment.

**7.2**  **Litigation Support**.  If any Party is evaluating, pursuing, contesting, or defending against any Proceeding in connection with (a) any of the Transactions or (b) any fact, situation, circumstance, status, condition, activity, practice, plan, occurrence, event, incident, action, failure to act, or transaction involving any of the Purchased Assets and/or any of the Assumed Liabilities, each other Party will reasonably cooperate with such Party and such Party's counsel in the evaluation, pursuit, contest, or defense, make available its personnel, and provide such testimony and access to its books and records as may be necessary in connection therewith. Each Party will bear its own costs and expenses related to such cooperation.

**7.3**  **Change and Use of Name**.  Within sixty (60) days after the Closing Date, Seller will cease to use, and will not grant any license to use, any name containing (a) the term "Ultra Safe Nuclear" or any variation, abbreviation, diminutive form, or derivation thereof; and/or (b) any name, slogan, logo, or trademark that is (i) a variation, abbreviation, diminutive form, or derivation of the term "Ultra Safe Nuclear", (ii) similar to any of the trademarks acquired by Buyer pursuant to this Agreement, or (iii) similar to any name, slogan, logo, or trademark formerly used by Seller prior to the Closing Date. Seller will take such actions as Buyer may from time to time reasonably request to enable Buyer and its Affiliates to use such name, slogan, logo, or trademark.

**7.4**  **Further Action**.  Seller shall, upon the request of Buyer made from time to time and at any time (whether on or after the Closing Date), and without further consideration (a) execute, file, deliver, and/or record (as applicable) such certifications, certificates, deeds, assignments, transfers, assumptions, conveyances, powers of attorney, receipts, acknowledgments, acceptances, assurances, and other agreements, instruments, and documents as may be reasonably necessary to satisfy and perform the obligations of either Party hereunder; (b) reasonably cooperate in evaluating, pursuing, contesting, or defending any Proceeding in connection with the Purchased Assets and/or the Assumed Liabilities; (c) forward any communication and payments related to the Assumed Liabilities and/or the Purchased Assets; and (d) take any such other actions as may be reasonably necessary for Buyer to receive its full benefits under this Agreement and the other Transaction Documents.

**7.5**  **Access to Records**.  On and after the Closing Date, Seller, on one hand, and Buyer on the other hand, will each afford promptly to the other Party and such Party's agents reasonable access to such other Party's books of account, financial, and other records (including, without limitation, accountant's work papers), information, employees, and auditors to the extent necessary or useful for the other Party in connection with any audit, investigation, dispute, or litigation, or any other reasonable business purpose relating to the Purchased Assets, including, without limitation, Seller's administration of the Bankruptcy Case; provided, however, that any such access shall not unreasonably interfere with the conduct of the business of any Party. Each Party shall bear such Party's own out-of-pocket costs and expenses reasonably incurred in connection with the foregoing.

**7.6**  **Tax Matters**.  Seller and Buyer shall comply with all post-Closing Tax filings as may be required to be filed following the Closing under applicable Law. Buyer shall pay all applicable federal and state sales Taxes, goods and services Taxes, excise Taxes, and all other Taxes, duties, and other like charges properly payable upon and in connection with the sale of the Purchased Assets. Buyer and Seller agree to

furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business, the Purchased Assets, and/or the Assumed Liabilities (including access to books and records, Tax Returns, and tax workpapers of Seller) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any Governmental Authority, and the prosecution or defense of any Proceeding relating to any Tax. Buyer and Seller shall cooperate with each other in good faith in the conduct of any audit or other Proceeding relating to Taxes involving the Business, the Purchased Assets, and/or the Assumed Liabilities. Buyer and Seller will consult and cooperate on a reasonable basis in preparing and timely filing all Tax Returns with respect to any Taxes.

7.7     **Conduct of Business.**  At all times from and after the Effective Date through the Closing, Seller covenants and agrees to:

(a)     subject to any limitations arising as result of Seller's operation as a debtor-in-possession, maintain the operation of the Business and conduct the Business in the ordinary course and in accordance with past business practices, including without limitation using commercially reasonable efforts to maintain all employee staffing;

(b)     subject to any limitations arising as result of Seller's operation as a debtor-in-possession, maintain all the tangible Purchased Assets in accordance with industry-standard or otherwise commercially reasonable practices;

(b)     comply with all applicable Laws, Orders, Permits, and Assignable Contracts in all material respects; and

(c)     allow Buyer and its Representatives reasonable access to the Purchased Assets and the Plant Employees (as mutually agreed upon by the Parties), provided that Seller shall be allowed to have its Representative(s) present at any such meeting and such access shall not unreasonably interfere with Seller's operation of the Business.

7.8     **Removal of Purchased Assets.**  Buyer shall cause all tangible Purchased Assets located at any location other than the Real Property to be removed from such location on or before the date that is ninety (90) days after the Closing Date, provided, however, if all such Purchased Assets are not removed by such date, then Buyer shall be responsible for and shall reimburse Seller or directly pay to the party entitled to receive such amounts all reasonable and documented out-of-pocket costs of occupancy of such premises, including, without limitation, any monthly rent, costs of utilities, security costs, maintenance, and any other costs related to the occupancy of such location (collectively, "***Occupancy Costs***").

## SECTION 8
### MISCELLANEOUS

**8.1     Bankruptcy Matters; Bidding Process.**

(a)     Seller and Buyer acknowledge that this Agreement and the sale of the Purchased Assets is subject to Bankruptcy Court approval. Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that they have taken reasonable steps to obtain the highest or otherwise best offer possible for the Purchased Assets, including giving notice of the contemplated Transactions to creditors and certain other interested parties as ordered by the Bankruptcy Court, and conducting an auction in respect of the Purchased Assets (the "***Auction***"), (ii) Seller must pay the Cure Costs in respect of the Initial Designated Contracts, and (iii) to the extent required by the Bankruptcy Court, Buyer shall provide adequate assurance of future performance to the counterparty to each Designated Contract.

(b)    Seller will promptly file with the Bankruptcy Court a motion (the "***Sale Motion***"), notices, and proposed Orders, to the extent amended as of the Effective Date, each in form and substance reasonably satisfactory to Buyer, seeking the Bankruptcy Court's issuance of:

(i)    the bidding procedures Order attached hereto as <u>Exhibit A</u> (the "***Bidding Procedures Order***"); and

(ii)    the Sale Order attached hereto as <u>Exhibit B</u> (the "***Sale Order***").

(c)    Seller shall serve a copy of the Sale Motion on: (i) all entities known to assert any interest in or Lien upon any of the Purchased Assets; (ii) all parties to any of the Designated Contracts; (iii) all parties that are entitled to notice under Bankruptcy Rule 2002; (iv) the attorneys general of all states in which the Purchased Assets are located; (v) the Office of the United States Trustee; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service and any other Governmental Authority that has filed a claim against Seller and/or any of the Purchased Assets; (viii) all Persons that expressed to Seller an interest in purchasing the Purchased Assets; (ix) any party appearing in the Bankruptcy Case and claiming a secured interest in the Purchased Assets; (x) any party known to Seller and claiming a secured interest in the Purchased Assets; and (xi) any and all other parties directed by the Bankruptcy Court.

(d)    Seller shall deliver to Buyer copies of all motions, applications, and supporting papers prepared by or on behalf of Seller (including forms of orders and notices to interested parties) directly or indirectly relating to the Purchased Assets, the Assumed Liabilities, any of the Transaction Documents, and/or any of the Transactions at least two (2) Business Days prior to the filing thereof in the Bankruptcy Case, so as to allow Buyer to provide reasonable comments for incorporation into the same, except with respect to pleadings (other than the Sale Motion) where circumstances prevent such notice.

(e)    If there is an Auction and Buyer is not the successful bidder at the conclusion of such Auction but is designated as the Backup Bidder, then Buyer shall keep Buyer's bid to consummate the Transactions upon the terms and conditions set forth in the Bidding Procedures Order.

(f)    <u>Break-Up Fee</u>.

(i)    In consideration for Buyer serving as the stalking-horse bidder, and this Agreement being subject to termination in the event Seller receives and accepts a higher and better bid consistent with the bid procedures (collectively, the "***Bid Procedures***") set forth in the Bidding Procedures Order (an "***Alternative Transaction***"), then, so long as this Agreement is not terminated prior to the Closing due to Buyer's uncured material breach or the failure to satisfy the conditions in <u>Section 4.2(c)</u> and <u>(d)</u> hereof, and regardless of whether Buyer makes any matching or competing bids, Seller shall pay to Buyer a stalking-horse bidder fee in an amount equal to $840,000.00 (the "***Break-Up Fee***") and an expense reimbursement of up to $300,000.00 (the "***Expense Reimbursement***" and collectively with the Break-Up Fee, the "***Bidding Protections***") upon the date an Alternative Transaction is consummated.

(ii)    The Parties intend that the Bidding Protections shall be treated as an administrative expense in the Bankruptcy Case, senior to all unsecured claims; <u>provided</u>, <u>however</u>, in no event will the Bidding Protections be paid in the absence of the entry of a sale order approving an Alternative Transaction and consummation of such Alternative Transaction. Seller hereby acknowledges and agrees that: (A) the approval of the Bidding Protections are an integral part of the Transactions contemplated by the Transaction

Documents; (B) in the absence of Seller's obligation to pay the Bidding Protections, Buyer would not have entered into this Agreement or any of the other Transaction Documents; (C) the entry of Buyer into this Agreement and the other Transaction Documents are necessary for preservation of the estate of Seller, and is beneficial to Seller because, in Seller's business judgment, it will enhance Seller's ability to maximize the value of its assets for the benefit of its creditors; (D) the Bidding Protections are reasonable in relation to Buyer's costs and efforts and to the magnitude of the contemplated Transactions, and to Buyer's lost opportunities resulting from the time spent pursuing the contemplated Transactions; and (E) time is of the essence with respect to the entry of the Bidding Procedures Order by the Bankruptcy Court, approving, among other things, the process by which bids may be solicited for the Purchased Assets. Seller's agreement to pay the Bidding Protections are subject to the Bankruptcy Court's entry of the Bidding Procedures Order.

(iii)    Notwithstanding anything to the contrary contained in this Agreement, Seller's obligations under this Section 8.1(f) shall survive the expiration or earlier termination of this Agreement.

(g)    Debtor in Possession.  During the pendency of the Bankruptcy Case, Seller shall continue to operate its business as a debtor in possession pursuant to the Bankruptcy Code.

(h)    Bankruptcy Pleadings.  Seller shall file the Bid Procedures motion and Sale Order on or within two (2) Business Days following the Petition Date, requesting, among other things, approval of the Bid Procedures and entry of the Bidding Procedures Order no later than twenty-five (25) days following the Petition Date.

(i)    The Bidding Procedures and Sale Order.

(i)    The Bidding Procedures Order, including the Bid Procedures and the Sale Order, each shall not be amended, modified, or supplemented from the forms attached hereto without Buyer's prior written consent.

(ii)    Seller agrees not to challenge Buyer's standing with respect to any motion, hearing, or other matter related to this Agreement, any of the other Transaction Documents, or any Qualified Bid (as defined in the Bid Procedures), or other sale of any of the Purchased Assets.

(iii)    The Bid Procedures may be modified by Seller as required by the terms of the Bidding Procedures Order, including pursuant to any further order entered by the Bankruptcy Court.

(j)    Bankruptcy Efforts.  Buyer and Seller shall use their commercially reasonable efforts to cause the Bankruptcy Court to enter (a) the Bidding Procedures Order within twenty-five (25) days following the Petition Date, and (b) the Sale Order within fifty-five (55) days after the Petition Date.

(k)    Public Announcements.  Other than the Parties' mutually-agreed upon press releases and other materials to be issued upon the announcement of this Agreement and the Transactions, with respect to which the Parties shall cooperate in good faith to jointly prepare or communicate consistent with the joint communication policy of the Parties, from and after the Effective Date, neither Party shall make any public announcement or public comment regarding this Agreement or the contemplated Transactions without the prior written consent of the other Party (which consent shall not be unreasonably withheld, delayed, or conditioned), unless and only

to the extent that (i) to the extent required by Order of the Bankruptcy Court, the Bankruptcy Code and the applicable rules; (ii) the furnishing or use of information is required in making any filing or obtaining any authorization of any Governmental Authority required for the consummation of the contemplated Transactions (including any creditor or counterparty approval); or (iii) the furnishing or use of such information as required by applicable Law.

        (l)      The Critical Vendor Motion.

        (i)      Seller shall file, within five (5) days after the Petition Date, a motion seeking authority from the Bankruptcy Court to, in Seller's discretion, pay certain critical vendors (the "***Critical Vendor Motion***") and seeking the entry of an Order allowing that relief (the "***Critical Vendor Order***").  After entry of the Critical Vendor Order and prior to the Closing, Seller shall provide Buyer with periodic reports of all payments made in accordance with the Critical Vendor Order.

        (ii)      Seller agrees to provide Buyer a draft of the Critical Vendor Motion at least two (2) days prior to filing and a schedule of anticipated payments (the "***Critical Vendor Payments***").

**8.2**    **Efforts to Close.**  Upon the terms and subject to the conditions of this Agreement, each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper, or advisable consistent with applicable Law to consummate and make effective, in the most expeditious manner practicable, each of the Transactions. Without limiting the foregoing provisions of this Section 8.2, Seller shall not voluntarily dismiss the Bankruptcy Case and shall use Seller's commercially reasonable efforts to:

        (a)      obtain the Bidding Procedures Order on or before November 22, 2024;

        (b)      obtain the Sale Order on or prior to December 24, 2024 and, upon entry, cause it not to be (i) vacated, stayed, or reversed, or (ii) amended, supplemented, or otherwise modified, except (A) with the express written consent of Buyer or (B) as would not be adverse to Buyer in any material respect; and

        (c)      subject to the fiduciary duties of the trustee appointed by the Bankruptcy Court with respect to the Bankruptcy Case, prevent the dismissal of the Bankruptcy Case.

**8.3**    **Bidding Procedures Order.**  Seller agrees to comply (and to cause its Representatives to comply) with each of the procedures, terms, conditions, and provisions set forth in the Bidding Procedures Order.

**8.4**    **Termination.**

        (a)      Termination by Mutual Consent.  This Agreement may be terminated at any time prior to the Closing Date by mutual written agreement of the Parties.

        (b)      Termination by Either Buyer or Seller.  This Agreement may be terminated at any time prior to the Closing Date by either Buyer or Seller if any Governmental Authority shall have issued an Order permanently restraining, enjoining, or otherwise prohibiting the consummation of the Transactions and either (i) thirty (30) days shall have elapsed from the issuance of such Order and such Order has not been removed or vacated, or (ii) such Order shall have become final and non-appealable.

        (c)      Termination by Seller.  This Agreement may be terminated with no further liability hereunder at any time prior to the Closing Date by Seller as follows:

(i)       if there has been a material breach of this Agreement by Buyer, which breach Buyer has failed to cure within fourteen (14) days following its receipt of written notice thereof from Seller;

(ii)      if any condition precedent of Seller specified in Section 4.3 shall not have been satisfied or waived and shall have become impossible to satisfy, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Seller;

(iii)     if the Closing Date shall not have occurred on or before 5:00 p.m. Eastern Standard Time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Seller's failure to meet its obligations hereunder, including, without limitation, using all diligent and commercially reasonable efforts to obtain approval of the Sale Order by the dates set forth herein; or

(iv)      if at the conclusion of any auction for the Purchased Assets, Buyer is not determined (in accordance with the Bidding Procedures Order) to be either (A) the successful bidder or (B) Backup Bidder.

(d)      Termination by Buyer.  This Agreement may be terminated at any time prior to the Closing Date by Buyer as follows:

(i)       if the Sale Order does not become a Final Order by the Outside Date;

(ii)      if there has been a material breach of this Agreement by Seller, which breach Seller has failed to cure within fourteen (14) days following its receipt of written notice thereof from Buyer;

(iii)     if any condition precedent of Buyer specified in Section 4.2 shall not have been satisfied or waived or, in the reasonable judgment of Buyer, shall have become reasonably unlikely to be satisfied, unless the failure of such condition to have been satisfied was caused primarily by a material breach by Buyer;

(iv)      if the Bankruptcy Court enters any Order approving any Alternative Transaction and Buyer has not been designated as a Backup Bidder in accordance with the Bidding Procedures Order or confirming any chapter 11 plan involving any Alternative Transaction;

(v)       if at the conclusion of any auction for the Purchased Assets, Buyer is not determined (in accordance with the Bidding Procedures Order) to be either (A) the successful bidder or (B) Backup Bidder;

(vi)      if the Closing Date shall not have occurred on or before 5:00 p.m. Eastern Standard Time on the Outside Date, but only to the extent the Closing has not occurred as of the Outside Date for reasons other than Buyer's failure to meet its obligations hereunder; or

(vii)     if the Bankruptcy Case shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or a Chapter 11 trustee has been appointed, and, with respect to any of the foregoing, the trustee or Seller (as applicable) does not timely indicate his/her willingness to fulfill the obligations in this Agreement.

(e)      Effect of Termination.  In the event of termination by either Party of this Agreement pursuant to this Section 8.4, written notice thereof shall as promptly as practicable be given to the other Party and thereupon this Agreement shall terminate and the Transactions shall

be abandoned without further action by the Parties hereto. Upon termination of this Agreement, (i) except as otherwise provided in this Agreement, this Agreement shall cease to have any force or effect, (ii) the Parties shall not have any liability to each other, except for fraud occurring on or before the date of such termination; provided, however, that if this Agreement is terminated by reason of (x) any material breach hereof by the non-terminating Party, or (y) any material non-compliance by the non-terminating Party with its obligations under this Agreement, which non-compliance shall have been the cause of the failure of one or more of the conditions to the terminating Party's obligations to effect the Transactions to have been satisfied, the terminating Party's right to pursue any available remedies at law will survive such termination unimpaired, and (c) the Parties under this Agreement shall cease to have any further obligations under this Agreement except pursuant to this Section 8.4 through Section 8.16 inclusive (as such obligations are affected by any defined terms contained herein relating thereto), and (d) all filings, applications and other submissions made pursuant to the Transactions shall, to the extent practicable, be withdrawn from the Government Authority or Person to which made.

(f)    Notification of Certain Events.  Seller shall give notice to Buyer promptly upon becoming aware of any occurrence or failure to occur, of any event, which occurrence or failure to occur has caused or could reasonably be expected to cause any condition to the obligations of Buyer to affect the Transactions not to be satisfied. If Seller gives Buyer a notice pursuant to this Section 8.4(f), then Buyer is permitted to terminate this Agreement pursuant to Section 8.4(d)(iii).

**8.5    Further Assurances.**  The Parties agree, upon receipt of any reasonable request from the other Party and without expense to the other Party, to furnish such further information and to do such further acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement, the other Transaction Documents, and the contemplated Transactions. Seller and Buyer shall cooperate and make available to each other, as reasonably requested, all information, records, and documents necessary to prepare or review any Tax Returns, financial statements, reports, or any calculations required pursuant to this Agreement or any of the other Transaction Documents.

**8.6    Expenses of the Transactions.**  Each of the Parties shall bear its own fees and expenses incident to this Agreement, the other Transaction Documents, and all of the contemplated Transactions. Seller and Buyer each agree that neither Party will assume any Liability to pay fees and expenses of the other in connection with the Transactions, except as specifically set forth herein.

**8.7    Remedies Cumulative.**  Each right, power, and remedy of a Party provided in this Agreement or now or hereafter existing, whether legal or equitable, and whether provided by statute, Contract, or otherwise, shall be cumulative and concurrent and shall be in addition to every other right, power, or remedy of such Party, and the exercise of any one or more of such rights, powers, or remedies shall not preclude the simultaneous or later exercise of any or all such other rights, powers, or remedies.

**8.8    Waiver.**  Any term or condition of this Agreement may be waived in writing at any time by a Party entitled to the benefit thereof, and any such term or condition may be modified at any time, only by an agreement in writing executed by a duly authorized officer of each of the Parties. No delay or failure on the part of any Party in exercising any rights hereunder, and no partial or single exercise thereof, shall constitute a waiver of such rights or of any other rights hereunder.

**8.9    Severability.**  If any provision of this Agreement shall be held unenforceable, invalid, or void to any extent for any reason, such provision shall remain in full force and effect to the maximum extent allowable, if any, and the enforceability or validity of the remaining provisions of this Agreement shall not be affected thereby.

**8.10    Entire Agreement; Amendment.**  Except to the extent expressly set forth otherwise herein, in any other Transaction Document, or in any other written instrument signed by each party to be

bound thereby which makes reference to this Agreement, this Agreement and all Exhibits and Schedules attached hereto and referenced herein, together with all of the other Transaction Documents, embodies the entire agreement in relation to the subject matter hereof, and no representations, warranties, covenants, understandings, agreements, or otherwise in relation thereto exist between or among the Parties. This Agreement may not be amended or modified except by a written instrument signed by all Parties.

   **8.11**  <u>**Binding Effect.**</u> This Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, executors, personal Representatives, successors, and assigns.

   **8.12**  <u>**Notices**</u>. All notices and other communications required or permitted under this Agreement shall be in writing and shall be deemed given upon: (i) personal delivery, (ii) on the date sent by e-mail transmission of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient, (iii) confirmed delivery by a standard overnight courier service, or when delivered by hand, or (iv) the date of receipt when mailed in the United States by certified or registered mail, postage prepaid, in each case addressed as respectively set forth in this <u>Section 8.12</u>, or to such other address as any Party shall have previously designated by such a notice in accordance with the foregoing provisions of this <u>Section 8.12</u>.

    If to Seller:

      c/o Ultra Safe Nuclear Corporation
      200 Europia Avenue
      Oak Ridge, TN 37830
      Attention: Mr. Kurt Terrani
          Steven Cuevas, Esq.
      Email:  kurt.terrani@usnc.com
          s.cuevas@usnc.com

    <u>*With a mandatory copy (which shall not constitute notice to Seller) to*</u>:

      Young Conaway Stargatt & Taylor, LLP
      Rodney Square
      1000 North King Street
      Wilmington, DE 19801
      Attention: Matthew B. Lunn, Esq.
          Craig D. Grear, Esq.
      Email:  mlunn@ycst.com
          cgrear@ycst.com

    If to Buyer:

      Standard Nuclear, Inc.
      100 Park Avenue, Suite 3505
      New York, NY 10017
      Attention: Thomas Hendrix
      Email:  tommy@standardnuclear.com

    <u>*With a mandatory copy (which shall not constitute notice to Buyer) to*</u>:

      Nelson Mullins Riley & Scarborough LLP
      330 Madison Avenue | 27th Floor
      New York, NY 10017
      Attention: Arina Shulga
      Email:  arina.shulga@nelsonmullins.com

8.13   **Counterparts.**   This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement, and the execution of a counterpart of the signature page to this Agreement shall be deemed the execution of a counterpart of this Agreement. This Agreement may also be executed through the use of electronic signature, which each Party acknowledges and agrees is a lawful means of obtaining signatures in the United States. The delivery of this Agreement and the Parties' executed counterpart signature pages hereto may be made by e-mail transmission of a PDF document, and such signatures shall be treated as original signatures for all applicable purposes.

8.14   **Interpretation.**   The Parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. Accordingly, any applicable Law that would require interpretation of any ambiguities in this Agreement against the Party that has drafted it, is of no application and is hereby expressly waived. The Section titles and headings contained herein are for convenience only and shall not affect the construction hereof. The Recitals set forth herein are by this reference fully incorporated into this Agreement. Except to the extent specifically provided otherwise herein, or to the extent the context of the relevant provision(s) of this Agreement clearly indicate(s) or require(s) otherwise, as used in this Agreement: (a) the singular shall be deemed to include the plural and vice versa; (b) words of any gender (including the neuter form) shall be held to include all genders (including the neuter form); (c) the terms "herein," "hereof," "hereunder," or other similar terms, refer to this Agreement as a whole and not only to the particular sentence, subsection, or section in which any such term may be employed; and (d) the word "including" shall be deemed to be for purposes of identifying only one or more of the possible alternatives, and the entire provision in which such word appears shall be read as if the phrase "including, without limitation" were actually used in the text.

8.15   **Governing Law; Venue; Jury Waiver.**   This Agreement shall be governed by and construed in accordance with the Law of the State of Delaware, without giving effect to principles of conflict of laws. In the event any Proceeding is commenced related to or arising from, under, or connection with the terms of this Agreement, the Parties agree that venue shall lie exclusively in the Bankruptcy Court or, to the extent the Bankruptcy Court does not have jurisdiction, a court of competent jurisdiction located in the State of Delaware. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable Law, any objection that they may now or hereafter have to the laying of venue of any such dispute brought in such courts or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a judgment in any such dispute may be enforced in other jurisdictions in any manner provided by applicable Law. EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT OR THE OTHER DOCUMENTS REFERRED TO HEREIN IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS, OR THE CONTEMPLATED TRANSACTIONS. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF ANY PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A PROCEEDING, (B) SUCH PARTY HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) SUCH PARTY MAKES THIS WAIVER VOLUNTARILY, AND (D) SUCH PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS <u>SECTION 8.15</u>.

8.16   **Survival.**   The (a) representations and warranties of the Parties and (b) covenants and agreements of the Parties that by their terms are to be performed at or prior to the Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith shall not survive the Closing. The covenants and agreements contained herein that by their terms are to be performed after the

Closing shall survive the Closing indefinitely except the covenants, agreements, representations and warranties contained in <u>Section 4.8</u> and <u>Section 7.6</u> shall survive until expiration of the statute of limitations applicable to the matters covered thereby (giving effect to any waiver, mitigation or extension thereof).

      **8.17**    **<u>Disclosure Schedules</u>.**  Each exception set forth in the Disclosure Schedules shall qualify the specific representations and warranties which are referenced in the applicable section of such Disclosure Schedules as well as any other section of such Disclosure Schedules to the extent that it is reasonably apparent from the face of such exception that such exception is applicable to such other section. The inclusion of any matter on any Schedule will not be deemed an admission by any Party that such listed matter is material. Matters reflected in the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in such Disclosure Schedules, and any such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.

      **8.18**    **<u>Bulk Sales Laws</u>.** Buyer hereby waives compliance by Seller, and Seller hereby waives compliance by Buyer, with the provisions of the "bulk sales", "bulk transfer" or similar Laws of any jurisdiction, other than any Laws that would exempt any of the transactions contemplated by this Agreement from any Tax liability that would be imposed but for such compliance.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF,** the Parties have each duly executed this Agreement as of the Effective Date hereof.

**SELLER:**

**ULTRA SAFE NUCLEAR CORPORATION,**
a Delaware corporation

By:_____
Name: Kurt Terrani
Title: Interim CEO

**ULTRA SAFE NUCLEAR CORPORATION
– TECHNOLOGIES,**
a Washington corporation

By:_____
Name: Steven J Cuevas
Title: Director

**USNC HOLDINGS, LLC,**
a Washington limited liability company

By:_____
Name: Kurt Terrani
Title: Interim CEO

**BUYER:**

**STANDARD NUCLEAR, INC.,**
a Delaware corporation

By:_____
Name:  Thomas Hendrix
Title:   CEO

*[Signature Page to Asset Purchase Agreement]*

**IN WITNESS WHEREOF,** the Parties have each duly executed this Agreement as of the Effective Date hereof.

<u>**SELLER:**</u>

**ULTRA SAFE NUCLEAR CORPORATION,**
a Delaware corporation

By: _____
Name:
Title:

**ULTRA SAFE NUCLEAR CORPORATION – TECHNOLOGIES,**
a Washington corporation

By: _____
Name:
Title:

**USNC HOLDINGS, LLC,**
a Washington limited liability company

By: _____
Name:
Title:

<u>**BUYER:**</u>

**STANDARD NUCLEAR, INC.,**
a Delaware corporation

By: _*Thomas Hendrix*_____
Name:    Thomas Hendrix
Title:    CEO

[*Signature Page to Asset Purchase Agreement*]

## <u>EXHIBIT A</u>

## BIDDING PROCEDURES ORDER

(To be Attached)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Ultra Safe Nuclear Corporation, *et al.*,[1] | Case No. 24-12443 (KBO) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 33** |

**ORDER (I) APPROVING BIDDING PROCEDURES IN CONNECTION
WITH SALE OF THE DEBTORS' ASSETS AND RELATED BID PROTECTIONS;
(II) APPROVING FORM AND MANNER OF NOTICE; (III) SCHEDULING AUCTION
AND SALE HEARING; (IV) AUTHORIZING PROCEDURES GOVERNING
ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND
UNEXPIRED LEASES; AND (V) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "**Motion**")[2] of the Debtors, for the entry of an

order (this "**Order**"):  (i) approving bidding procedures, substantially in the form attached as

**Annex 1** hereto (the "**Bidding Procedures**"), to govern the marketing and sale of all or

substantially all of the Debtors' assets (the "**Assets**"), and approving bid protections in

connection therewith; (ii) authorizing the Debtors to schedule an auction to sell the Assets

(the "**Auction**") and scheduling the hearing to approve a sale of the Assets (the "**Sale Hearing**");

(iii) approving the form and manner of notice of the proposed sale transactions, the Bidding

Procedures, the Auction, the Sale Hearing, and related dates and deadlines; (iv) authorizing

procedures governing the assumption and assignment of certain executory contracts and

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Ultra Safe Nuclear Corporation (9774); Ultra Safe Nuclear Corporation – Technologies (9815); USNC-Power Ltd. (6500); and Global First Power Limited (7980).  The Debtors' mailing address is 200 Europia Ave., Oak Ridge, Tennessee 37830.

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Stalking Horse Agreement and the Motion, as applicable, and to the extent of any inconsistency in the defined terms, the Stalking Horse Agreement shall govern.

unexpired leases (the "**Assumed Contracts**") to the prevailing bidder(s) acquiring the Debtors' assets (each, a "**Successful Bidder**"); and (v) granting related relief, as more fully described in the Motion; and the Court having reviewed the Motion and the First Day Declaration; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and the Court may enter an order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the record herein; and after due deliberation thereon; and good and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND CONCLUDED THAT**:[3]

A.      The statutory bases for the relief requested in the Motion are sections 105(a), 363, 365, 503, and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 3007, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedures of the United States Bankruptcy Court for the District of Delaware.

---

[3]      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To

B.       Good and sufficient notice of the Motion was given and no further notice is required except as otherwise provided for herein.  A reasonable opportunity to object or be heard regarding the relief granted by this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rule 2002 and all other interested parties.

C.       The Debtors have articulated good and sufficient reasons for the Court to grant the relief requested in the Motion regarding the sales process, including (a) the payment of the Bid Protections, if necessary, to the Stalking Horse Bidder in accordance with the Stalking Horse Agreement; (b) the scheduling of the Bid Deadline (as defined in the Bidding Procedures), the Auction, and the Sale Hearing with respect to the proposed sale of the Assets; (c) the establishment of procedures to fix the Proposed Cure Amounts (as defined below) to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption, assignment, and/or transfer of the Assumed Contracts; and (d) approval and authorization to serve the Sale Notice.

D.       The Sale Notice (in substantially the form annexed hereto as Annex 2), is reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, the Auction, the Sale Hearing, and the Sale and any and all objection deadlines related thereto.

E.       The Cure Notice (in substantially the form annexed hereto as Annex 3) is reasonably calculated to provide all non-Debtor counterparties (the "**Counterparties**") to the Debtors' executory contracts and unexpired leases (each, a "**Contract**" and, collectively, the "**Contracts**") with reasonable and proper notice of the potential assumption and assignment of their Contract and any cure amounts relating thereto, although the mere listing of any Contract

_____

the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To

on the Cure Notice does not require or guarantee that such Contract will be assumed and assigned and all rights of the Debtors and Stalking Horse Bidder with respect to such Contracts are reserved (including, but not limited to, with respect to whether any Contract constitutes an executory contract and whether any Contract shall be an Assumed Contract under the Stalking Horse Agreement.

      F.     The Stalking Horse Agreement was negotiated by the Debtors, their advisors, and the Stalking Horse Bidder in good faith and at arms-length.

      G.     The Bidding Procedures are reasonably designed to maximize the value to be achieved for the Assets.

      H.     The Bid Protections, as approved by this Order, are fair and reasonable and provide a benefit to the Debtors' estates and stakeholders.

      I.     If triggered in accordance with the terms of the Stalking Horse Agreement, payment of the Bid Protections, under this Order and upon the conditions set forth in the Stalking Horse Agreement and the Bidding Procedures, are (i) an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code; (ii) reasonably tailored to encourage, rather than hamper, bidding for the Assets by providing a baseline of value, increasing the likelihood of competitive bidding at the Auction, and facilitating participation of other potential bidders in the sale process, thereby increasing the likelihood that the Debtors will receive the best possible price and terms for the Assets subject to the Stalking Horse Agreement; (iii) of substantial benefit to the Debtors' estates and stakeholders; (iv) reasonable and appropriate; (v) a material inducement for, and conditions necessary to, ensure that the Stalking Horse Bidder will continue pursuit of the proposed

---

the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

agreement to purchase the Assets subject to the Stalking Horse Agreement; and (vi) reasonable in relation to the Stalking Horse Bidder's lost opportunities resulting from the time and money spent pursuing such transaction.

J.       The entry of this Order is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

**IT IS HEREBY ORDERED THAT**:

1.       The Motion is GRANTED as set forth herein.

2.       The Debtors are authorized to enter into the Stalking Horse Agreement, subject to higher or otherwise better offers, in accordance with this Order.

## **Bidding Procedures**

3.       The Bidding Procedures, substantially in the form attached hereto as **Annex 1**, are hereby approved.  The Debtors are authorized, but not directed, to take any and all actions necessary or appropriate to implement the Bidding Procedures.

4.       All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled except as otherwise set forth herein.

## **Notice Procedures**

5.       The Sale Notice, substantially in the form attached hereto as Annex 2, is hereby approved and shall be served within three (3) business days of entry of this Order, upon the Notice Parties identified in the Motion.  Service of the Sale Notice as described in the Motion shall be sufficient and proper notice of the Sale and sale process contemplated by this Order with respect to all known interested parties.

**Assignment Procedures**

6.      The Cure Notice, substantially in the form attached hereto as <u>Annex 3</u>, is hereby approved.  The Cure Notice shall identify the Contracts, including the Government Contracts, of the Debtors that may be assumed and assigned in connection with the sale of the Assets and provide the corresponding cure amounts that the Debtors believe must be paid to cure all defaults under each of the Contracts as contemplated by section 365 of the Bankruptcy Code (the "**Proposed Cure Amounts**").  No later than three (3) business days after entry of this Order, the Debtors shall serve the Cure Notice on all Counterparties.  If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts Schedule but was not (any such Contract, a "**Previously Omitted Contract**"), the Debtors shall, promptly following discovery thereof (but in no event later than two (2) business days following discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted Contract notifying such counterparties of the Debtors' intention to assume and assign such Previously Omitted Contract to the Successful Bidder, including the Proposed Cure Amounts relating thereto (the "**Previously Omitted Contract Notice**").

7.      For the avoidance of doubt, no Government Contract may be assumed and/or assigned without:  (i) the express written consent of the Government; (ii) the execution of a novation agreement applicable to the Government Contract; and (iii) the payment of all outstanding obligations and cure amounts arising under or related to such Government Contract.

**Objection Procedures**

8.      Notwithstanding anything to the contrary in the Motion, any objection to any aspect of the relief requested in the Motion must:  (i) be in writing and filed with this Court; (ii) comply with the Bankruptcy Rules; (iii) set forth the name of the objecting party, the nature

and amount of any claims or interests held or asserted against the Debtors' estates or properties,

the basis for the objection, and the specific grounds therefor; and (iv) be served upon (so as to be

received by) the following parties (collectively, the "Objection Notice Parties") by the applicable

deadline established in this Order:

(a)　　　[proposed] counsel to the Debtors, Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Matthew B. Lunn, Esq. (mlunn@ycst.com), and Elizabeth S. Justison, Esq. (ejustison@ycst.com);

(b)　　　the U.S. Trustee, 844 King Street, Room 2207, Wilmington, Delaware 19801, Attn: Malcolm M. Bates, Esq. (malcolm.m.bates@usdoj.gov);

(c)　　　counsel to the DIP Lender and Prepetition First Lien Lender, (a) Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, New York 10019-6022, Attn: Robert M. Hirsh, Esq. (robert.hirsh@nortonrosefulbright.com) and Francisco Vazquez, Esq. (francisco.vazquez@nortonrosefulbright.com), and (b) Morris James LLP, 500 Delaware Ave., Suite 1500, Wilmington, Delaware 19801, Attn: Eric J. Monzo, Esq. (emonzo@morrisjames.com);

(d)　　　counsel to the Prepetition Secured Noteholder; Greenberg Traurig, One Vanderbilt Avenue, New York, New York 10017, Attn: Nathan A. Haynes, Esq. (haynesn@gtlaw.com); and

(e)　　　proposed counsel to the official committee of unsecured creditors, (a) Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, Attn: Robert J. Gayda, Esq. (gayda@sewkis.com) and Catherine V. LoTempio, Esq. (lotempio@sewkis.com), and (b) Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801, Attn: Christopher M. Samis, Esq. (csamis@potteranderson.com) and Jeremy W. Ryan, Esq. (jryan@potteranderson.com).

9.　　　Objections, other than the objections served pursuant to Paragraph 10, below, if

any, to the relief requested in the Motion shall be considered at the Sale Hearing, other than

objections expressly described in paragraphs 11 or 12 of this Order, and must be served upon

(such as to be received by) the Objection Notice Parties, **on or before 4:00 p.m. (prevailing**

**Eastern Time) on December 11, 2024 (the "Sale Objection Deadline")**; *provided,* that

objections, if any, to material modifications to the form of Sale Order with a Successful Bidder

and to the form of asset purchase agreement with a Successful Bidder other than the Stalking Horse Bidder, must be made by the Buyer Specific Objection Deadline (defined below).   For the avoidance of doubt, objections to the form of Sale Order attached as Exhibit B to the Stalking Horse Agreement and/or to the Stalking Horse Agreement must be made by the Sale Objection Deadline.

10.     Each Counterparty shall have until 4:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable) (the "**Contract Objection Deadline**") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, the amount of the Proposed Cure Amounts, but excluding any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code or, other than the Stalking Horse Bidder, on the basis of the identity of the Successful Bidder.  Any unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; provided that the Debtors shall have the right to adjourn any Sale Hearing without the consent of any objecting party.

11.     Each Counterparty may raise objections as to adequate assurance of future performance or on the basis of the identity of the Successful Bidder until 4:00 p.m. (prevailing Eastern time) on the date that is five (5) days after the filing and service by the Debtors to the Counterparty of a notice identifying the applicable Successful Bidder, which, for the avoidance of doubt, may be provided with the Cure Notice or the Previously Omitted Contract Notice or at any time thereafter with respect to the Stalking Horse Bidder; *provided*, *however*, that objections, if any, on the basis of the identity of the Successful Bidder or adequate assurance of future performance by the Successful Bidder, to the extent that the Successful Bidder is not the Stalking

8

Horse Bidder, shall not, in any event, be raised later than one (1) hour prior to the commencement of the Sale Hearing (the "**Buyer Specific Objection Deadline**").  Any such objection must be filed and served on the Debtors and their counsel, any statutory committee appointed in these chapter 11 cases and its proposed counsel, and the applicable Successful Bidder or Stalking Horse Bidder, as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline.  Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

12.     Unless the Counterparty to any Contract timely files an objection to its Cure Amount or to the assumption and assignment of its Contract and timely serves a copy of such objection in accordance with this Order, such Counterparty shall forever be barred and estopped from objecting (a) to the Cure Amount as the amount to cure all defaults to satisfy section 365 of the Bankruptcy Code and from asserting that any additional amounts are due or defaults exist; (b) that any conditions to assumption and assignment must be satisfied under such Contract before it can be assumed and assigned or that any required consent to assignment has not been given; or (c) that the Successful Bidder has not provided adequate assurance of future performance as contemplated by section 365 of the Bankruptcy Code.  For the avoidance of doubt, Counterparties may seek Cure Amounts with respect to defaults that occur between the deadline to object to Proposed Cure Amounts and the assumption of the underlying Contract, if any.

13.     The inclusion of a Contract, including a Government Contract, or other agreement on the Cure Notice shall not constitute or be deemed a determination or admission by the Debtors and their estates or any other party in interest that such Contract or other agreement is, in

fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code, and any and all rights of the Debtors and their estates with respect thereto are hereby reserved.

14.     If a Counterparty does not timely object to: (a) the Proposed Cure Amount for its Contracts; (b) the ability of the Successful Bidders(s) (including the Stalking Horse Bidder or such other Successful Bidders(s)) to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code; or (c) any other matter pertaining to assumption or assignment, then the Proposed Cure Amounts owed to such Counterparty shall be paid as soon as reasonably practicable after the effective date of the assumption and assignment of such Assumed Contract or as the Counterparty and Successful Bidder may otherwise agree.

15.     In the event of a timely filed objection by a Counterparty regarding any Cure Amount with respect to any of the Contracts, the Cure Amounts owed to such Counterparty shall be paid as soon as reasonably practicable after the later of (i) the effective date of the assumption and assignment of such Assumed Contract, and (ii) the entry of a final order that resolves the dispute and approves the assumption and assignment of such Assumed Contract.

### Auction and Sale Hearing

16.     The Debtors shall file a notice identifying all Qualified Bidders (the "Qualified Bid Notice") within twenty-four (24) hours after the Debtors determine which Bids (if any) are Qualified Bids.  The Debtors shall serve the Qualified Bid Notice on all parties that have requested notice pursuant to Bankruptcy Rule 2002.

17.     The Debtors are authorized to conduct the Auction as set forth in the Bidding Procedures.

18.     The Debtors are authorized to conduct the Sale without the necessity of complying with any state or local bulk transfer laws or requirements.

19.     Each bidder participating at the Auction shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

20.     No entity, other than the Stalking Horse Bidder, shall be entitled to any expense reimbursement, break-up fee, "topping," termination, contribution, or other similar fee or payment.

21.     **The Bid Deadline is December 9, 2024 at 4:00 p.m. (Prevailing Eastern Time).  The Auction shall commence on December 12, 2024 at 10:00 a.m. (Prevailing Eastern Time).  The Sale Hearing will be conducted on December 18, 2024 at 3:00 p.m. (Prevailing Eastern Time)**.  The Debtors may seek the entry of an order of this Court at the Sale Hearing approving and authorizing the Sale to the Stalking Horse Bidder or, if there is an Auction, the highest or otherwise best offer(s) at the Auction, as applicable, on terms and conditions consistent with the applicable purchase agreement.  The Sale Hearing may be adjourned or rescheduled without notice other than a notice or hearing agenda filed with the Court or by an announcement of the adjourned date at the Sale Hearing.

22.     The Debtors shall file a notice identifying the Successful Bidder and the material terms of the Successful Bidder's bid within twenty-four (24) hours of the conclusion of the Auction, if any.

## <u>Approval of Bid Protections</u>

23.     The Break-Up Fee is approved in the amount of $840,000 and the Expense Reimbursement is approved in the amount of $300,000.  The Break-Up Fee and Expense Reimbursement shall be paid pursuant to the terms of the Stalking Horse Agreement.

24.     The obligation of the Debtors to pay the Bid Protections: (i) shall be entitled to administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code; *provided further* that the Bid Protections shall be payable directly out of the proceeds of, and as a

precondition to an Alternative Transaction (as defined in the Stalking Horse Agreement); (ii) shall survive the termination of the Stalking Horse Agreement; and (iii) shall be payable in accordance with the terms set forth in the Stalking Horse Agreement, as modified herein.

25.    The Debtors' obligations under this Order, the provisions of this Order and the portions of the Stalking Horse Agreement pertaining to the Bidding Procedures, including Bid Protections, shall survive conversion of these chapter 11 cases to cases under Chapter 7 of the Bankruptcy Code, confirmation of any plan of reorganization or liquidation, or discharge of claims thereunder and shall be binding upon the Debtors, any Chapter 7 trustee, the reorganized or reconstituted debtors, as the case may be, after the effective date of a confirmed plan or plans in the Debtors' cases (including any order entered after any conversion of the cases of the Debtors to cases under Chapter 7 of the Bankruptcy Code).

## **Miscellaneous Provisions**

26.    Subject to section 363(k) of the Bankruptcy Code, the rights of the DIP Lender to credit bid with respect to any assets on which they hold liens are expressly reserved; *provided* that in the event of a credit bid, such credit bid shall contain a cash component sufficient to pay any Break-Up Fee and Expense Reimbursement actually required to be paid by the Debtors with respect to the assets subject to such credit bid, which cash component shall be used solely to pay such Bid Protections subject to the terms provided in the Stalking Horse Agreement related to such Assets.

27.    UT Battelle, LLC timely raised an informal objection to the Motion, which is resolved as follows.  Entry of this Order is without prejudice to the rights of UT-Battelle, LLC to renew its objection to the Sale, the potential assumption and assignment of license agreements with UT-Battelle, LLC, and/or approval of the Stalking Horse Agreement, including section 2.2(e) thereof.

28.     Notice of the Motion as provided therein shall be deemed good and sufficient notice, and the requirements of Bankruptcy Rule 6004(a) are satisfied by such notice or otherwise deemed waived.

29.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

30.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

31.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

32.     Attached hereto as **Schedule A** is a summary of the key dates established by this Order.

33.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

**SCHEDULE A**

| Event | Date |
|---|---|
| Service of Sale Notice (as defined below) | **Three (3) business days after the entry of this Bidding Procedures Order** |
| Bid Deadline | **December 9, 2024 at 4:00 p.m. (ET)** |
| Sale Objection Deadline (as defined below) | **December 11, 2024 at 4:00 p.m. (ET)** |
| Auction (if applicable) | **December 12, 2024 at 10:00 a.m. (ET)** |
| Sale Hearing | **December 18, 2024 at 3:00 p.m. (ET)** |
| Sale Closing | **No later than December 27, 2024** |

### Annex 1

**Bidding Procedures**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Ultra Safe Nuclear Corporation, *et al.*,[1] | Case No. 24-12443 (KBO) |
| Debtors. | (Jointly Administered) |

### BIDDING PROCEDURES FOR THE SALE OF THE DEBTORS' ASSETS

On [•], 2024, the United States Bankruptcy Court for the District of Delaware (the "**Court**") entered the *Order (I) Approving Bidding Procedures in Connection with Sale of Assets of the Debtors, (II) Approving Form and Manner of Notice, (III) Scheduling Auction and Sale Hearing, (IV) Authorizing Procedures Governing Assumption and Assignment of Certain Contracts and Unexpired Leases, and (V) Granting Related Relief* [Docket No. {•}] (the "**Bidding Procedures Order**"),[2] by which the Court approved the following procedures (these "**Bidding Procedures**"). These Bidding Procedures set forth the process by which the Debtors are authorized to conduct an auction (the "**Auction**") for the sale (the "**Sale**") of substantially all of the Debtors' assets (collectively, the "**Assets**").

Subject to the terms of these Bidding Procedures, interested parties may bid on the Assets (i) in individual lots, (ii) as a collective whole, or (iii) in any combination.

1. **Submissions to the Debtors.**

All submissions to the Debtors required to be made under these Bidding Procedures must be directed to each of the following persons unless otherwise provided (collectively, the "**Notice Parties**"):

A. **Debtors.** Ultra Safe Nuclear Corporation, *et al.*, 200 Europia Ave., Oak Ridge, Tennessee 37830, Attn: Steven Cuevas (s.cuevas@usnc.com).

B. **Debtors' [Proposed] Counsel.** Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000 North King Street, Wilmington, Delaware 19801, Attn: Michael R. Nestor, Esq. (mnestor@ycst.com), Matthew B. Lunn, Esq. (mlunn@ycst.com), and Elizabeth S. Justison, Esq. (ejustison@ycst.com).

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are: Ultra Safe Nuclear Corporation (9774); Ultra Safe Nuclear Corporation – Technologies (9815); USNC-Power Ltd. (6500); and Global First Power Limited (7980). The Debtors' mailing address is 200 Europia Ave., Oak Ridge, Tennessee 37830.

[2] All capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order.

C.    **Debtors' Investment Banker.**  Intrepid Investment Bankers LLC, 1221 Avenue of the Americas, 9th Floor, New York, New York 10020, Attn:  Carl Comstock (ccomstock@intrepidib.com) and Lorie Beers (lbeers@intrepidib.com).

D.    **Counsel for the DIP Lender and Prepetition First Lien Lender.**  Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, New York 10019-6022, Attn: Robert M. Hirsh, Esq. (robert.hirsh@nortonrosefulbright.com) and Francisco Vazquez, Esq. (Francisco.vazquez@nortonrosefulbright.com), and Morris James LLP, 500 Delaware Ave., Suite 1500, Wilmington, Delaware 19801, Attn:  Eric J. Monzo, Esq. (emonzo@morrisjames.com).

E.    **Counsel for the Prepetition Secured Noteholder.**  Greenberg Traurig, One Vanderbilt Avenue, New York, New York 10017, Attn:  Nathan A. Haynes, Esq. (haynesn@gtlaw.com).

F.    **Proposed counsel to the Committee.** Seward & Kissel LLP, One Battery Park Plaza, New York, New York 10004, Attn:  Robert J. Gayda, Esq. (gayda@sewkis.com) and Catherine V. LoTempio, Esq. (lotempio@sewkis.com), and Potter Anderson & Corroon LLP, 1313 North Market Street, 6th Floor, Wilmington, Delaware 19801, Attn:  Christopher M. Samis, Esq. (csamis@potteranderson.com) and Jeremy W. Ryan, Esq. (jryan@potteranderson.com).

**2.    Potential Bidders.**

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity (other than the Stalking Horse Bidder) interested in consummating a Sale (a "**Potential Bidder**") must deliver or have previously delivered:

(i)    an executed confidentiality agreement on terms acceptable to the Debtors (a "**Confidentiality Agreement**"), to the extent not already executed; and

(ii)    information demonstrating (in the Debtors' reasonable business judgment) that the Potential Bidder has the financial capability to consummate the applicable Sale, including, but not limited to, the most current audited and latest unaudited financial statements (the "**Financials**") of the Potential Bidder (or such other form of financial disclosure acceptable to the Debtors in their discretion) (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Assets, (x) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Debtors, in consultation with:  (a) the DIP Lender and Prepetition First Lien Lender, and (b) the advisors to the Committee (collectively, the "**Consultation Parties**"), and (y) a written funding commitment acceptable to the Debtors and their advisors, in consultation with the Consultation Parties, of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale).

To the extent any of the Consultation Parties become potential bidders, such Consultation Party shall immediately cease being a Consultation Party and, in the case of the Committee, shall immediately be walled off from any discussions with the Committee's advisors in their capacity as Consultation Parties, until such time as their bid may be withdrawn.

**3.    Stalking Horse Bidder.**

The Debtors have entered into (as more fully described in the Stalking Horse Agreement) a purchase agreement (the "**Stalking Horse Agreement**") with Standard Nuclear, Inc., where Standard Nuclear, Inc. will serve as a stalking horse bidder (the "**Stalking Horse Bidder**") for certain of the Debtors' Assets, as set forth in the Stalking Horse Agreement.

**4.    Qualified Bidders.**

(a)    A "**Qualified Bidder**" is a Potential Bidder whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the applicable Sale and whose Bid is a Qualified Bid (as defined below), that the Debtors, in consultation with the Consultation Parties, determine should be considered a Qualified Bidder. Prior to the commencement of the Auction, the Debtors' advisors will (i) notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder and (ii) provide to the Qualified Bidders for such Assets copies of all Qualified Bids with respect to such Assets. The Stalking Horse Bidder shall be deemed a Qualified Bidder at all times and for all purposes with respect to the Assets to which its Bid (the "**Stalking Horse Bid**") relates, and notwithstanding anything in these Bidding Procedures, the Stalking Horse Bid shall be deemed a Qualified Bid for all purposes.

(b)    The Debtors shall provide regular updates to the Consultation Parties on Potential Bidders and shall specifically identify any Potential Bidder who did not qualify to be a Qualified Bidder and the Debtors' basis for such determination. If any Potential Bidder is determined by the Debtors, in consultation with Consultation Parties, not to be a Qualified Bidder, the Debtors will refund such Qualified Bidder's Deposit and all accumulated interest thereon promptly after the Bid Deadline.

(c)    Between the date that the Debtors notify a Potential Bidder that it is a Qualified Bidder and the Auction, the Debtors, in consultation with the Committee, may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Except as otherwise set forth in the Stalking Horse Agreement, without the written consent of the Debtors, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided that* any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures.

**5.    Due Diligence.**

Potential Bidders shall be eligible to receive due diligence information and access to the Debtors' electronic data room (the "**Data Room**") and to additional non-public information

regarding the Debtors. In addition, the Debtors will provide to Potential Bidders reasonable due diligence information, as requested by such Potential Bidders in writing, as soon as reasonably practicable after such request, and the Debtors shall post to the Data Room all written due diligence provided to any Potential Bidder. For all Potential Bidders other than the Stalking Horse Bidder, the due diligence period will end on the Bid Deadline, and subsequent to the expiration of the due diligence period, the Debtors shall have no obligation to furnish any due diligence information. The Stalking Horse Bidder's due diligence period with respect to its Stalking Horse Bid has expired or will expire in accordance with the Stalking Horse Agreement; *provided, however*, that the Stalking Horse Bidder shall retain access to the Data Room and shall receive all other due diligence information provided to any Potential Bidders on the same terms and timing that such Data Room access and due diligence information are made available to other Potential Bidders.

The Debtors shall not furnish any confidential information relating to the Assets, liabilities of the Debtors, or a Sale to any person except to the Stalking Horse Bidder, a Potential Bidder or to such Potential Bidder's duly authorized representatives to the extent expressly permitted by the applicable Confidentiality Agreement. The Debtors and their advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided that*, the Debtors may decline to provide such information to Potential Bidders who, at such time and in the Debtors' reasonable business judgment after consultation with the Consultation Parties, have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the applicable Sale.

The Debtors also reserve the right, subject to the terms of the Stalking Horse Agreement and after consultation with the Consultation Parties, to withhold any diligence materials that the Debtors determine are sensitive after notifying the Potential Bidder requesting such materials of such determination. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Potential Bidder in accordance with these Bidding Procedures.

**All due diligence requests must be directed to Intrepid Investment Bankers LLC, 1221 Avenue of the Americas, 9th Floor, New York, NY 10020, Attn: Carl Comstock (ccomstock@intrepidib.com), Lorie Beers (lbeers@intrepidib.com), and Jacob Lee (jacoblee@intrepid.com).**

(a)     **Communications with Potential Bidders.**

Notwithstanding anything to the contrary in these Bidding Procedures, all direct communications between and amongst Potential Bidders regarding the Debtors or their Assets shall involve the Debtors and the Debtors' advisors. No Potential Bidder shall communicate with any other Potential Bidder absent prior written consent from the Debtors.

(b)     **Due Diligence from Potential Bidders.**

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Debtors or their advisors regarding the ability of the Potential Bidder to consummate the applicable Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for

the Debtors to determine, in consultation with the Consultation Parties, that such bidder is no longer a Potential Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Debtors and each of their respective advisors and representatives shall be obligated to maintain in confidence any such confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures or with the prior written consent of such bidder. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding process or in accordance with the terms of any applicable confidentiality agreement.

**6.    Bid Requirements.**

A proposal, solicitation, or offer (each, a "**Bid**") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (the "**Bid Requirements**") as determined by the Debtors, in consultation with the Consultation Parties, shall constitute a "**Qualified Bid**"). The Stalking Horse Bid will be deemed a Qualified Bid for all purposes without any further action required by the Stalking Horse Bidder.

**(a)    Identification of Bidder.**  Each Bid must fully disclose the following:  (i) the legal identity of each person or entity bidding for the Assets and/or otherwise sponsoring, financing (including through the issuance of debt in connection with such Bid) or participating in (including through license or similar arrangement with respect to the Assets to be acquired in connection with such Bid) the Auction in connection with such Bid and the complete terms of any such participation; and (ii) any past or present connections or agreements with the Debtors, any Stalking Horse Bidder, any other known Potential Bidder or Qualified Bidder, or any officer or director of any of the foregoing (including any current or former officer or director of the Debtors.

**(b)    Assets.**  Each Bid must clearly state which Assets (including any executory contracts and unexpired leases) and liabilities of the Debtors the Qualified Bidders are agreeing to purchase and assume.  For the avoidance of doubt, a Bid may be on the Assets in either (i) individual lots, (ii) as a collective whole, or (iii) in any combination.

**(c)    Purchase Price.**  Each Bid must clearly set forth the cash purchase price to be paid for the applicable Asset Category (the "**Purchase Price**"), *provided*, *however,* that the DIP Lender shall be entitled to credit bid any portion of their outstanding secured obligations subject to section 363(k) of the Bankruptcy Code with respect to any assets on which they hold liens in accordance with the final order approving the Debtors' post-petition financing.  Each Bid must also specify how the Purchase Price is allocated among the Assets.

**(d)    Minimum Bid.**  The Minimum Bid for the Assets subject to the Stalking Horse Bid is $29,390,000 equal to the Stalking Horse Bid amount of $28,000,000 plus (i) the Bid Protections (defined below) of $1,140,000 and (ii) the Minimum Overbid Increment of $250,000.

**(e)    Deposit.**  Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the Purchase Price of the Bid, to be held in a segregated account to be identified and established by the Debtors (the "**Deposit**").  The Debtors reserve the right to increase the Deposit requirement, after consultation with the Committee.

(f)     **Assumption of Obligations.**  Each Bid must identify the obligations contemplated to be assumed by such Bid, and be on terms in the aggregate (together with the other consideration contemplated in such Bid) no less favorable to the Debtors than the Stalking Horse Agreement (if any), as determined in the Debtors' business judgment, and after consultation with the Consultation Parties.  Other than the obligations to be assumed, the Assets shall be sold free and clear of all liens, claims, interests, and encumbrances (collectively, the "**Encumbrances**"), and any Encumbrances shall attach to the net proceeds of the Sales after payment of any applicable Break-Up Fee.

(g)     **The Same or Better Terms.**  In addition to meeting or exceeding the applicable Minimum Bid, each Bid must be on terms that are no less favorable in the aggregate (together with the other consideration contemplated in such Bid), in the Debtors' business judgment and after consultation with the Consultation Parties, than the terms of the Stalking Horse Agreement.  Each Bid must include duly executed, non-contingent purchase agreement and other transaction documents necessary to effectuate the transactions contemplated in the Bid and shall include a schedule of assumed contracts to the extent applicable to the Bid.  Each Bid should be based on the form of the Stalking Horse Agreement, which is available in Word format in the Data Room, and must include a copy of the Stalking Horse Agreement clearly marked to show all changes requested by the Qualified Bidder, including those relating to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid, including a form of sale order marked against the applicable sale order (collectively, the "**Qualified Bid Documents**").

(h)     **Committed Financing / Adequate Assurance Information.**  To the extent that a Bid is not accompanied by evidence of the Qualified Bidder's capacity to consummate the Sale set forth in its Bid with cash on hand, each Bid must include committed financing documents to the satisfaction of the Debtors (in consultation with the Consultation Parties) that demonstrate that the Qualified Bidder has: (i) received sufficient debt and/or equity funding commitments to satisfy the Qualified Bidder's Purchase Price and other obligations under its Bid; and (ii) adequate working capital financing or resources to finance going concern operations for the Assets and the proposed transactions.  Such funding commitments or other financing must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have only those covenants and conditions acceptable to the Debtors, in consultation with the Consultation Parties.  In addition to evidence of financial wherewithal to timely consummate the transaction, a Bid must include adequate assurance information with respect to any executory contracts or unexpired leases included or that may be included in the Bid in a form that allows the Debtors to serve such information on any counterparties to any contracts or leases being assumed and assigned in connection with the Sale that have requested, in writing, such information.

(i)     **Contingencies; No Financing or Diligence Outs.**  A Bid shall not be conditioned on the obtaining or the sufficiency of financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy at the closing of specified representations and warranties or the satisfaction at the closing of specified conditions, which shall not be more burdensome, in the Debtors' business judgment, and after consultation with the Consultation Parties, than those set forth in the Stalking Horse Agreement (if any).

**(j)      Demonstrated Financial Capacity.**    A Qualified Bidder must have, in the Debtors' business judgment (in consultation with the Consultation Parties) the necessary financial capacity to consummate the proposed transactions required by its Bid (including, if necessary, to obtain transfer of any of the Debtors' licenses, permits, and to obtain any necessary surety bonds or other financial assurances) and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid.

**(k)      Time Frame for Closing.**    Closing of the Sale as to any Asset related to a Bid by a Qualified Bidder (a "**Closing**") must be reasonably likely (based on availability of financing, antitrust, or other regulatory issues, experience, and other considerations) to be consummated, if selected as the Successful Bid, on or before December 27, 2024.

**(l)      Binding and Irrevocable.**    Except as provided herein, a Qualified Bidder's Bid for the Assets shall be irrevocable unless and until the Debtors (in consultation with the Consultation Parties) accept a higher Bid for such Assets and such Qualified Bidder is not selected as the Backup Bidder for such Assets.  If selected as Backup Bidder, such Bid shall be irrevocable until the Closing of a Successful Bid for such Assets.

**(m)      Expenses; Disclaimer of Fees**.    Each Bid (other than the Stalking Horse Bid) must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation.  For the avoidance of doubt, no Qualified Bidder (other than the Stalking Horse Bidder) will be permitted to request, nor be granted by the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

**(n)      Authorization.**    Each Bid must contain evidence that the Qualified Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

**(o)      As-Is, Where-Is.**    Each Bid must include a written acknowledgement and representation that the Qualified Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Assets prior to making its offer; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bidder's Bid or accompanying asset purchase agreement.

**(p)      Adherence to Bid Procedures.**    By submitting its Bid, each Qualified Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction.

**(q)    Regulatory Approvals and Covenants.**  A Bid must set forth each regulatory and third-party approval required for the Qualified Bidder to consummate the applicable Sale, if any, and the time period within which the Qualified Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible) and any undertakings that will be required by the Debtors in connection with such regulatory and third party approvals.  For the avoidance of doubt, each Bidder must acknowledge that consummation of such Bidders' Bid shall not be contingent on obtaining government, regulatory, or other third-party approvals for novation of the Government Contracts or any necessary security clearances.

**(r)    Consent to Jurisdiction.**  The Qualified Bidder must submit to the jurisdiction of and entry of final orders by the Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of bids, the Auction, the construction and enforcement of these Bidding Procedures, the transaction documents related to the Sale, and the Closing, as applicable.

**(s)    Bid Deadline.**  Each Bid must be transmitted via email (in .pdf or similar format) so as to be <u>actually received</u> on or before December 9, 2024 at 4:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**") by the Notice Parties.

## 7.    Auction.

If the Debtors receive a Qualified Bid for the Assets, other than the Stalking Horse Bid for such Assets, if any, the Debtors will conduct the Auction to determine the Successful Bidder with respect to such Assets.  If the Debtors do not receive a Qualified Bid for the Assets (other than the Stalking Horse Bid for such Assets), the Debtors will not conduct the Auction as to such Assets and shall designate the Stalking Horse Bidder's Bid for such Assets as the Successful Bid for such Assets.

Prior to the commencement of the Auction, the Debtors will notify each Qualified Bidder of the highest or otherwise best Qualified Bid for the Assets for which such Qualified Bidder submitted a Bid, as determined in the Debtors' reasonable business judgment, in consultation with the Consultation Parties (the "**Baseline Bid**"), and provide copies of the applicable Qualified Bid Documents supporting the applicable Baseline Bid to each Qualified Bidder.  The Debtors shall consult with the Consultation Parties as to how the Debtors are valuing the Bids made by Qualified Bidders during the Auction.

The Auction shall take place at the offices of Intrepid Investment Bankers LLC, 1221 Avenue of the Americas, 9th Floor, New York, New York 10020 on December 12, 2024 at 10:00 a.m. (prevailing Eastern Time), or such later date and time as selected by the Debtors.  For the avoidance of doubt, so long as the Stalking Horse Bidder has executed the Stalking Horse Agreement and not breached the Stalking Horse Agreement as of the date of the Auction, the Stalking Horse Bidder is deemed to have participated in the Auction for all purposes, whether or not the Stalking Horse Bidder makes a bid at the Auction.

The Debtors will file a notice of any change to the time or location of the Auction and will serve such notice on all bidders and all parties requesting service under Bankruptcy Rule 2002 at least twenty-four (24) hours prior to the Auction or as soon as the Debtors become aware of such change.

The Auction shall be conducted in a timely fashion according to the following procedures:

**(a)        The Debtors Shall Conduct the Auction.**

The Debtors and their advisors shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid for the Assets.  All incremental Bids made thereafter shall be Overbids (defined below) for such Assets and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids on such Assets.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

Only the Debtors, the Qualified Bidders, the DIP Lender and Prepetition First Lien Lender, the Prepetition Secured Noteholder, members of the Committee, and each such parties' respective legal and financial advisors shall be entitled to attend the Auction, along with any other creditor, and any other party the Debtors deem appropriate (*provided, however,* that any party other than the Qualified Bidders, the DIP Lender and Prepetition First Lien Lender, the Prepetition Secured Noteholder, members of the Committee, and each such parties' respective legal and financial advisors shall be required to provide notice to the Debtors at least two (2) days prior to the auction by sending an email to Troy Bollman, paralegal for counsel to the Debtors, at tbollman@ycst.com; the Debtors will provide copies of any such notices to the Qualified Bidders, the DIP Lender and Prepetition First Lien Lender, the Prepetition Secured Noteholder, members of the Committee, and each such parties' respective legal and financial advisors within one (1) day of receipt.  The Qualified Bidders shall appear at the Auction in person and may speak or bid themselves or through duly authorized representatives.  Only Qualified Bidders shall be entitled to bid at the Auction.

**(b)        Terms of Overbids.**

"**Overbid**" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid and accepted by the Debtors, in consultation with the Consultation Parties, as a higher or otherwise better bid.  Each applicable Overbid must comply with the following conditions:

(i)        **Minimum Overbid Increment.**  The initial Overbid for the Assets subject to the Stalking Horse Bid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid for the subject Assets, giving effect to the credit for the Break-Up Fee for the Stalking Horse Bid that is a Baseline Bid (as described below), by an incremental amount that is not less than $250,000 (the "**Minimum Overbid Increment**").  Except as may be otherwise provided in the Stalking Horse Agreement, the Debtors reserve the right, after consultation with the Consultation Parties, to announce reductions or

increases in the Minimum Overbid Increment for the Assets at any time during the Auction.  For the avoidance of doubt, if any Overbid is made as to the Assets subject to the Stalking Horse Agreement, the Stalking Horse Bidder shall be entitled to a dollar-for-dollar credit against the Minimum Overbid equal to the amount of the Stalking Horse Bidder's Break-Up Fee pursuant to the Stalking Horse Agreement to take into account that, if the Stalking Horse Bidder is the Successful Bidder (as defined below), no payment of the Stalking Horse Bidder's Break-Up Fee will be required. Conversely, if a Bidder other than the Stalking Horse Bidder is the Successful Bidder as to the Assets subject to the Stalking Horse Agreement, the net proceeds available to the Debtors for any such Assets will be reduced by the amount of the Break-Up Fee of the Stalking Horse Bidder under the Stalking Horse Agreement and paid to the Stalking Horse Bidder at closing of such Bidder's Bid.

(ii) **Conclusion of Each Overbid Round.**  Upon the solicitation of each round of applicable Overbids, the Debtors, in consultation with the Committee, may announce a deadline (as may be extended from time to time, the "**Overbid Round Deadline**") by which time any Overbids must be submitted to the Debtors.

(iii) **Overbid Alterations.**  An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable in the aggregate to the Debtors' estates than any prior Bid or Overbid, as determined in the Debtors' reasonable business judgment, in consultation with the Committee, but shall otherwise comply with the terms of these Bidding Procedures.

**(c)**      **Closing the Auction.**

(i)    The Auction shall continue until there is only one non-overlapping Bid for the Assets that the Debtors determine, in their reasonable business judgment, in consultation with the Consultation Parties, to be the highest or otherwise best Bid for such Assets.  Such Bid shall be declared the "**Successful Bid**," for such Assets and such Qualified Bidder, the "**Successful Bidder**" for such Assets at which point the Auction will be closed as to such Assets.  Such acceptance by the Debtors of the Successful Bid is conditioned upon approval by the Court of the Successful Bid.

(ii)    The Debtors shall have no obligation to consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall not constitute a Qualified Bid.

(iii)     Within twenty-four (24) hours after closing the Auction, the Debtors shall cause the Qualified Bid Documents for each Successful Bid and Backup Bid to be filed with the Court.

**(d)**          **No Collusion; Good-Faith *Bona Fide* Offer.**

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding, and (ii) its Bid is a good-faith *bona fide* offer and it intends to consummate the proposed transaction on the terms of its Qualified Bid if selected as the Successful Bidder.

**8.     Backup Bidder.**

(a)     Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted for the Assets, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction for such Assets, as determined by the Debtors in the exercise of their reasonable business judgment, and in consultation with the Consultation Parties (the "**Backup Bid**"), shall be required to serve as a backup bidder (the "**Backup Bidder**") for such Assets, and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Debtors.

(b)     The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder. The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement. The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder or as otherwise provided in the Stalking Horse Agreement.

(c)     If a Successful Bidder fails to consummate the approved transactions contemplated by its Successful Bid, the Debtors may select the applicable Backup Bidder as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. The defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all remedies available against the defaulting Successful Bidder, including specific performance, if applicable, unless otherwise provided in the Stalking Horse Agreement should the Stalking Horse Bidder be the Successful Bidder. For the avoidance of doubt, if the Deposit becomes property of the Debtors' estates, the Deposit shall be subject to the liens and super-priority claims granted in favor of the DIP Lender under the interim

authorizing the Debtors to obtain postpetition financing and related relief and the final order thereon.

### 9.    Reservation of Rights.

The Debtors reserve their rights to modify these Bidding Procedures in their reasonable business judgment, and in consultation with the Consultation Parties, at or prior to the Auction, with respect to: (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) cancelling the Auction; and (e) rejecting any or all bids or Bids; *provided, however*, that nothing in this Section shall limit any rights or remedies of the Stalking Horse Bidder under the Stalking Horse Agreement with respect to material modifications to these Bidding Procedures, the Bidding Procedures Order or the agreed form of sale order; *provided further* that any modification of these Bidding Procedures shall not be inconsistent with the Stalking Horse Agreement, the Bidding Procedures Order, or any other order of the Bankruptcy Court entered in these chapter 11 cases, and shall be disclosed to each Qualified Bidder at the Auction.

### 10.    Sale Hearing.

A hearing to consider approval of the Sale of the Assets to the Successful Bidders (or to approve the Stalking Horse Agreement, as applicable, if no Auction is held) (the "**Sale Hearing**") is currently scheduled to take place at 3:00 p.m. (ET) on December 18, 2024 before the Honorable Karen B. Owens in the United States Bankruptcy Court for the District of Delaware, 824 N. Market Street, 6th Floor, Courtroom No. 3, Wilmington, Delaware 19801.

**The Sale Hearing may be continued to a later date by the Debtors, by filing a hearing agenda and/or sending notice prior to, or making an announcement at, the Sale Hearing.  No further notice of any such continuance will be required to be provided to any party (excluding the Stalking Horse Bidder).**

At the Sale Hearing, the Debtors shall present the Successful Bids to the Court for approval.

### 11.    Bidding Protections.

To provide an incentive and to compensate the Stalking Horse Bidder for performing the substantial due diligence and incurring the expenses necessary and entering into a Stalking Horse Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed to pay the Stalking Horse Bidder, under the conditions and in the amount set forth in the Bidding Procedures Order, (i) a break-up fee in the amount of $840,000 (the "**Break-Up Fee**") and (ii) an expense reimbursement in the amount of  $300,000 (the "**Expense Reimbursement**" and, together with the Break-Up Fee, the "**Bid Protections**"). The Break-Up Fee and the Expense Reimbursement shall each be paid pursuant to the terms of the Stalking Horse Agreement.

The obligation of the Debtors to pay the Bid Protections: (i) shall be entitled to administrative expense status under sections 503(b) and 507(a)(2) of the Bankruptcy Code,

*provided, however,* that the Bid Protections shall be payable directly out of the proceeds of, and as a precondition to an Alternative Transaction (as defined in the Stalking Horse Agreement); (ii) shall survive the termination of the Stalking Horse Agreement; and (iii) shall be payable in accordance with the terms set forth in the Stalking Horse Agreement, as modified by the Bidding Procedures Order.

### 12. Return of Deposit; Remedies.

The Deposit of the Successful Bidder shall be applied to the respective Purchase Price of such transaction at closing.  The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Debtors (in consultation with the Consultation Parties) and shall be returned (other than with respect to the Successful Bidder, and the Backup Bidder) on or within five (5) business days after the Auction, including the Deposit of the Stalking Horse Bidder if it is not the Successful Bidder or Backup Bidder.  Upon the return of the Deposits, their respective owners shall receive any and all interest that will have accrued thereon.

If a Successful Bidder fails to consummate a proposed transaction because of a breach by such Successful Bidder, and except as otherwise provided in the Stalking Horse Agreement, the Debtors will not have any obligation to return the Deposit deposited by such Successful Bidder, which may be retained by the Debtors as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Debtors (except, in the case of a Stalking Horse Bidder, as otherwise provided in the Stalking Horse Agreement), and the Debtors shall be free to consummate the proposed transaction with the applicable Backup Bidder without the need for an additional hearing or order of the Court, *provided* that nothing herein shall prohibit any party from seeking an additional hearing or order of the Court.

### 13. Fiduciary Out.

Nothing in these Bidding Procedures shall require the board of directors, board of managers, or similar governing body of a Debtor to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent such board of directors, board of managers, or such similar governing body determines, or based on the advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

### 14. Contract Procedures.

Within three (3) business days from the entry of the Bidding Procedures Order, the Debtors shall file and serve on all counterparties (the "**Counterparties**") to their executory contracts and unexpired leases (the "**Contracts**") a notice (the "**Cure Notice**") of (a) the potential assumption by the Debtors and assignment to the Successful Bidder(s) of the Contracts, and (b) the proposed amount necessary, under section 365(b)(1) of the Bankruptcy Code, to cure any outstanding monetary defaults and compensate the Counterparties for any pecuniary losses in connection with such assumption and assignment (the "**Proposed Cure Amounts**"), which shall be included on a schedule attached to the Cure Notice (the "**Executory Contracts Schedule**").

If at any time after the issuance of the Cure Notice but prior to the Sale Hearing it is discovered that a Contract should have been listed on the Executory Contracts Schedule but was not (any such Contract, a "**Previously Omitted Contract**"), the Debtors shall (in consultation with the Consultation Parties), promptly following discovery thereof (but in no event later than two (2) Business Days following discovery thereof), file and serve a notice on the non-Debtor counterparty(ies) to such Previously Omitted Contract notifying such counterparties of the Debtors' intention to assume and assign such Previously Omitted Contract to the Successful Bidder, including the Proposed Cure Amounts relating thereto (the "**Previously Omitted Contract Notice**").

Each Counterparty shall have until 4:00 p.m. (prevailing Eastern time) on the date that is fourteen (14) days after the filing and service by the Debtors to the Counterparty of the Cure Notice or the Previously Omitted Contract Notice (as applicable) (the "**Contract Objection Deadline**") to object to the assumption and assignment of its Contract on any grounds, including, without limitation, the amount of the Proposed Cure Amounts, but excluding any objection as to adequate assurance of future performance under section 365(b)(1) of the Bankruptcy Code or, other than the Stalking Horse Bidder, on the basis of the identity of the Successful Bidder. Any unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties; *provided* that the Debtors, in consultation with the Committee, shall have the right to adjourn any Sale Hearing without the consent of any objecting party. If any objections to the amount of Proposed Cure Amounts remain unresolved as of the date of the Closing of the Sale of any Assets, the Debtors may (but are not required to) deposit the disputed amount of Proposed Cure Amounts relating to such Asset(s) in a segregated account to hold pending resolution of such objections.

Each Counterparty may raise objections as to adequate assurance of future performance or on the basis of the identity of the Successful Bidder until 4:00 p.m. (prevailing Eastern time) on the date that is five (5) days after the filing and service by the Debtors to the Counterparty of a notice identifying the applicable Successful Bidder, which, for the avoidance of doubt, may be provided with the Cure Notice or the Previously Omitted Contract Notice or at any time thereafter with respect to the Stalking Horse Bidder; provided, however, that objections, if any, on the basis of the identity of the Successful Bidder or adequate assurance of future performance by the Successful Bidder, to the extent that the Successful Bidder is not the Stalking Horse Bidder, shall not, in any event, be raised later than one (1) hour prior to the commencement of the Sale Hearing (the "**Buyer Specific Objection Deadline**"). Any such objection must be filed and served on the Debtors and their counsel, the Committee and its counsel and the applicable Successful Bidder or Stalking Horse Bidder (if any), as applicable, and its counsel, so as to be actually received by the Buyer Specific Objection Deadline. Any such unresolved objections shall be heard at the Sale Hearing, unless otherwise agreed by the parties.

*[Remainder of Page Intentionally Left Blank]*

## **Annex 2**

**Sale Notice**

*Intentionally Omitted*

**<u>Annex 3</u>**

**Cure Notice**

*Intentionally Omitted*

**EXHIBIT B**

**SALE ORDER**

(To be Attached)

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| Ultra Safe Nuclear Corporation, *et al.*,[1] | Case No. 24-_____ (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. __** |

**ORDER (A) AUTHORIZING THE SALE AND TRANSFER OF CERTAIN ASSETS
FREE AND CLEAR OF ALL LIENS, CLAIMS, AND ENCUMBRANCES,
(B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN
EXECUTORY CONTRACTS, AND (C) GRANTING RELATED RELIEF**

Upon the motion (the "**Sale Motion**") of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") for entry of an order (this "**Sale Order**"), pursuant to sections 105(a), 363, 365, 503, and 507 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), (i) authorizing Ultra Safe Nuclear Corporation ("**USNC**") to enter into that certain Asset Purchase Agreement, dated as of        , 2024, by and between Standard Nuclear, Inc. (the "**Buyer**") and USNC (the "**Agreement**," attached hereto as **Exhibit 1**);[2] (ii) approving and authorizing the acquisition of certain assets of USNC as defined in the Agreement (the "**Assets**") by the Buyer; (iii) authorizing the assumption and assignment of

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Ultra Safe Nuclear Corporation (9774); Ultra Safe Nuclear Corporation – Technologies (9815); USNC-Power Ltd. (6500); and Global First Power Limited (7980).  The Debtors' mailing address is 200 Europia Ave., Oak Ridge, Tennessee 37830.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Agreement or the Sale Motion, as applicable.

certain contracts (the "**Assumed Contracts**") as set forth in the Agreement; and (iv) granting related relief; and this Court having entered an order [Docket No. __] (the "**Bidding Procedures Order**") authorizing the Debtors to conduct, and approving the terms and conditions of, the Auction and Bidding Procedures to consider higher and better offers for the Assets, establishing a date for the Auction and approving, *inter alia*, (i) the Bidding Procedures in connection with the Auction; (ii) the form and manner of notice of the Auction and Bidding Procedures; (iii) procedures relating to certain Assumed Contracts, including Government Contracts, including notice of proposed cure amounts; and (iv) the Break-Up Fee; and this Court having established the date of the Sale Hearing; and this Court having jurisdiction to consider the Sale Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157(b)(2) and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012; and upon consideration of the Sale Motion, the relief requested therein, and the responses thereto, if any; and upon consideration of the [_____] [Docket No. __] (the "_____ **Declaration**"); and this being a core proceeding in accordance with 28 U.S.C. § 157(b); and the appearance of all interested parties and all responses and objections, if any, to the Sale Motion having been duly noted in the record of the Sale Hearing; and upon the record of the Sale Hearing, and all other pleadings and proceedings in these chapter 11 cases, including the Sale Motion; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their creditors, and all other parties in interest; and after due deliberation and sufficient cause appearing therefore;

## I.    FINDINGS OF FACT:

**IT IS HEREBY FOUND, DETERMINED, AND CONCLUDED THAT:**[3]

A.     The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.     This Court has jurisdiction over the Sale Motion and the transactions contemplated by the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N).  Venue of these chapter 11 cases and the Sale Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory predicates for the relief sought in the Sale Motion are sections 105(a), 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rules 2002-1 and 6004-1.

D.     This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).   To any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Sale Order.

E.     The Debtors gave due and proper notice of the proposed Sale, Auction, and Sale Hearing on [_____], 2024 [Docket No. __] (the "**Sale Notice**").  The Sale Notice constituted good, sufficient, and appropriate notice of the Sale under the particular circumstances and no further notice need be given with respect to the proposed Sale.  As provided by the Sale Notice, a

---

[3]    To the extent that any finding of fact herein is more properly characterized as a conclusion of law, or vice versa, this Court hereby provides for and adopts such characterization.

reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested persons and entities.  Other parties interested in bidding on the Assets were provided, pursuant to the Bidding Procedures Order, sufficient information to make an informed judgment on whether to bid.

F.      The Debtors also gave due and proper notice of the potential assumption and assignment of each executory contract or unexpired lease available to be assumed by the Debtors and assigned to the Buyer to each non-debtor party under each such executory contract or unexpired lease as reflected on the notice of potential assumption and assignment of the Assumed Contracts, filed on [_____], 2024 [Docket No. __] (the "**Assumption and Assignment Notice**"). Such notice was good, sufficient, and appropriate under the particular circumstances, and the counterparties to the Assumed Contracts are hereby deemed to consent to the relief granted herein unless otherwise provided in this Sale Order.

G.      As evidenced by the affidavits of service [Docket Nos. •] previously filed with this Court, and based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate and sufficient notice of the Motion, the Bidding Procedures Order, the Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts, the Agreement, this Sale Order and the Sale transaction has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 9006, 9007, and 9014, and Local Rules 2002-1 and 6004-1.  The Debtors have complied with all obligations to provide notice of the Motion, the Bidding Procedures Order, the Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts, the Agreement, this Sale Order and the Sale transaction as required by the Bidding Procedures Order.  The aforementioned notices are good, sufficient, and appropriate under the circumstances, and no other or further notice of the Motion, the Bidding Procedures Order, the

Auction, the Sale Hearing, the assumption and assignment of the Assumed Contracts, the Agreement, this Sale Order or the Sale transaction is or shall be required.

H.       A reasonable opportunity to object or be heard regarding the relief requested in the Motion and provided in this Sale Order was afforded to all parties in interest.

I.        Each of the Debtors, as applicable, (i) has the requisite entity power and authority to execute the Agreement and all other documents contemplated by the Sale Motion; (ii) has all of the requisite entity power and authority necessary to consummate the transactions contemplated by the Sale Motion; (iii) have taken all corporate action necessary to authorize and approve the Sale and the consummation by the Debtors of the transactions contemplated thereby; and (iv) require no consents or approvals, other than those expressly provided for in the Agreement, to consummate such transactions.  The Debtors are the sole and lawful owners of the Assets to be sold pursuant to the Agreement.

J.        The Buyer is a third-party purchaser unrelated to the Debtors and is not an "insider" or "affiliate" of the Debtors (as each such term is defined in the Bankruptcy Code).

K.       The Assets are property of the Debtors' estates.

L.        The Debtors have demonstrated sound business justifications, pursuant to section 363(b) of the Bankruptcy Code, with respect to the Sale and other transactions contemplated by the Sale Motion on the timeline set forth therein, and it is a reasonable exercise of the Debtors' business judgment to execute, deliver, and consummate the Agreement and the transactions contemplated thereby.

M.       The sales process engaged in by the Debtors and the Buyer, [including, without limitation, the Auction, which was conducted in accordance with the Bidding Procedures and the Bidding Procedures Order], and the negotiation of the Agreement, was at arm's length,

non-collusive, in good faith, and substantively and procedurally fair to all parties in interest. Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the Agreement or the Sale transaction to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code.

N.      The Debtors and the Buyer have complied, in good faith, in all respects with the Bidding Procedures Order and the Bidding Procedures.  The Debtors, and their management, board of directors, employees, agents, advisors, and representatives, and the Buyer and its employees, agents, advisors and representatives, each actively participated in the bidding process [and in the Auction], and each acted in good faith and without collusion of fraud of any kind.  The Buyer subjected its bid to competitive bidding in accordance with the Bidding Procedures and was designated the Successful Bidder for the Assets in accordance with the Bidding Procedures and the Bidding Procedures Order.

O.      The Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision in respect of the Sale transaction, each term of the Agreement (and any ancillary documents executed in connection therewith) and each term of this Sale Order, and otherwise has proceeded in good faith in all respects in connection with this proceeding.  Neither the Debtors nor the Buyer has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code.  The Debtors were free to deal with any other party interested in buying or selling some or all of the Assets on behalf of the Debtors' estates.  The protections afforded by section 363(m) of the Bankruptcy Code are integral to the Sale transaction and the Buyer would not consummate the Sale transaction without such protections.  The Buyer is entitled to the protections afforded under section 363(m) of the Bankruptcy Code because Buyer is a good faith purchaser in that, *inter alia*:

(a) the Buyer participated in an open sale process for the Assets and recognized that the Debtors were free to deal with any other party interested in acquiring the Assets; (b) the Buyer complied with the provisions of the Bidding Procedures Order; (c) the Buyer's bid was the subject of the opportunity for competitive bidding; (d) the Buyer in no way induced or caused the chapter 11 filing by the Debtors; (e) all payments to be made by Buyer in connection with the Sale have been disclosed; (f) no common identity of directors or controlling stockholders exists between Buyer and the Debtors; and (g) the negotiation and execution of the Agreement was at arm's length and in good faith.

P.    In the absence of a stay pending appeal, the Buyer will be deemed to have acted in good faith, pursuant to section 363(m) of the Bankruptcy Code and entitled to the protections therein in closing the transactions contemplated by the Agreement after the entry of this Sale Order and in accordance with the Agreement.  Furthermore, in the absence of a stay pending appeal, should the Buyer elect to close or otherwise perform after the entry of this Sale Order and in accordance with the Agreement while an appeal or motion for rehearing pertaining to this Sale Order is pending, the Buyer shall be entitled to the protections of section 363(m) of the Bankruptcy Code in the event this Sale Order or any authorization contained herein is reversed or modified on appeal.

Q.    Neither the Buyer nor the Debtor has engaged in any conduct that would cause or permit the Agreement to be voided under section 363(n) of the Bankruptcy Code.  The Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction.  The sale price to be paid by Buyer was not controlled by an agreement among potential bidders.  The transactions under the Agreement may not be avoided, and no damages may be assessed against Buyer or any

other party under section 363(n) of the Bankruptcy Code or any other applicable bankruptcy or non-bankruptcy law.

R.      The consideration provided by the Buyer for the Assets (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Assets; (iii) constitutes fair consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia; and (iv) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practically available alternative.

S.      The Debtors and the Buyer and their professionals have complied, in good faith, in all respects with the Bidding Procedures Order, as demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing.  Through marketing, and an open and competitive sale process conducted in accordance with the Bidding Procedures Order, the Debtors (i) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify as bidders and submit their highest or otherwise best offer to purchase the Assets; and (ii) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Assets.

T.      The transfer of the Assets to the Buyer pursuant to the Sale under the Agreement will, upon the occurrence of the Closing, vest in Buyer all rights, title, and interest of the Debtors in the Assets, free and clear of any and all Encumbrances, except as expressly set forth in the Agreement.  The Buyer shall not assume or become liable for any interests in or relating to the Assets being sold by the Debtors (other than Assumed Liabilities).

8

U.      The Assets  shall be sold free and clear of all of the following (collectively, the "**Encumbrances**"), other than the Assumed Liabilities and Permitted Encumbrances (each as defined in the Agreement): mortgages, security interests, conditional sale or other retention agreement, pledges, liens (as that term is defined in section 101(37) of the Bankruptcy Code), claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, guaranties, debts, rights, contractual commitments, interests, judgments, demands, easements, charges, encumbrances, defects, options, rights of first refusal, other encumbrances, liens, and restrictions of any kind or nature whether imposed by agreement, understanding, law, equity, or otherwise, including, without limitation (i) encumbrances that purport to give any party a right or option to effect any forfeiture, modification or termination of the Debtors' rights or interests in the Assets or the Buyer's rights or interests in the Assets or (ii) in respect of taxes, in each case accruing, arising or relating to a period prior to the Closing; in all cases, except as expressly set forth in the Agreement.

V.      The transfer of the Assets to the Buyer pursuant to the Sale will be a legal, valid and effective transfer of the Assets, shall vest the Buyer with all right, title, and interest of the Debtors to the Assets free and clear of any and all Encumbrances, other than Assumed Liabilities and Permitted Encumbrances. The Buyer shall not assume or become liable for any Encumbrances relating to the Assets being sold by the Debtors, other than Assumed Liabilities and Permitted Encumbrances.

W.      All persons having Encumbrances, other than Permitted Encumbrances, of any kind or nature whatsoever against or in the Debtors or the Assets shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such Encumbrances against the Buyer or any of its assets, property, successors or assigns.

9

X.      The Debtors may sell the Assets free and clear of all Encumbrances (excluding the Permitted Encumbrances) of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  Those (i) holders of Encumbrances and (ii) non-debtor parties, who did not object, or who withdrew their objections, to the sale of the Assets and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of Encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.   All Liens, claims, interests, and Encumbrances in or on the Assets shall attach to the Purchase Price with the same priority, validity, force, and effect that they now have, if any, as against the Assets or the Debtor and subject to any claims and defenses Debtors or other parties may possess with respect thereto.

Y.      The assumption and assignment of the Assumed Contracts pursuant to the Assumption and Assignment Notice, the terms of this Sale Order, and the Agreement is integral to the transactions contemplated by the Agreement and is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest, and represents a reasonable exercise of the Debtors' sound and prudent business judgment.

Z.      Pursuant to the terms of the Agreement and this Sale Order, on or before the Closing Date, as applicable pursuant to the terms of this Sale Order, the Debtors or the Buyer, as applicable, shall have, except as otherwise provided in the Agreement or this Sale Order, or as otherwise expressly agreed to between the Debtors or the Buyer, as applicable, and such counterparty: (i)  cured, or provided adequate assurance of cure of, any monetary default existing as of and including the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code, (ii) provided compensation, or adequate assurance of

compensation, to any party for actual pecuniary loss to such party resulting from a monetary default existing as of and including the Closing Date under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code, and (iii) provided adequate assurance of future performance under the Assumed Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

AA.    The terms and conditions of the Sale and the Agreement including the total consideration to be realized by the Debtors pursuant to the Agreement are fair and reasonable, and the transactions contemplated by the Agreement are in the best interests of the Debtors, the creditors, and the estates. A valid business purpose exists for the approval of the Sale and other transactions contemplated by the Sale Motions.

BB.    The requirements of sections 363(b) and 363(f) of the Bankruptcy Code and any other applicable law relating to the sale of the Assets have been satisfied.

CC.    A reasonable opportunity has been afforded to all interested parties to make a higher or better offer to purchase the Assets.

DD.    Approval at this time of the Sale, the Agreement, and all the transactions contemplated thereby and hereby is in the best interests of the Debtors, the creditors, the estates, and other parties in interest.

EE.    The Buyer has the financial capability to fulfill the obligations contemplated under the Agreement.

FF.    The transactions contemplated under the Agreement do not amount to a consolidation, merger or de facto merger of Buyer and the Debtors, there is no substantial continuity between Buyer and the Debtors, there is no continuity of enterprise between the Debtors

and Buyer, Buyer is not a mere continuation of the Debtors or their chapter 11 estates, and Buyer does not constitute a successor to the Debtors.

GG.    The transfer of the Assets to the Buyer does not and will not subject the Buyer or any of its affiliates or subsidiaries to any liability by reason of such transfer under (i) the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based in whole or part on, directly or indirectly, including without limitation, any theory of antitrust, environmental, products liability, successor, transferee or vicarious liability, labor law, de facto merger or substantial continuity or (ii) any employment contract, understanding or agreement, including without limitation collective bargaining agreements, employee pension plans or employee welfare or benefit plans (collectively, "**Debtor Liabilities**"). The Buyer has not assumed, and shall not be liable for any Debtor Liability or other obligation of the Debtor, other than the Assumed Liabilities, and such liabilities and obligations are expressly excluded from the sale of the Assets and shall remain liabilities and obligations of the Debtors and their estates.

HH.    Upon and following the Closing, all persons and entities are hereby forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Buyer, its successors and assigns, with respect to any Debtor Liability.

EE.    Subject to the terms and conditions of the Agreement, time is of the essence in consummating the Sale. To effectuate the terms of the Agreement, it is essential that the Closing thereunder occur as soon as possible. Accordingly, there is cause to lift the fourteen (14) day stay imposed by Bankruptcy Rules 6004 and 6006.

II.      **CONCLUSIONS OF LAW:**

**NOW, THEREFORE, BASED UPON THE FOREGOING FINDINGS OF FACT, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED, EFFECTIVE IMMEDIATELY, THAT:**

1.      The relief requested in the Sale Motion is granted as set forth herein.  Any prior written or oral objections to the Sale Motion or entry of this Sale Order are overruled in their entirety.

2.      Notice of the Sale Hearing was fair and adequate under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004.  Notwithstanding Bankruptcy Rules 6004 and 6006, this Sale Order shall be effective and enforceable immediately upon entry.

3.      The sale of the Assets and the consideration provided by Buyer under the Agreement therefor is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and any other applicable law.

4.      The Buyer is hereby granted and is entitled to all of the protections provided to a good faith buyer under section 363(m) of the Bankruptcy Code.

5.      The Agreement attached hereto as **Exhibit 1**, as may be amended, supplemented or modified in accordance with its terms, and all of the terms and conditions thereof, are hereby approved.  Pursuant to section 363(b) of the Bankruptcy Code, the Debtors are authorized to consummate the Sale pursuant to and in accordance with the terms and conditions of the Agreement, without any further corporate authorization.

6.      The Debtors are authorized and directed to fully assume, perform under, consummate and implement the terms of the Agreement together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Agreement, this Sale Order, and the sale of the Assets contemplated thereby and hereby including, without limitation, deeds, assignments, stock powers and other instruments of transfer, and to take all further actions as may reasonably be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession any or all of the Assets, as may be necessary or appropriate to the performance of the Debtor's obligations as contemplated by the Agreement, without any further corporate action or orders of this Court.  The Buyer shall have no obligation to proceed with the Closing of the Agreement until all conditions precedent to its obligations to do so have been met, satisfied or waived.  The Buyer may, in its sole discretion, waive any of the closing conditions required of the Debtors and, subject to satisfying the Buyer's obligations to close, consummate the transactions under the Agreement at any time after the entry of this Sale Order (including immediately thereafter) without any notice to this Court, any pre-petition or post-petition creditor of the Debtors or any other party in interest.

7.      The Debtors and each other person or entity having duties or responsibilities under the Agreement, any agreements related thereto or this Sale Order,  and their respective directors, officers, employees, members, agents, representatives and attorneys, are authorized and empowered, subject to the terms and conditions contained in the Agreement, to carry out all of the provisions of the Agreement and any related agreements; to issue, execute, deliver, file and record, as appropriate, the documents evidencing and consummating the Agreement, and any related agreements; to take any and all actions contemplated by the Agreement,  any related agreements

or this Sale Order; and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, indentures, mortgages, deeds, bills of sale, assignments, leases or other agreements or documents and to perform such other acts and execute and deliver such other documents, as are consistent with, and necessary or appropriate to implement, effectuate, and consummate, the Agreement, any related agreements and this Sale Order and the transactions contemplated thereby and hereby, all without further application to, or order of, this Court.  The Debtors shall be, and hereby are, authorized to certify or attest to any of the foregoing actions (but no such certification or attestation shall be required to make any such action valid, binding, and enforceable).  The Debtors are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units any and all certificates, agreements or amendments necessary or appropriate to effectuate the transactions contemplated by the Agreement, any related agreements and this Sale Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as the Debtors may determine are necessary or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.  Without limiting the generality of the foregoing, this Sale Order shall constitute all approvals and consents, if any, required by the corporation laws of the State of Delaware and all other applicable business corporation, trust and other laws of the applicable governmental units with respect to the implementation and consummation of the Agreement, any related agreements and this Sale Order, and the transactions contemplated thereby and hereby.

8.      Effective as of the Closing, (a) the Sale of the Assets by the Debtors to the Buyer shall constitute a legal, valid, and effective transfer of the Assets notwithstanding any requirement for approval or consent by any person and shall vest Buyer with all right, title and interest of the Debtors in and to the Assets, and (b) the Assets shall be transferred to Buyer free and clear of all Liens, claims, interests, and Encumbrances in or on the Assets in accordance with section 363(f) of the Bankruptcy Code, except to the extent expressly set forth in the Agreement, including with respect to Assumed Liabilities and Permitted Encumbrances; notwithstanding anything set forth in this Sale Order, in the event of any conflict between the "free and clear" provisions of this Sale Order and the Agreement, the provisions of this Sale Order shall prevail.

9.      The sale of the Assets is not subject to avoidance, and no damages may be assessed against Buyer or any other party, pursuant to section 363(n) of the Bankruptcy Code.

10.     Except to the extent specifically provided in the Agreement or this Sale Order, upon the Closing the Debtors shall be, and hereby are, authorized, empowered and directed, pursuant to sections 105 and 363(b) of the Bankruptcy Code, to sell the Assets to Buyer.  The sale of Assets shall vest Buyer with all right, title and interest of the Debtors to the Assets free and clear of any and all Encumbrances and other liabilities and claims, other than Assumed Liabilities and Permitted Encumbrances, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or noncontingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise.  Following the Closing Date, no holder of any Encumbrance in the Assets, other than Permitted Encumbrances, shall interfere with Buyer's use and enjoyment of the Assets based on or related to such Encumbrance, or any actions that the

16

Debtors may take in the chapter 11 cases, or any action by any trustee in any subsequent chapter 7 cases, and no person shall take any action to prevent, interfere with or otherwise enjoin consummation of the transactions contemplated in or by the Agreement or this Sale Order.

11.     The provisions of this Sale Order authorizing the sale of the Assets free and clear of Encumbrances shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents or other instruments in order to effectuate, consummate and implement the provisions of this Sale Order.  However, the Debtors and the Buyer, and each of their respective officers, employees, and agents are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Buyer deem necessary or appropriate to implement and effectuate the terms of the Agreement and this Sale Order.

12.     On or before the Closing Date, all parties holding Encumbrances (other than Permitted Encumbrances) of any kind are authorized and directed to execute such documents and take all other actions as may be necessary to release any Encumbrances of any kind against the Assets and, as such Encumbrances may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements or other documents or agreements evidencing any Encumbrances in or against the Assets shall not have delivered to the Debtors prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such Encumbrances that the person or entity has with respect to the Assets, the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Assets prior to the Closing, and the Buyer  is authorized to execute and file such documents after Closing.

13.     To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to Buyer as of the Closing Date.

14.     All of the Debtors' interests in the Assets to be acquired by the Buyer under the Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Buyer pursuant to the Agreement.  Upon the occurrence of the Closing, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Assets acquired by the Buyer under the Agreement and/or a bill of sale/deed or assignment transferring good and marketable, indefeasible title and interest in the Assets to the Buyer.

15.     Other than the Assumed Liabilities and Permitted Encumbrances, the Buyer is not assuming nor shall it, or any affiliate or subsidiary of Buyer, be in any way liable or responsible, as a successor or otherwise, for any Debtor Liabilities, any other liabilities, debts or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Assets prior to the consummation of the transactions contemplated by the Agreement, or any liabilities calculable by reference to the Debtors or their operations or the Assets, or relating to continuing or other conditions existing on or prior to consummation of the transactions contemplated by the Agreement, which liabilities, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against Buyer or any affiliate or subsidiary of the Buyer.

16.     The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Agreement or any other Sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified to the extent necessary to implement the preceding sentence and the other provisions of this Sale Order.

17.     Except as otherwise expressly provided in the Agreement or this Sale Order, upon the Closing Date, pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, the Debtors are authorized to (a) assume each of the Assumed Contracts and assign the Assumed Contracts, set forth in __Exhibit 2__ (the "**Assumed Contracts Exhibit**") attached hereto to the Buyer free and clear of all Encumbrances and (b) execute and deliver to the Buyer such documents or other instruments as may be reasonably requested by the Buyer to assign and transfer the Assumed Contracts to the Buyer.

18.     The Cure Costs listed on the Assumption and Assignment Notice and Assumed Contracts Exhibit are the sole amounts necessary to be paid upon assumption and assignment of the Assumed Contracts under sections 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code.  Upon the payment of the Cure Costs, if any, the Assumed Contracts shall remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.  The Cure Costs shall not be subject to further dispute or audit, including, without limitation, any based on performance prior to the Closing Date, irrespective of whether such Assumed Contract contains an audit clause.  After the payment of the Cure Costs by the Buyer (except with respect to the Initial Designated Contracts as set forth in the Agreement), following

19

the Closing Date the Debtors shall have no further liabilities to the counterparties to the Assumed Contracts.

19.     In the event of a dispute as of, or after, the Closing Date regarding assumption and assignment or Cure Costs of any executory contract or unexpired lease proposed to be an Assumed Contract, the assumption and assignment of such executory contract or unexpired lease, and payment of any applicable Cure Costs, shall be made upon (a) the entry of an order of the Court resolving any such dispute and upon the election of the Buyer to retain such executory contract or unexpired lease as an Assumed Contract, or (b) the consensual resolution of such dispute as may be agreed by the Buyer and such counterparty and, solely with respect to disputes regarding Cure Costs, the Debtors.  Any disputed Cure Amounts shall be held in escrow pending resolution of any objections to the Assumption and Assignment Notice by parties to the Assumed Contracts.  The Buyer shall designate all Assumed Contracts for assumption and assignment no later than the Closing Date.  The Buyer is not required to assume any of the Assumed Contracts.

20.     To the extent any non-Debtor party to an Assumed Contract has failed to timely object to a proposed Cure Cost, such Cure Cost has been and shall be deemed to be finally determined in the amount listed on the Assumption and Assignment Notice and Assumed Contracts Exhibit and any such non-Debtor party shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at any time.  The non-Debtor party to an Assumed Contract is forever bound by the applicable Cure Cost and, upon payment of the Cure Cost as provided herein and in the Agreement, is hereby enjoined from taking any action against the Debtors or the Buyer with respect to any claim for cure under the Assumed Contract.

21.     Any provisions in any Assumed Contract that prohibit or condition the assignment of such Assumed Contract or allow the party to such Assumed Contract to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon assignment of such Assumed Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect.

22.     Any party that may have had the right to consent to the assignment of an Assumed Contract is deemed to have consented to such assignment, including for purposes of sections 365(c)(1)(B) and 365(e)(2)(A)(ii) of the Bankruptcy Code and otherwise, if such party failed to object to the assumption and assignment of such Assumed Contract.

23.     Each Assumed Contract constitutes an executory contract or unexpired lease under the Bankruptcy Code and all requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of the Assumed Contracts have been, or will be, satisfied.  Upon the Buyer's assumption of the Assumed Contracts in accordance with the terms hereof, in accordance with sections 363 and 365 of the Bankruptcy Code, (a) the Buyer shall be fully and irrevocably vested with all rights, title and interest of the Debtors under the Assumed Contracts, (b) the Buyer shall be deemed to be substituted for the applicable Debtor as a party to the applicable Assumed Contracts, and (c) the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assumed Contracts.

24.     The Buyer has demonstrated adequate assurance of future performance under the relevant Assumed Contracts within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

25.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Debtors or the Buyer as a result of the assumption and assignment of the Assumed Contracts.  Subject to the terms of the Agreement, the validity of the transactions contemplated by the Agreement, including, without limitation, the Sale transaction and the assumption and assignment of the Assumed Contracts, shall not be affected by any dispute between the Debtors and the non-Debtor party to an Assumed Contract regarding the payment of any amount.  Upon assignment to the Buyer, the Assumed Contracts shall be valid and binding, in full force and effect and enforceable by the Buyer in accordance with their respective terms.

26.     Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, all counterparties to the Assumed Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors or the Buyer any assignment fee, default, breach or claim of pecuniary loss, or condition to assignment, arising under or related to the Assumed Contracts existing as of and including the Closing Date under the Agreement or arising by reason of the consummation of the transactions contemplated by the Agreement, including, without limitation, the Sale transaction and the assumption and assignment of the Assumed Contracts.

27.     All counterparties to the Assumed Contracts shall cooperate and expeditiously execute and deliver, upon the reasonable requests of the Buyer, any instruments, applications, consents or other documents that may be required or requested by any public or quasi-public authority or other party or entity to effectuate the applicable transfers in connection with the Sale of the Assets.

28.     Notwithstanding anything to the contrary in this Sale Order, no Assumed Contract will be assumed and assigned to the Buyer until the Closing.

29.     <u>Provisions regarding the United States</u>. Notwithstanding any provision to the contrary in the Sale Motion, Bidding Procedures Order, the Cure Notice, this Order, or any implementing sale documents, nothing shall be deemed to: (1) authorize the assumption, sale, assignment or other transfer to the Buyer of any federal (i) grants, (ii) grant funds, (iii) contracts between the Debtors and the United States or its agencies, including but not limited to agreements, contracts, awards, and task orders, (iv) property, including but not limited to, any intellectual property and patents belonging to the United States or any of its agencies or components thereof, (v) leases, (vi) other interests belonging to the United States or its agencies (collectively, "**Federal Interests**") without compliance by the Debtors and the Buyer with all terms of the Federal Interests and with all applicable non-bankruptcy law; (2) be interpreted to set cure amounts or to require the government to novate, approve or otherwise consent to the sale, assumption, assignment or other transfer of any Federal Interests; (3) waive, alter or otherwise limit the United States' property rights, including without limitation, inventory, patents, intellectual property, licenses, and data; (4) affect the setoff or recoupment rights of any governmental unit (as defined in 11 U.S.C. § 101(27)); (5) authorize the sale, assumption, assignment or other transfer of any governmental unit's (a) license, (b) permit, (c) registration, (d) authorization or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable requirements, obligations and approvals under non-bankruptcy laws; (6) release, nullify, preclude or enjoin the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the owner or operator of property after the date of entry of this Order; (7) confer exclusive jurisdiction to the Bankruptcy Court except to the extent set forth in 28 U.S.C. § 1334 (as limited by any other provisions of the United States Code); (8) divest any tribunal of any

jurisdiction it may have under police or regulatory law to interpret this Order or to adjudicate any defense asserted under this Order; or (9) expand the scope of section 525 of the Bankruptcy Code.

30.    This Sale Order shall be binding upon and shall govern the acts of all entities, including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

31.    This Court retains and shall have exclusive jurisdiction to endorse and implement the terms and provisions of the Agreement, any amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to the Buyer; (b) resolve any disputes arising under or related to the Agreement; (c) enforce the injunctions and releases contained within this Sale Order and (d) interpret, implement, and enforce the provisions of the Agreement and this Sale Order.

32.    The terms and provisions of the Agreement and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of the Debtors, the estates, and all parties in interest in these chapter 11 cases (including the Debtors' creditors and equity holders) (collectively, the "**Debtor Parties**"), the Buyer, and each of the Debtor Parties' and Buyer's respective affiliates, members, officers, directors, successors and permitted assigns, and any affected third parties.

33.     The failure specifically to include any particular provisions of the Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, and the Agreement is, by this Sale Order, authorized and approved in its entirety.

34.     The Agreement and any related contract, document, or other instrument may be waived, modified, amended, or supplemented by agreement of the parties thereto, in a writing signed by such parties, and in accordance with the terms thereof, without further action or order of this Court; provided that any such waiver, modification, amendment, or supplement does not have a material adverse effect on the Debtors' Estate or any creditor or party in interest.

35.     From time to time, as and when requested by any Party, a Party to the Agreement shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as such other Party may reasonably deem necessary or desirable at no cost to such respective counter-Party to consummate the Sale and achieve Closing, or further perform the terms of the Agreement, including such actions as may be necessary to vest, perfect, or confirm, of record or otherwise, in the Buyer its right, title, and interest in and to the Assets.

**EXHIBIT 1**

**Agreement**

**<u>EXHIBIT 2</u>**

**Assumed Contracts List**

**EXHIBIT C**

**FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT**

(To be Attached)

*Execution Version*

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "***Assignment***") is made and entered into as of [●], 2024, by and between Ultra Safe Nuclear Corporation, a Delaware corporation, Ultra Safe Nuclear Corporation – Technologies, a Washington Corporation (collectively, "***Assignor***"), and Standard Nuclear, Inc., a Delaware corporation ("***Assignee***"). Assignor and Assignee are referred to collectively as the "***Parties***" herein, and each individually, as a "***Party***".

**RECITALS**

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement, dated as of November 21, 2024 (as amended, the "***Purchase Agreement***"), pursuant to which to which Assignor agreed to assign, and Assignee agreed to assume, all of Assignor's right, title, and interest in and to the Designated Contracts listed in Exhibit A attached hereto and incorporated fully herein by this reference for all purposes (the "***Designated Contracts***");

WHEREAS, in connection with the consummation of the transactions contemplated by the Purchase Agreement, Assignor agreed to assign, and Assignee agreed to assume, pay, perform, discharge, or otherwise satisfy the Assumed Liabilities; and

WHEREAS, all capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and incorporating the recitals above, the Parties agree as follows:

**AGREEMENT**

1. Assignment of Designated Contracts. Subject to the terms and conditions set forth in the Purchase Agreement, for valuable consideration received from Assignee, Assignor hereby assigns, transfers and conveys to Assignee all of Assignor's right, title, and interest in and to the Designated Contracts and Assignee accepts such assignment.

2. Assumption of Assumed Liabilities. Subject to the terms and conditions set forth in the Purchase Agreement, Assignor hereby assigns to Assignee the Assumed Liabilities and Assignee hereby accepts such assignment and agrees to pay, perform, discharge, or otherwise satisfy the Assumed Liabilities. Other than as specifically set forth herein, Assignee assumes no debt, liability, or obligation of Assignor, all of which shall remain the responsibility of Assignor and shall be Excluded Liabilities.

3. Further Assurances. In case at any time after the date hereof, any further actions are necessary or desirable to carry out the purposes of this Assignment, the Parties shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof.

4. Instrument of Conveyance Only. This Assignment is being made by the Parties pursuant to the requirements of the Purchase Agreement, the terms and conditions of which are incorporated herein by this reference, and this Assignment shall be subject to such terms and conditions. Except for the actual conveyance of the Designated Contracts as set forth in Section 1 of this Assignment and the assumption of the Assumed Liabilities as set forth in Section 2 of this Assignment, nothing set forth in this Assignment is intended to or shall expand, enlarge, modify, restrict, limit, or abridge any of the terms, representations, warranties, covenants, conditions, agreements, provisions, rights, benefits, obligations, or liabilities of Assignors or Assignee beyond that set forth in the Purchase Agreement. In the event of any conflict, ambiguity, or discrepancy between the terms or conditions of the Purchase Agreement and this Assignment, the terms and conditions of the Purchase Agreement shall be controlling in all respects.

5.      <u>No Third-Party Beneficiaries</u>.  This Assignment is for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns, and nothing herein is intended or shall be construed to confer upon any person other than the Parties and their respective successors and permitted assigns any rights, remedies, or claims under, or by any reason of, this Assignment of any term, covenant, or condition hereof.

6.      <u>Governing Law; Disputes</u>.  The Parties agree that this Assignment shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflict of laws. Any dispute arising from this Assignment shall be subject to the terms and conditions of the Purchase Agreement.

7.      <u>Counterparts</u>.  This Assignment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement, and the execution of a counterpart of the signature page to this Agreement shall be deemed the execution of a counterpart of this Agreement. This Agreement may also be executed through the use of electronic signature, which each Party acknowledges and agrees is a lawful means of obtaining signatures in the United States. The delivery of this Agreement and the Parties' executed counterpart signature pages hereto may be made by e-mail transmission of a PDF document, and such signatures shall be treated as original signatures for all applicable purposes.

*[Signature Page Follows]*

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment effective as of the date first set forth above.

**ASSIGNOR:**

**ULTRA SAFE NUCLEAR CORPORATION,**
a Delaware corporation


By:_____
Name:  Kurt Terrani
Title:    Interim CEO

**ULTRA SAFE NUCLEAR CORPORATION - TECHNOLOGIES,**
a Washington corporation


By:_____
Name:  Steven J Cuevas
Title:    Director

**ASSIGNEE:**

**STANDARD NUCLEAR, INC.,**
a Delaware corporation


By:_____
Name:  Thomas Hendrix
Title:    CEO

**EXHIBIT A**

**DESIGNATED CONTRACTS**

**<u>EXHIBIT D</u>**

**FORM OF BILL OF SALE**

(To be Attached)

*Execution Version*

## BILL OF SALE

THIS BILL OF SALE (this "***Bill of Sale***") is made and entered into as of [●], 2024, by and among Ultra Safe Nuclear Corporation, a Delaware corporation, Ultra Safe Nuclear Corporation – Technologies, a Washington Corporation (Collectively, "***Seller***"), and Standard Nuclear, Inc., a Delaware corporation ("***Buyer***"). Seller and Buyer are referred to collectively as the "***Parties***" herein, and each individually, as a "***Party***".

## RECITALS

WHEREAS, Buyer and Seller are parties to that certain Asset Purchase Agreement, dated as of November 21, 2024 (as amended, the "***Purchase Agreement***"), pursuant to which Seller agreed to sell, convey, assign, transfer, and deliver to Buyer, all of its respective right, title, and interest in and to the Purchased Assets (as defined therein), and Buyer agreed to acquire the same; and

WHEREAS, all capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Purchase Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and incorporating the recitals above, the Parties agree as follows:

## AGREEMENT

1.    <u>Assignment</u>.  Subject to the terms and conditions set forth in the Purchase Agreement, for valuable consideration received from Buyer, Seller does hereby irrevocably and unconditionally sell, assign, transfer, convey, and deliver to Buyer, its successors and assigns forever, all of Seller's rights, title, and interest in and to the Purchased Assets, including good and marketable title thereto, free and clear of any and all Encumbrances, to have and to hold the same and each and all thereof unto Buyer, its successors and assigns forever, to its and their own use and benefit forever.

2.    <u>Further Assurances</u>.  In case at any time after the date hereof any further actions are necessary or desirable to carry out the purposes of this Bill of Sale, Seller shall execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably requested by Buyer to carry out the provisions hereof.

3.    <u>Instrument of Conveyance Only</u>.  This Bill of Sale is being made by Seller pursuant to the requirements of the Purchase Agreement, the terms and conditions of which are incorporated herein by this reference, and this Bill of Sale shall be subject to such terms and conditions. Except for the actual conveyance of the Purchased Assets as set forth in <u>Section 1</u> of this Bill of Sale, nothing set forth in this Bill of Sale is intended to or shall expand, enlarge, modify, restrict, limit, or abridge any of the terms, representations, warranties, covenants, conditions, agreements, provisions, rights, benefits, obligations, or liabilities of the Parties beyond that set forth in the Purchase Agreement. In the event of any conflict, ambiguity, or discrepancy between the terms or conditions of the Purchase Agreement and this Bill of Sale, the terms and conditions of the Purchase Agreement shall be controlling in all respects.

4.    <u>No Third-Party Beneficiaries</u>.  This Bill of Sale is for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns, and nothing herein is intended or shall be construed to confer upon any person other than the Parties and their respective successors and permitted assigns any rights, remedies, or claims under, or by any reason of, this Bill of Sale of any term, covenant, or condition hereof.

5.    <u>Governing Law; Disputes</u>.  The Parties agree that this Bill of Sale shall be governed by and construed in accordance with the laws of the State of Delaware, without giving effect to principles of conflict. Any dispute arising from this Bill of Sale shall be subject to the terms and conditions of the Purchase Agreement.

6.      _Counterparts_.  This Assignment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement, and the execution of a counterpart of the signature page to this Agreement shall be deemed the execution of a counterpart of this Agreement. This Agreement may also be executed through the use of electronic signature, which each Party acknowledges and agrees is a lawful means of obtaining signatures in the United States. The delivery of this Agreement and the Parties' executed counterpart signature pages hereto may be made by e-mail transmission of a PDF document, and such signatures shall be treated as original signatures for all applicable purposes.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the undersigned has executed this Bill of Sale effective as of the date first set forth above.

**SELLER:**

**ULTRA SAFE NUCLEAR CORPORATION,**
a Delaware corporation


By:_____
Name:  Kurt Terrani
Title:    Interim CEO

**ULTRA SAFE NUCLEAR CORPORATION - TECHNOLOGIES,**
a Washington corporation


By:_____
Name:  Steven J Cuevas
Title:    Director


**BUYER:**

**STANDARD NUCLEAR, INC.,**
a Delaware corporation


By:_____
Name:  Thomas Hendrix
Title:    CEO

[Signature Page to Bill of Sale]

**<u>EXHIBIT E</u>**

**FORM OF RPA**

(To be Attached)

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement ("**Agreement**") is made as of November 21, 2024 (the "**Effective Date**"), and entered by and between **USNC HOLDINGS, LLC,** a Washington limited liability company ("**Seller**"), and **STANDARD NUCLEAR, INC.,** a Delaware corporation or its successors or assigns ("**Buyer**"). Buyer and Seller are referred to collectively as the "**Parties**" or individually as a "**Party**".

### WITNESSETH:

**WHEREAS,** Seller is engaged in the business of developing and selling nuclear fuel energy projects (the "**Business**");

**WHEREAS,** on October 29, 2024 (the "**Petition Date**"), Seller and Seller's affiliates will file voluntary petitions for relief (the "**Bankruptcy Case**") under Chapter 11, Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**");

**WHEREAS,** subject to approval of the Bankruptcy Court and on the terms and subject to the conditions set forth herein, the Parties desire to enter into that certain Asset Purchase Agreement ("**APA**")[1] by and between the Parties, dated as of the same date hereof, pursuant to which, among other things, Seller shall sell to Buyer, and Buyer shall purchase from Sellers all of Seller's right, title and interest in and to Seller's assets specified in the APA;

**WHEREAS**, it is a condition to Buyer's obligations to close on the transactions contemplated under the APA that the Parties enter into this Agreement; and

**WHEREAS,** as part of the transaction contemplated in the APA, Seller desires to sell, and Buyer desires to purchase, the real property described in this Agreement on the terms and conditions set forth in this Agreement.

**NOW, THEREFORE,** in consideration of the foregoing, the mutual covenants and agreements set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are mutually acknowledged by the Parties, the Parties agree as follows:

**1.** **Property.** Subject to and in accordance with the terms and conditions in this Agreement, Buyer shall purchase from Seller and Seller shall sell to Buyer the following property (collectively, the "**Property**"):

**1.1.** Approximately (a) 28.14 acres, known as ED-5 West in Heritage Century, City of Oak Ridge, Tennessee, commonly known as 200 Europia Avenue, Oak Ridge, Roane County, Tennessee 37830; (b) 7.73 acres, known as City Parcel ED-5 East; and (c) 0.98 acres, known as Parcel ED9-C and more particularly described in Exhibit A, which is incorporated by this reference (the "Real Property").

**1.2.** All improvements located on the Real Property (the "**Improvements**");

**1.3.** All of Seller's rights under all easements and appurtenances pertaining to the Real Property, and/or Improvements (whether now or hereafter existing), including without limitation development rights, utility capacity reservations, entitlements, claims, permits, licenses and approvals,

---

[1] Capitalized terms used herein and not otherwise defined shall have the meaning set forth in the APA.

certificates of occupancy, plans, specifications, drawings, engineering information and data, warranties, lien waivers, utility arrangements and other similar items relating to the ownership of the Real Property and Improvements (collectively, the "**Related Rights**"); and

    **1.4.**    Fixtures located on or within the Real Property or Improvements as of the Effective Date and used in connection therewith (the "**Personal Property**").

**2.**    **Purchase Price**. The purchase price ("Purchase Price") for the Property shall be that portion of the cash consideration payable by Buyer under the APA that is allocated by the Parties to the purchase of the Property (the "Allocated Value").

**3.**    **[Intentionally Omitted]**

**4.**    **TITLE COMMITMENT AND SURVEY**

    **4.1.**    **Title Commitment.** Buyer shall obtain a commitment (with copies of all exceptions) (the "**Title Commitment**") for an owner's policy of title insurance in the amount of the Allocated Value of the Property, covering title to the Real Property (the "**Owner's Policy**")**.**

    **4.2.**    **Survey.** Buyer may obtain, at its cost, an updated ALTA survey of the Real Property from a surveyor selected by Buyer (the "**Survey**")**.**

    **4.3.**    **Title Commitment Updates; Objectionable Exceptions; Permitted Encumbrances**.

        **4.3.1.**    **Title Objection Notice**. If there are exceptions to title set forth in the Title Commitment or the Survey (each an "**Objectionable Exception**" and collectively the "Objectionable Exceptions") that would prohibit issuance of the Owner's Policy, Buyer or its representative shall notify Seller in writing (a "**Title Objection Notice**") of the Objectionable Exceptions on or before fifteen (15) days after entry of the Bidding Procedures Order.

        **4.3.2.**    **Title Response Notice**. Not more than ten (10) days after receipt of the Title Objection Notice (the "Title Response Notice Deadline"), Seller shall elect, by written notice (a "Title Response Notice") to Buyer, to either:

            (a)    Take all actions at its own expense or as directed by the Court as may be necessary to cure or remove the Objectionable Exception(s) prior to or at Closing (all exceptions Seller agrees to cure are referred to as "**Seller Cure Exceptions**")**;** or

            (b)    Not to take any remedial action.

A failure of Seller to timely deliver a Title Response Notice shall be deemed an election of option (b).

        **4.3.3.**    **Termination Notice**. If Seller does not elect to cure all Objectionable Exceptions, or if Seller fails to timely deliver a Title Response Notice, Buyer may either:

            (a)    Terminate the Agreement by written notice (a "**Title Termination Notice**") to Seller within ten (10) days after receipt of the Title Response Notice, or, if none was delivered, after the Title Response Notice Deadline, in which case all Earnest Money then deposited shall be disbursed to

Buyer and the Parties shall have no further obligations to each other except for obligations which by their terms survive the termination of this Agreement; or

(b)    Proceed to Closing subject to the Objectionable Exceptions that Seller has not elected to cure or has been deemed to have not elected to cure.

A failure to timely deliver a Title Termination Notice shall be deemed an election of option (b).

4.3.4.    **Definition of Permitted Encumbrances**. "**Permitted Encumbrances**" has the meaning ascribed to it in the APA.

4.3.5.    **Monetary Liens**. Notwithstanding the foregoing, no uncontested lien or exception to Seller's title to the Property that secures the payment of a liquidated sum of money, including without limitation a judgment lien, a mortgage or deed of trust, a mechanics' lien and/or delinquent taxes or taxes which are otherwise due and payable on or before the Closing (each a "Monetary Lien" and collectively the "**Monetary Liens**"), shall be deemed a Permitted Encumbrance, irrespective of whether Buyer has identified it as an Objectionable Exception.

## 5. **CLOSING**

5.1.    **Closing Date and Method.** The closing of this transaction shall be held simultaneously and in accordance with the APA as provided in Section 4.4 thereof.

5.2.    **Seller Deliverables**.

5.2.1.    **Special Warranty Deed**. Seller shall convey good and merchantable title to the Property by means of a special warranty deed (the "Deed"), free and clear of all liens and encumbrances, except the Permitted Encumbrances. The Deed shall be in the form attached as Exhibit B-1. If requested by Buyer, Seller shall also deliver a quitclaim deed, in a form reasonably acceptable to Buyer and Seller, which includes the legal description prepared by the surveyor as a part of the Survey.

5.2.2.    **Other Deliverables**. At Closing, Seller shall also deliver all of the following:

(a)    Exclusive possession of the Property;

(b)    Non-foreign status certification as required by Section 1445 of the Internal Revenue Code of 1986;

(c)    Owner's affidavit and indemnity and a so-called "gap indemnity", and, if applicable, a survey affidavit, in a form reasonably acceptable to the Title Company and Seller, and executed by Seller, reasonably adequate to remove the so-called "standard exceptions" from the Owner's Policy;

(d)    The Sale Order with provisions releasing or discharging any Monetary Liens if applicable;

(e)    Seller's share of Closing Costs, if any;

3

      (f)      Any other documents reasonably required by Buyer or the Title Company, including without limitation those necessary to issue the Owner's Policy (including any endorsements thereto).

**5.3.**    **Buyer Deliverables.** At Closing, Buyer shall deliver the following:

    **5.3.1.**    The Cash Consideration as required by the APA;

    **5.3.2.**    Buyer's share of Closing Costs; and

    **5.3.3.**    Any other documents reasonably required by Seller or the Title Company.

**5.4.**    **Closing Costs.** The Parties shall be responsible for the following costs (collectively, the "**Closing Costs**") in association with this Agreement:

    **5.4.1.**    Buyer shall pay for (a) all costs associated with Buyer's Property investigations; (b) search and exam fees and the base premium associated with the Owner's Policy and all other Title Company fees and charges associated with the Owner's Policy; (c) the cost of any endorsements to its Owner's Policy; (d) Tennessee indebtedness tax associated with financing to acquire the Property, if any; (e) all costs associated with any loan policy of title insurance, if any; and (f) one-half of the Title Company's escrow charges, if any.

    **5.4.2.**    Seller shall pay all for (a) recording fees associated with the Deed; (b) Tennessee transfer tax; (c) the cure of any and all Monetary Liens, if applicable; and (d) one-half of the Title Company's escrow charges, if any.

    **5.4.3.**    Except as otherwise provided in this Agreement, Buyer and Seller shall be responsible for their own attorneys' fees.

**5.5.**    **Prorations**.

    **5.5.1.**    <u>**Items to be Prorated**</u>. The following (the "Prorations") shall be adjusted as indicated as of midnight immediately preceding the Closing Date (the "Adjustment Date") and the Buyer shall be deemed to own the Property for the entirety of the Closing Date:

      (a)    *Taxes.* Real estate and personal property taxes and assessments, including penalties and interest, shall be prorated as follows: Seller shall pay all taxes and assessments, including any applicable penalties and interest, which accrued and became due and payable prior to the Closing, and a pro rata share of the taxes and assessments which accrued prior to the Closing but will become due and payable after the Closing based on the taxes assessed for the year of the Closing, even if the taxes and assessments are not yet due and payable, in which case the taxes and assessments for the immediately prior year shall be used for the proration at the Closing; <u>provided that</u> if prorations are made based on the prior year's taxes and assessments, then, following issuance of the assessments for the year in which the Closing occurs, Buyer may deliver to Seller the tax bill and Seller shall within thirty (30) days thereafter remit to Buyer any additional amount allocable to Seller (it being understood and agreed that Seller's obligation in this subsection shall survive the Closing);

      (b)    *Utilities.* Electric, gas, water and sewer charges based on the most recent bills available; and

(c)    *Other*. Any other amounts customarily prorated in the jurisdiction in which the Property is located.

**5.5.2.    Delivery of Proration Information; Purchase Price Adjustment**. Within a reasonable time prior to the Closing Date, Seller shall provide Buyer and the Title Company all information required to calculate the Prorations and reflect them on the Settlement Statement. If the Prorations result in a payment due to Buyer, then the Purchase Price shall be reduced at Closing by that amount. If the Prorations result in a payment due to Seller, then that amount shall be paid to Seller in addition to the Purchase Price at Closing. The provisions of this subsection shall survive the Closing. The Parties shall correct any errors in the Prorations as soon as practicable after Closing.

## 6.    REPRESENTATIONS AND WARRANTIES

6.1.    Seller incorporates by reference those Representations and Warranties of Seller contained in Section 5.1 and 5.3 of the APA. In addition to those Representations and Warranties, Seller represents and warrants to Buyer on the Effective Date and as of the Closing Date the following (collectively, the "**Seller Reps/Warranties**"):

### 6.1.1.    Legal Violations; Condition of Property.

(a)    For purposes of this Agreement, the term "Applicable Law" shall mean and include the following, as the same may be in effect from time to time: (i) any and all judicial decisions, statutes, rulings, rules, regulations, permits, or ordinances of any governmental or quasi-governmental authority that relate in any way or are applicable to the Property or the ownership, use, or occupancy thereof; and (ii) any and all covenants, conditions, and restrictions contained in any deed or other form of conveyance or in any other instrument of any nature that relate in any way or are applicable to the Property or the ownership, use, or occupancy thereof.

(b)    Seller has received no written notice from any governmental authority, and has no knowledge, of any violation of Applicable Law which has not been corrected, or any special tax or assessment to be levied against the Property, or any change in the tax assessment of the Property.

(c)    Seller has not received written notice of any, and to Seller's knowledge there are no, violations of any Applicable Law relating to the ownership, use and operation of the Property as it is now operated.

**6.1.2.    No Condemnation**. There are no pending or, to Seller's knowledge, threatened condemnation or eminent domain proceedings against the Property or any part thereof.

**6.1.3.    Environmental**. With respect to environmental matters, the Property is entitled to the benefits of an indemnification from the United States Department of Energy with respect to any losses arising out of any underground hazards.  A copy of that indemnification has been provided to Buyer.

**6.1.4.    Title.** Subject to entry of the Sale Order, Seller has the right to convey the Property pursuant to the terms of this Agreement. No person (other than Buyer pursuant to this Agreement) has a right or option to acquire any interest in the Property.

**6.1.5.    No Zoning Changes**. To Seller's knowledge, there are no pending or contemplated zoning changes, variances, special zoning exceptions, conditions or agreements affecting, or potentially affecting, the Property or any part thereof.

**6.1.6.    No Agreements**. Other than the Designated Contracts, there are no service, maintenance, supply, brokerage, listing and/or other contracts affecting the Property. As of the Closing Date, there will be in existence no leases, licenses, occupancy agreements or other similar agreements (each a "Lease" and, collectively, "Leases") giving any individual or entity any right of possession or use of all or any part of the Property.

DISCLAIMER; NO OTHER WARRANTIES. EXCEPT FOR THE REPRESENTATIONS OF SELLER EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY CONCERNING THE PROPERTY (INCLUDING WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE). EXCEPT AS EXPRESSLY SET FORTH IN THIS SECTION 6.1, THE PROPERTY IS PROVIDED AND WILL BE CONVEYED TO BUYER "AS IS," "WHERE IS," AND IN "WITH ALL FAULTS" CONDITION.

**6.2.    Buyer's Representations and Warranties.** Buyer incorporates by reference those Representations and Warranties of Buyer as contained in Section 6 of the APA (collectively, the "**Buyer/Reps Warranties**" and together with the Seller Reps/Warranties, the "**Representations/Warranties**").

**6.3.    Effective Date; Survival.** The Representations/Warranties, as they relate to the Property, are true, complete and correct, as of the Effective Date, and shall be true, complete and correct in all material respects as of the Closing Date with the same force and effect as if first made at that time, subject to the limitations and qualifications contained in this Agreement. The Representations/Warranties shall not survive the Closing.

## 7.    PRE-CLOSING COVENANTS OF SELLER

Seller covenants with Buyer that from and after the Effective Date through the Closing Date:

**7.1.    Insurance.** Seller shall maintain existing liability and casualty insurance coverage in effect with respect to the Property.

**7.2.    Taxes and Assessments.** Subject to any limitations imposed on Seller by the filing of the Bankruptcy Case, Seller shall pay in a timely fashion all taxes and other public charges against the Property.

**7.3.    Condemnation Notices.** Seller shall provide Buyer, within two (2) business days after receipt, copies of any notices Seller receives with respect to any condemnation or eminent domain proceedings affecting the Property.

**7.4.    No Transfers.** Seller will not sell, transfer, convey, or encumber, or cause or permit to be sold, transferred or conveyed, the Property or any part of or interest in it.

**7.5.    Leases and Contracts.** Seller shall not enter into any Leases or Contracts with a term extending beyond the Closing Date and shall terminate any and all existing Leases at Seller's sole cost and expense prior to the Closing Date.

## 8.    CONDITIONS PRECEDENT TO CLOSING

**8.1.** **Conditions Precedent to Obligations of Buyer.** The obligation of Buyer under this Agreement to purchase the Property from Seller is subject to the satisfaction, as of Closing, of each of the following conditions precedent (each a "**Buyer Condition Precedent**" and collectively the "**Buyer Conditions Precedent**")**,** which are for the sole benefit of Buyer and may be waived by Buyer, if at all, only in writing and in Buyer's sole and absolute discretion:

**8.1.1.** The Seller Reps/Warranties shall be true, accurate and complete in all material respects as of the Closing Date with the same force and effect as if the representations and warranties had been made on and as of the Closing Date;

**8.1.2.** Seller shall have performed all of the covenants and obligations required by this Agreement to be performed by Seller on or before the Closing Date;

**8.1.3.** The closing of the transactions contemplated by the APA shall have occurred or be set to occur concurrently with the Closing;

**8.1.4.** Title to the Property shall conform with the requirements of Article 4; and

**8.1.5.** Any and all Leases shall have been terminated and no party shall have the right to occupy all or any part of the Property.

**8.2.** **Conditions Precedent to Obligations of Seller.** The obligation of Seller under this Agreement to sell the Property to Buyer is subject to the satisfaction, as of Closing, of each of the following conditions precedent (each a "**Seller Condition Precedent**" and collectively the "**Seller Conditions Precedent**")**,** which are for the sole benefit of Seller and may be waived by Seller, if at all, in Seller's sole and absolute discretion:

**8.2.1.** The Buyer Reps/Warranties shall be true, accurate and complete in material respects as of the Closing Date with the same force and effect as if the representations and warranties had been made on and as of the Closing Date;

**8.2.2.** Buyer shall have performed all of the covenants and obligations required by this Agreement and the APA to be performed by Buyer on or before the Closing Date; and

**8.2.3.** The closing of the transactions contemplated by the APA shall have occurred or be set to occur concurrently with the Closing.

**8.3.** **Failure of a Condition Precedent.** The Buyer Conditions Precedent and Seller Conditions Precedent are referred to collectively as the "**Conditions Precedent**". Upon the failure of a Condition Precedent in favor of a Party, that Party may terminate this Agreement by written notice to the other Party, whereupon the Earnest Money shall be distributed to Buyer and the Parties shall be relieved of all further obligations under this Agreement, except obligations that by their terms survive the termination of this Agreement; provided that if the failure of a Condition Precedent is due to a Buyer Default or Seller Default, as applicable, then the Parties' rights and remedies shall be governed by Article 10.

## 9. RISK OF LOSS

**9.1.** **Who Bears Risk.** All risk of loss with respect to the Property shall remain with the Seller until the Closing Date, after which all risk of loss shall be with Buyer.

**9.2.    Pre-Closing Condemnation.** If at any time prior to the Closing Date, all or any part of the Property is taken or appropriated by virtue of eminent domain or similar proceedings or is condemned for any public or quasi-public use (or proceedings to condemn a material part of the Property are initiated), Seller shall promptly give written notice thereof to Buyer, and then Buyer may either (**a**) terminate this Agreement upon written notice (a "**Condemnation Termination Notice**") to Seller and all Earnest Money will be returned to Buyer, or (**b**) elect to maintain this Agreement and proceed with the Closing with no reduction in Purchase Price. If Buyer terminates this Agreement, then Seller shall be entitled to receive all condemnation proceeds paid for that portion of the Property taken or destroyed. If Buyer elects to maintain this Agreement in full force and effect, then Buyer shall be entitled to receive all condemnation proceeds paid for that portion of the Property taken or destroyed.

**9.3.    Pre-Closing Casualty.** If all or a material portion of the Improvements on the Real Property are damaged or destroyed by a casualty before the Closing, Seller shall promptly give written notice thereof to Buyer, and then Buyer may either (a) terminate this Agreement upon written notice (a "**Casualty Termination Notice**") to Seller and all Earnest Money will be returned to Buyer, or (b) elect to maintain this Agreement and proceed with the Closing with no reduction in the Purchase Price. If Buyer terminates this Agreement, then Seller shall be entitled to receive all insurance proceeds paid for that portion of the Property damaged or destroyed. If Buyer elects to maintain this Agreement in full force and effect, then Buyer shall be entitled to receive all insurance proceeds paid for that portion of the Property damaged or destroyed and assume responsibility for any repairs.

**10.    TERMINATION.** This Agreement shall automatically terminate without any action of the Parties and be of no further force and effect upon a termination of the APA in accordance with Section 8.4 of the APA.

**11.    MISCELLANEOUS**

**11.1.    Notice.** Any notice or consent authorized or required by this Agreement shall be governed by Section 8.12 of the APA.

**11.2.    Real Estate Commission.** Each Party represents and warrants to the other that, other than Intrepid Investment Bankers LLC ("**Facilitating Broker**")**,** no broker, finder, or agent is entitled to a commission or fee resulting from this transaction and shall indemnify the other Party against claims to the contrary by any person claiming by, through or under the indemnifying Party. Seller shall pay Facilitating Broker a commission at Closing pursuant to the terms of a separate written agreement. This Section 11.2 shall survive the Closing or any earlier termination of this Agreement.

**11.3.    Benefit and Binding Effect.** This Agreement shall be binding upon and shall inure to the benefit of the Parties and their respective heirs, legal representatives, successors and assigns.

**11.4.    Time of the Essence.** Time is of the essence of this Agreement.

**11.5.    Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the state in which the Property is located, without respect to conflict of laws provisions. Disputes between the Parties arising from this Agreement shall be decided in the United States Bankruptcy Court for the District of Delaware.

**11.6.    Entire Agreement.** This Agreement and APA, to the extent incorporated herein by reference, contains the entire agreement between the Parties with respect to the subject matter and may be amended only by written agreement signed by all Parties, and, with respect to amendments to Section 11.14, the Title Company. Neither Buyer nor Seller shall be bound by any covenants, agreements, statements,

representations or warranties, oral or written, not contained in this Agreement. No waiver of any of the provisions of this Agreement shall be valid unless the same is in writing and is signed by the Party against whom it is sought to be enforced.

**11.7.    Headings/Drafting.** The paragraph headings used in this Agreement are for convenience purposes only and do not constitute matters to be construed in interpreting this Agreement. This Agreement was drafted by Buyer for convenience purposes only and shall not be construed for or against Buyer on that basis.

**11.8.    Assignment.** Buyer shall not assign this Agreement to any other person or entity without Seller's prior written consent, not to be unreasonably withheld, conditioned or delayed. Notwithstanding the foregoing, Buyer may assign this Agreement to an affiliate of Buyer so long as notice of such assignment is delivered to Seller at least five (5) business days prior to the Closing Date and so long as the originally-named Buyer is not released from any liability hereunder in connection with such assignment. Any assignee or transferee under any such assignment or transfer by Buyer shall expressly assume all of Buyer's duties, liabilities and obligations under this Agreement by written instrument delivered to Seller as a condition to the effectiveness of such assignment or transfer. Seller shall not assign this Agreement to any other person or entity except pursuant to the applicable provisions of <u>Section 11.15</u> below.

**11.9.    Savings Clause.** If any covenant or clause or portion thereof be deemed unenforceable by statute or by court decision, then only that portion which is so declared unenforceable shall be unenforceable and the remainder of this Agreement shall survive in full force and effect.

**11.10.    Extension of Time Periods for Non-Business Days.** Whenever the last day for the exercise of any privilege or the discharge of any duty hereunder shall fall upon a Saturday, Sunday or public or legal holiday, the Party having the privilege or duty shall have until 5:00 p.m. on the next succeeding regular business day to exercise the privilege or to discharge the duty.

**11.11.    Counterparts; Electronic Signatures.** This Agreement may be executed in any number of counterparts, each of which shall be considered an original document. Facsimile and electronic signatures have the same force and effect as originals.

[SIGNATURES ON FOLLOWING PAGES]

SIGNATURE PAGE
TO
PURCHASE AND SALE AGREEMENT

IN WITNESS WHEREOF, the Parties have executed this Purchase and Sale Agreement as of the Effective Date.

**SELLER:**

**USNC HOLDINGS, LLC,**

a Washington limited liability company

By: _____

Name: _____

Title: _____

[PARTY SIGNATURES CONTINUE ON NEXT PAGE]

SIGNATURE PAGE
TO
PURCHASE AND SALE AGREEMENT

---

**<u>BUYER</u>**:

**STANDARD NUCLEAR, INC.,**

a Delaware corporation


By: _____


Name:  _____


Title:_____


[END OF PARTY SIGNATURES; TITLE COMPANY SIGNATURE ON NEXT PAGE]

SIGNATURE PAGE
TO
PURCHASE AND SALE AGREEMENT

---

The Title Company signs below for the limited purpose of agreeing to <u>Section 12.14 </u>(Escrow Provisions) of the foregoing Purchase and Sale Agreement.

<u>**TITLE COMPANY**</u>:

**FIRST AMERICAN TITLE INSURANCE COMPANY**


By: _____


Name: _____


Title:_____


[END OF SIGNATURES]

EXHIBIT A
to Purchase and Sale Agreement
Description of Real Property

**Parcel 1, 2 & 3**:

Beginning at an iron rod in the southerly right-of-way line of South Perimeter Road and located at Tennessee Grid coordinate North = 584,236.81 and East = 2,442,147.12; Thence, the following calls along the southerly right-of-way line of South Perimeter Road 187.36 feet along a curve to the left having a radius of 853.45 feet and a chord bearing of South 89 deg. 45 min. 16 sec. East, and a chord distance of 186.98 feet to an iron rod;

Thence, North 83 deg. 57 min. 24 sec. East, 316.19 feet to an iron rod; Thence, 311.94 feet along a curve to the left having a radius of 500.00 feet and a chord bearing of North 66 deg. 04 min. 54 sec. East, and a chord distance of 306.91 feet to an iron rod;

Thence, North 48 deg. 12 min. 25 sec. East, 122.51 feet to an iron rod;

Thence, North 44 deg. 04 min. 08 sec. East, 398.14Z feet to an iron rod;

Thence, 41.47 feet along a curve to the right having a radius of 60.00 feet and a chord bearing of North 63 deg. 52 min. 09 sec. East, and a chord distance of 40.65 feet to an iron rod;

Thence, North 83 deg. 40 min. 12 sec. East, 6.72 feet to an iron rod being the common corner with ED-5 East Lot 1R;

Thence, 21.53 feet along a curve to the right having a radius of 14.00 feet and a chord bearing of South 52 deg. 16 min. 16 sec. East, and a chord distance of 19.47 feet to an iron rod found in the common property line of ED-5 West and ED-5 East Lot 1R;

Thence, continuing with said common line, South 08 deg. 12 min. 46 sec. East, 90.37 feet to an iron rod;

Thence, 430.41 feet along a curve to the left having a radius of 1,250.00 feet and a chord bearing of South 18 deg. 04 min. 35 sec. East, and a chord distance of 428.29 feet to an iron rod;

Thence, South 27 deg. 56 min. 26 sec. East, 89.04 feet to an iron rod;

Thence, continuing with said common property line and a portion of the southerly right-of-way of Europia Avenue, 286.44 feet along a curve to the left having a radius of 500.00 feet and a chord bearing of South 44 deg. 21 min. 05 sec. East and a chord distance of 282.53 feet to an iron rod in the southerly right-of-way line of Europia Avenue;

Thence, leaving the southerly right-of-way of Europia Avenue the following calls along the southerly property line of ED-5 West, South 51 deg. 01 min. 01 sec. West, 209.35 feet to an iron rod;

Thence, South 41 deg. 30 min. 10 sec. West, 188.76 feet to an iron rod;

Thence, South 30 deg. 09 min. 56 sec. West, 180.88 feet to an iron rod;

Thence, South 07 deg. 09 min. 00 sec. West, 140.08 feet to an iron rod;

Thence, South 02 deg. 50 min. 05 sec. East, 215.28 feet to an iron rod;

Thence, South 80 deg. 23 min. 02 sec. West, 360.31 feet to an iron rod;

Thence, South 64 deg. 49 min. 07 sec. West, 169.17 feet to an iron rod found in the easterly right-of-way line of Burchfield Road.

Thence, along the easterly right-of-way line of Burchfield Road the following calls, North 25 deg. 03 min. 24 sec. West, 276.98 feet to an iron rod;

Thence, North 22 deg. 47 min. 05 sec. West, 205.60 feet to an iron rod found;

Thence, North 19 deg. 23 min. 18 sec. West, 94.01 feet to an iron rod found;

Thence, 239.35 feet along a curve to the left having a radius of 1730.13 feet and a chord bearing North 23 deg. 21 min. 05 sec. West, and a chord distance of 239.16 feet to an iron rod found;

Thence, 204.65 feet along a curve to the left having a radius of 543.35 feet and a chord bearing North 38 deg. 06 min. 18 sec. West, and a chord distance of 203.45 feet to an iron rod found;

Thence, North 48 deg. 53 min. 43 sec. West, 348.08 feet to an iron rod found;

Thence, 34.06 feet along a curve to the right having a radius of 13.42 feet and a chord bearing of North 23 deg. 49 min. 11 sec. East, and a chord distance of 25.62 feet to the point of beginning and containing 28.14 acres more or less.

<u>EXHIBIT B-1</u>

to Purchase and Sale Agreement

<u>Form of Special Warranty Deed</u>

[SEE FOLLOWING PAGES]

This Instrument Prepared By:

Nelson Mullins Riley & Scarborough LLP (WWD)
1222 Demonbreun Street, Suite 1700
Nashville, Tennessee 37203

| **Address New Owner**: | **Send Tax Bills To:** | **Map & Parcel Nos.:** |
|---|---|---|
|  | Same |  |

### SPECIAL WARRANTY DEED

**FOR AND IN CONSIDERATION** of the sum of Ten ($10.00) Dollars, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **USNC HOLDINGS, LLC,** a Washington limited liability company ("**Grantor**"), has bargained and sold and does hereby transfer and convey unto _____, a _____ ("**Grantee**"), its successors and assigns, all of Grantor's right, title and interest in and to those certain tracts or parcels of land located in Roane County, Tennessee and described with greater particularity in **Exhibit A,** attached and incorporated by this reference, together with all of Grantor's rights, title and interest in and to all rights, appurtenances and hereditaments pertaining thereto, and all of Grantor's interest in and to all improvements in, upon and under such land.

The above-referenced land is improved property known as 200 Europia Avenue, Oak Ridge, Roane County, Tennessee, together with the improvements and other rights described in the first paragraph (collectively, the "**Property**")**.**

**TO HAVE AND TO HOLD** the Property, and the appurtenances and hereditaments thereunto belonging or in any way appertaining to the said Grantee, its successors and assigns, forever.

**AND** Grantor does hereby covenant with Grantee that it is lawfully seized and possessed of the Property in fee simple; that it has a good right to sell and convey the same.

**AND** Grantor does further covenant and bind itself, its successors and assigns, to warrant and forever defend the title to the Property against the lawful claims of all persons claiming by, through or under Grantor, but not further or otherwise.

[SIGNATURE ON FOLLOWING PAGE]

SIGNATURE PAGE
TO
SPECIAL WARRANTY DEED

_____

**IN WITNESS WHEREOF,** Grantor has executed or caused this instrument to be executed on the day and year first above written.

<u>**GRANTOR**</u>:

**USNC HOLDINGS, LLC,**

a Washington limited liability company

By: _____

Name: _____

Title _____

STATE OF _____

COUNTY OF _____

Personally appeared before me, the undersigned, a Notary Public for the state and county aforesaid, _____, with whom I am personally acquainted (or proved to me on the basis of satisfactory evidence), and who, upon oath acknowledged that she/he executed the within instrument for the purposes therein contained, and who further acknowledged that she/he is the _____ of **USNC HOLDINGS, LLC,** a Washington limited liability company, and is authorized to execute this instrument on behalf of the such limited liability company.

WITNESS my hand and office, this_____ day of _____, 20___.

Notary Public

My Commission Expires: _____

<u>EXHIBIT A</u>

to Special Warranty Deed

<u>Legal Description</u>

[Record legal description be inserted before Closing]

**EXHIBIT F**

**FORM OF INTELLECTUAL PROPERTY ASSIGNMENT**

(To be Attached)

*Execution Version*

## ASSIGNMENT OF INTELLECTUAL PROPERTY

THIS ASSIGNMENT OF INTELLECTUAL PROPERTY (this "***Assignment***"), effective as of [●], 2024, is made by and between **ULTRA SAFE NUCLEAR CORPORATION**, a Delaware corporation, **ULTRA SAFE NUCLEAR CORPORATION – TECHNOLOGIES**, a Washington Corporation (each an "***Assignor***" and collectively, the "***Assignors***"), and **STANDARD NUCLEAR, INC.**, a Delaware corporation ("***Assignee***"). Assignor and Assignee are each referred to herein individually as a "***Party***" and collectively, as the "***Parties***."

**WHEREAS**, Assignors, Assignee and those certain other parties thereto are parties to that certain Asset Purchase Agreement, dated November 21, 2024 (the "***Purchase Agreement***"), pursuant to which Assignee shall acquire certain assets of Assignors consisting of the Purchased Assets and Assumed Liabilities; and

**WHEREAS**, in accordance therewith, Assignors desire to transfer and assign to Assignee, and Assignee desires to accept the transfer and assignment of, all of the intellectual property set forth on Schedule A attached hereto (the "***Intellectual Property***").

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows.

1.      Definitions. Capitalized terms used and not defined herein shall have the meanings ascribed to them in the Purchase Agreement.

2.      Assignment. Assignors do hereby assign to Assignee all of its legal and equitable right, title, and interest of whatever nature throughout the world in and to Assignors' Intellectual Property and all registrations and applications for registrations of any of Assignors' Intellectual Property, including the registrations identified on Schedule A attached hereto (collectively, the "***Assigned Property***"), together with the goodwill of the Business symbolized by the Assigned Property, and together with all of such Assignors' right to income, to licensing fees, and to sue and recover for past, present, and future claims or causes of action arising out of or related to any infringements, dilutions, or misappropriations of the Assigned Property, which right, title, and interest is being assigned free and clear of all encumbrances, the same to have and to hold by the Assignee as fully and entirely as the same would have been held by the Assignors had this Assignment not been made.

For all Intellectual Property that comprises a patent or patent application, the assignment includes the entire worldwide right, title, and interest in and to the same, the inventions, improvements, and discoveries disclosed therein, and any and all related patent applications and patents which may be applied for or granted therefor in the United States and in all foreign countries and jurisdictions, including all divisions, continuations, continuations-in-part, reissues, reexaminations, renewals, restorations, extensions, counterparts, substitutes, and extensions thereof, and all rights of priority resulting from the filing of such applications and granting of such patents; and all applications for industrial property protection, including without limitation, all applications for patents and utility models, which may hereafter be filed in any country or countries, together with the right to file such applications and the right to claim the priority rights derived from the respective patent application under the patent laws of the United States, the International Convention for the Protection of Industrial Property, or any other international agreement, or the domestic laws of the country in which any such application is filed, as may be applicable; and all applications for industrial property protection, including, without limitation, all applications for patents and utility models which may hereafter be filed for said patent or patent application in any country or countries, together with the right to file such applications; and all forms of industrial property protection, including, without limitation, patents, utility models, and inventors' certificates which may be granted for said patent or patent application in any country or countries and all extensions, renewals, and reissues thereof.

Assignors hereby authorize and request the Director of the United States Patent and Trademark Office to issue any United States patent, and foreign patent authorities to issue any foreign patent, granted for the Intellectual Property, to Assignee, its successors, legal representatives, and assigns, the entire worldwide right, title, and interest in and to the same to be held and enjoyed by Assignee, its successors, legal representatives, and assigns to the full end of the terms for which any and all such patents may be granted, as fully and entirely as would have been held and enjoyed by the undersigned had this Assignment not been made; and each undersigned inventor agrees to execute any and all documents and instruments and perform all lawful acts reasonably related to recording this Assignment or perfecting title to the Patent Application and all related patents and applications, to Assignee, its successors, legal representatives, and assigns, whenever reasonably requested by Assignee, its successors, legal representatives, or assigns.

Each such Assignor authorizes and requests Assignee to request the United States Patent and Trademark Office ("***USPTO***") to record Assignee as Assignee or transferee of all Intellectual Property that comprises a Trademark(s) and shall, promptly upon presentation to such Assignor by Assignee, execute, or procure the execution of, such transfer documents and provide such information as required by the USPTO, and each such Assignor hereby covenants that such Assignor has full right to convey such Assignor's entire interest herein assigned, and that such Assignor has not executed, and will not execute, any agreements in conflict herewith.

3.      <u>Further Assurances</u>. Each such Assignor hereby agrees to execute, at Assignee's expense, all documents for use in applying for and obtaining patent, trademark, and copyright registrations and other rights and protections relating to the Assigned Property and enforcing the same, as Assignee may reasonably request, together with any assignments thereof to Assignee or persons designated by it. In the event Assignee is unable, after reasonable effort, to secure such Assignor's signature on any document or documents needed to apply for or prosecute any patent, trademark, copyright, or other right or protection relating to any Assigned Property, for any reason whatsoever, each such Assignor hereby irrevocably designates and appoints Assignee and its duly authorized officers and agents as such Assignor's agent and attorney-in-fact to act for and on such Assignor's behalf to execute and file any such application or applications and to do all other lawfully permitted acts to further the prosecution of any patents, trademarks, copyrights, or similar protections thereon with the same legal force and effect as if executed by such Assignor.

4.      <u>Validity Disputes; Use</u>. Each such Assignor agrees to assist Assignee, upon Assignee's reasonable request and at Assignee's sole expense, in any pending or threatened suits or actions by third parties challenging the validity or enforceability of any Assigned Property. Further, each such Assignor shall not directly or indirectly, challenge Assignee's ownership of or right to use any of the Assigned Property. Each such Assignor shall not directly or indirectly use, register, or attempt to register or use any domain name, trade name, trademark, or service mark that implies an association between such Assignor and Assignee or is confusingly similar to any of the Assigned Property.

5.      <u>No Third-Party Beneficiaries</u>. Nothing in this Assignment, expressed or implied, is intended or shall be construed to confer upon or give to any person, firm, corporation, association, or other entity, other than Assignee, Assignors, and each of their respective successors and assigns, any remedy or claim under or by reason of this Assignment or any agreement, term, covenant, or condition hereof, and all of the agreements, terms, covenants, and conditions contained in this Assignment shall be for the sole and exclusive benefit of Assignee, Assignors, and each of their respective successors and assigns.

6.      <u>No Additional Representations</u>. This Assignment is subject in all respects to the provisions of the Purchase Agreement. This Assignment shall not be deemed to defeat, limit, alter, impair, enhance, or enlarge any right, obligation, liability, claim, or remedy created by the Purchase Agreement or any ancillary agreement thereto. In the event of any conflict or inconsistency between the terms and conditions

2

set forth in this Assignment and the Purchase Agreement, the terms and conditions set forth in the Purchase Agreement shall control.

7.      <u>Modification</u>. This Assignment may not be modified except by a writing executed by all the Parties hereto.

8.      <u>Assignment</u>. The terms of this Assignment shall be binding upon, inure to the benefit of, and be enforceable by the Parties hereto and each of their respective successors and assigns.

9.      <u>Governing Law</u>. This Assignment and the legal relations among the Parties hereto shall be governed by and construed in accordance with the laws of the State of Delaware (without giving effect to principles of conflict of laws) as to all matters.

10.     <u>Headings</u>. The paragraph headings in this Assignment are for convenience only and such headings form no part of this Assignment and shall not affect its interpretation.

11.     <u>Counterparts</u>. This Assignment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which shall constitute the same agreement, and the execution of a counterpart of the signature page to this Agreement shall be deemed the execution of a counterpart of this Agreement. This Agreement may also be executed through the use of electronic signature, which each Party acknowledges and agrees is a lawful means of obtaining signatures in the United States. The delivery of this Agreement and the Parties' executed counterpart signature pages hereto may be made by e-mail transmission of a PDF document, and such signatures shall be treated as original signatures for all applicable purposes.

12.     <u>Filing</u>. Each such Assignor hereby agrees that this Assignment may be recorded with the USPTO, the United States Copyright Office, and any other office deemed applicable by Assignee, and, accordingly, that Assignee will be reflected as the successor in title to the Intellectual Property and all applications and registrations therefore.

*[**Signature Page Follows**]*

**IN WITNESS WHEREOF**, this Assignment has been duly executed and delivered by the Parties as of the date first written above.

<u>**ASSIGNORS**</u>:

**ULTRA SAFE NUCLEAR CORPORATION**, a Delaware corporation

By: _____
Name:  Kurt Terrani
Title:    Interim CEO

**ULTRA SAFE NUCLEAR CORPORATION - TECHNOLOGIES**, a Washington corporation

By: _____
Name:  Steven J Cuevas
Title:    Director

<u>**ASSIGNEE**</u>:

**STANDARD NUCLEAR, INC.,** a Delaware corporation

By: _____
Name:  Thomas Hendrix
Title:    CEO

## SCHEDULE A

**Patents**:
[●]


**Trademarks**

[●]

**Copyrights**

[●]

**Domain Names**

[●]

**Trade Names**

[●]

**Other**

[●]

**Logos**

[●]