## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| ULTRA SAFE NUCLEAR CORP., *et al.*,[1] | Case No. 24-12443 (KBO) |
| Debtors. | (Jointly Administered) |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, | |
| Plaintiff, | Adv. Proc. No. |
| v. | |
| USNC INVESTMENT, LLC, | |
| Defendant. | |

## <u>COMPLAINT</u>

The Official Committee of Unsecured Creditors (the "<u>Committee</u>" or "<u>Plaintiff</u>") appointed in the bankruptcy cases of the above-captioned debtors and debtors-in-possession (collectively the "<u>Debtors</u>"), by and through its undersigned counsel, respectfully submits this complaint (the "<u>Complaint</u>") on behalf of the Debtors' estates and alleges the following facts and claims:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of their respective federal tax identification numbers, are:  Ultra Safe Nuclear Corporation (9774); Ultra Safe Nuclear Corporation – Technologies (9815); USNC-Power Ltd. (6500); and Global First Power Limited (7980).  The Debtors' mailing address is 200 Europia Ave., Oak Ridge, Tennessee 37830.

## SUMMARY OF THE ACTION

1.      The Committee hereby seeks to recharacterize certain advances made to the Debtors by USNC Investment, LLC ("USNC Investment" or "Defendant") aggregating approximately $25.47 million, together with any fees and interest associated therewith (the "Advances"), as equity contributions, or, in the alternative, to (i) avoid the liens and security interests purportedly securing the repayment of the Advances, (ii) equitably subordinate the Advances to the claims of unsecured creditors, and (iii) disallow approximately $10 million of Defendant's claims in the underlying bankruptcy proceeding related to the Advances that were converted to equity in July 2023.

2.      As set forth below, Defendant is an insider of the Debtors for myriad reasons.  First, Defendant directly or indirectly owned or controlled over 20% of the voting securities of USNC (defined below), which in turn owned the equity of and controlled the remaining Debtor entities.  Defendant was also the alter ego of its Chief Executive Officer, Richard Hollis Helms ("Mr. Helms"), who concurrently served as Chairman of the Debtors' two-person board of directors (the "Board") from January 2020 through his passing in May of 2024.  Separately, Defendant was a person in control of the Debtors, given that Defendant, vis-à-vis Mr. Helms, possessed the ability to (and did in fact) dictate corporate policy at the Debtors and exert control over the disposition of their corporate assets.  In the alternative, Defendant's control over and close relationship with the Debtors made it a non-statutory insider of those entities, granting Defendant an unfair advantage with respect to the transactions challenged herein.

3.      Prior to making the Advances, Defendant was the Debtors' primary investor, having contributed approximately $98.5 million in preferred equity to the Debtors from 2020 to 2023.  Given the close relationship between Defendant and the Debtors, Defendant was acutely aware, at all times, of the Debtors' financial condition.

4.      The Advances, made at a time when the Debtors were grossly undercapitalized, were treated by both Defendant and the Debtors as equity.  The Debtors were not profitable at any point in their existence,[2] and Defendant had no expectation that the Advances could be repaid unless (i) the Debtors obtained significant third-party investment or (ii) the Debtors became profitable, which, by the Debtors' own projections, would not occur until 2028.

5.      The Advances carry many of the hallmarks of equity.  The Advances were made by an insider of the Debtors, which was controlled by the Debtors' largest economic stakeholder who also acted as Chairman of the Board.  $13.5 million of the Advances (the "Initial Advances") was provided to the Debtors without formal documentation.  Defendant did not document the terms of the Initial Advances until almost five months after the first of the Initial Advances was made.  The Advances were finally documented on August 31, 2023, as obligations of USNC and USNC-Tech (defined below) secured by certain collateral.  The Advances, however, were "secured" in name only.  Defendant did not seek to perfect its alleged liens and security interests until April 18, 2024, when it was clear that the Debtors were on the precipice of liquidation, and more than a year after the first Advance.

6.      Any maturity date relating to the Advances was entirely illusory—the Advances were the subject of at least four maturity date extensions over the course of one year, each of which was granted at the Debtors' request for no consideration.  Defendant in fact committed in writing to the Debtors that it would not seek repayment of the Advances, if at all, prior to the receipt of sufficient third-party financing.  Interest on the Advances was included in the relevant documentation but was to be paid only at maturity, which the parties knew might never

---

[2]      The Debtors, for example, produced negative cash flow of $75 million in 2023.  The Debtors were thus entirely reliant on Mr. Helms, Defendant, and other investors to fund the company.

happen.  Further, the Advances carried with them rights to appoint directors to the Board in certain circumstances, and were all, by design, convertible to equity.  It is clear that the "parties called an instrument one thing when in fact they intended it as something else."[3]

7.      In an explicit display of the parties' true intent, $10 million of the Advances were converted by Defendant into equity in July of 2023, which conversion was later retroactively approved by the Board (including Mr. Helms in his capacity as Chairman of the Board) by unanimous written consent.  Upon information and belief, Defendant alleges that this conversion was rescinded and seeks to recover all $25.47 million of the Advances as debt.  However, all of the factors described demonstrate that the Advances were "debt" in name only.  The Advances were, in substance, equity, and were treated as equity by both Defendant and the Debtors.

8.      Alternatively, (i) the perfection of Defendant's purported liens and security interests in April of 2024 is a paradigmatic preference—the transfer of an interest in the Debtors' property for the benefit of an insider, made on account of antecedent debt within one year of the bankruptcy filing that would also permit Defendant to recover more in a chapter 7 case had the transfer not been made; (ii) Debtors' grant of liens and security interests on account of the Initial Advances (which occurred months after the Initial Advances were made) was a transfer made while the Debtors were insolvent for less than reasonably equivalent value; and (iii) the advancement of $25.47 million in purported debt at a time when the Debtors had no operating income, were undercapitalized, and had no ability to otherwise repay the Advances (which acted as a demonstrable deterrent to much needed third-party investment), justifies equitable subordination of the Advances to the claims of general unsecured creditors.

---

[3]      *See Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.)*, 432 F.3d 448, 456 (3d Cir. 2006).

9.      In view of these circumstances, Plaintiff brings this Complaint seeking, as applicable, (i) recharacterization of the Advances as equity, (ii) avoidance of the liens and security interests securing the Advances as a preference under sections 544 and 547 of the Bankruptcy Code (defined below), (iii) avoidance of the liens and security interests granted on account of the Initial Advances as a constructive fraudulent transfer under section 548 of the Bankruptcy Code, (iv) equitable subordination of the Advances to the claims of general unsecured creditors under section 510 of the Bankruptcy Code, and (v) disallowance of that portion of Defendant's claim in the underlying bankruptcy proceeding relating to the $10 million of Advances that was converted to equity in July 2023.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and rules 6009 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

11.      Venue of this adversary proceeding is proper pursuant to 28 U.S.C. §§ 1408 and 1409 because this adversary proceeding arises under title 11 and arises in and is related to the Debtors' bankruptcy cases pending in this Court.

12.      This adversary proceeding presents "core" proceedings under 28 U.S.C. § 157(b).

13.      Plaintiff consents to entry of final orders and judgments by the Court in this adversary proceeding pursuant to Bankruptcy Rule 7008 and rule 7008-1 of the Local Rules of the United States Bankruptcy Court for the District of Delaware.  Plaintiff also consents to entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders on judgments consistent with Article III of the United States Constitution.

## **THE PARTIES**

14.     Plaintiff is the Committee appointed in the bankruptcy cases of the Debtors.

15.     The Debtors consist of four entities:  Debtor Ultra Safe Nuclear Corporation ("USNC") is a Delaware corporation and wholly owns Debtor Ultra Safe Nuclear Corporation – Technologies ("USNC-Tech"), a Washington corporation, and Debtor USNC-Power Ltd. ("USNC-P"), a British Columbian corporation.  USNC-P wholly owns Debtor Global First Power Limited ("GFP"), a Canadian corporation.  The Debtors are headquartered in Tennessee and have offices or facilities in Tennessee and Utah.

16.     Defendant USNC Investment is a Florida limited liability company formed on December 23, 2019, as a non-operating special purpose vehicle solely intended to hold the shares of USNC stock owned by Mr. Helms.  Defendant is member-managed, with its current sole member being the Richard Hollis Helms Revocable Trust.

17.     Upon information and belief, at all relevant times, Mr. Helms and his wife, Teresa Rose Helms, were the co-trustees of the Richard Hollis Helms Revocable Trust.  Mr. Helms also served as the chief executive officer of USNC Investment from its inception until in or around May 2024.  In or around March 2024, Alexander Helms and Lindsay Helms, Mr. Helms's children, were appointed as officers of USNC Investment.

## **PROCEDURAL HISTORY**

18.     On October 29, 2024 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their business and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12078002v.2

19.     On November 13, 2024, the Office of the United States Trustee appointed the Committee in these cases pursuant to 11 U.S.C. § 1102. *See* Dkt. No. 71.[4]

20.     On November 15, 2024, the Committee selected Seward & Kissel LLP as lead counsel, Potter Anderson & Corroon LLP as Delaware co-counsel, and Emerald Capital Advisors Corp. as its financial advisor.

21.     On February 24, 2025, the Bankruptcy Court entered the *Order Granting the Committee Leave, Standing and Authority to Commence, Prosecute and Settle Claims* [Dkt. No. 389] (the "<u>Derivative Standing Order</u>"), which authorized and gave derivative standing to the Committee to assert, on behalf of the Debtors' estates, the instant causes of action set forth in this Complaint.

## **<u>STATEMENT OF FACTS</u>**

### A.  **<u>The Debtor' Business</u>**

22.     The Debtors were founded in 2011 by Dr. Francesco Venneri ("<u>Dr. Venneri</u>"), the Debtors' former chief executive officer and chief science officer, to commercialize technology for nuclear fuel.  Since their founding, the Debtors expanded their initiatives to include the development of the Micro Modular Reactor Energy System, which purports to provide carbon-free, "walk-away safe" modular nuclear energy, as well as nuclear power and propulsion technologies for defense applications and space exploration.

23.     As discussed more fully below, like other companies developing technology, the Debtors were a "start-up" company that primarily relied on investors to fund their operations.  The Debtors' annual revenue in fiscal year 2023, for example, was approximately $5.8

---

[4]    The Committee consists of three members: MPR Associates, Inc., NAVTON Consulting Services, LLC, and EACL Consulting Services.

million, while they incurred $81.2 million in expenses, for a staggering net loss of $75.4 million. By the Debtors' own projections, they would not produce positive cash flow until 2028.

### B. Defendant Was an Insider of the Debtors

24.     At all times relevant to this Complaint, Defendant was an "insider" of the Debtors, both as defined by the Bankruptcy Code and as a matter of common law (*i.e.*, a "non-statutory insider").

25.     Upon information and belief, Defendant was an affiliate of USNC, and thus a statutory insider under 11 U.S.C. § 101(31)(E).  Indeed, upon information and belief, at various times from 2020 through the Petition Date, Defendant directly or indirectly owned, controlled, and/or held with the power to vote approximately 50% of the outstanding voting securities of USNC.  Defendant also held an economic interest in USNC of approximately 15%.[5]

26.     Separately, Defendant was an insider pursuant to 11 U.S.C. § 101(31)(B)(i) because it was the alter ego of Mr. Helms, a director of the Debtors.  Upon information and belief, Mr. Helms dominated and controlled Defendant such that there was a unity of interest between them.  For example, upon information and belief, Defendant was a single-member limited liability company with no employees, no operations, and which did not transact business with any entities other than the Debtors.  Defendant's sole existence was to make investments in the Debtors on behalf of Mr. Helms.  Further, despite corporate documents which provided that Defendant was member-managed by the Richard Hollis Helms Revocable Trust, for which both Mr. Helms and his wife acted as trustees, Mr. Helms solely managed Defendant's business endeavors, including

---

[5]     Additionally, during the relevant time period, Mr. Helms's children, Alexander and Lindsay Helms, each held an economic interest in USNC of approximately 17%.  The only other significant stockholder was Miranda Group, LLC, a non-operating special purpose vehicle formed for the sole purpose of holding the shares of USNC stock owned jointly by Dr. Venneri and his wife Giulia De Lorenzi-Venneri, which holds an economic interest of approximately 30% and a voting interest of approximately 33%.  There are approximately thirty-three additional stockholders whose individual economic or voting interests in USNC do not rise above five percent (5%).

negotiating on Defendant's behalf, signing all documents (often in the wrong capacity, including seemingly on his personal behalf rather than Defendant's), and making all investment decisions.

27.     Further, upon information and belief, Defendant was never properly capitalized and relied on Mr. Helms to personally fund all investments in USNC. Defendant, upon information and belief, did not maintain separate bank accounts. Instead, all investments were paid from Mr. Helms' personal account on the advice of his personal financial advisor. Defendant's façade of "corporate form" was for the sole benefit of Mr. Helms. By acting through Defendant, while at the same time serving as Debtors' Chairman of the Board, Mr. Helms was able to have it "both ways"—negotiating and ultimately papering the Advances on terms that inured to his benefit (and which belied the parties' true intent to treat the Advances as equity), and approving those terms on behalf of the Board, often irrespective of corporate formalities. This conduct was inequitable to the Debtors and the Debtors' creditors, who, as set forth below, were suddenly saddled with purportedly-secured debt that the Debtors could not pay—debt that ultimately scared off any real investments, and unfairly subordinated legitimate creditors.

28.     Upon information and belief, Defendant's control over USNC, vis-à-vis Mr. Helms, extended to major decisions regarding the Debtors' strategic go-forward plans, their use of cash, their capital raising activities, and C-Suite personnel decisions, among other things. For example, upon information and belief, Defendant, vis-à-vis Mr. Helms, provided input and instructions to the Debtors' management team concerning the Debtors' negotiations with potential investors, including which investors to focus efforts on and the content of marketing materials, authorized specific projects pursued by the Debtors, and recommended personnel and Board changes, which were adopted. In one particularly egregious example of Defendant's control (as well as Defendant's role as Mr. Helms's alter ego), in late 2023, Mr. Helms threatened to withhold

funding and chastised Dr. Venneri for drafting a poor message to investors that did not incorporate Mr. Helms's thoughts.[6]

29.     The remarkably close relationship between Defendant and the Debtors also granted Defendant control over the transactions described herein, which Mr. Helms both advanced in his capacity as CEO of Defendant, and then approved in his capacity as Chairman of the Debtors' Board.  Notably, Mr. Helms did not recuse himself from consideration of any transactions in which he, or Defendant, had an economic or other interest.  As such, Defendant's dealings with the Debtors were not conducted at arms-length, and consistently gave Defendant an unfair advantage over the Debtors.  For these reasons, Defendant was a non-statutory insider of the Debtors.

### C.  Helms, Through Defendant USNC Investment, Was the Debtors' Largest Investor

30.     The Debtors primarily relied on investments to fund their development efforts and operations.  The Debtors' largest and most significant investor was Mr. Helms.  Mr. Helms and his family, through Defendant, invested approximately $98.5 million in the Debtors (exclusive of the Advances).

31.     In January 2020, the Debtors entered into the first stock purchase agreement for the sale of series A preferred stock to Defendant for an aggregate purchase price of approximately $17.4 million.

---

[6]    Mr. Helms stated by email to Dr. Venneri "[w]e discussed this sitting 3 feet apart.  As drafted it's a disservice to USNC.  I believe we gave you a paper pad and a pen so you could take notes.  Where are those notes?  You clearly had no intention of doing what I asked.  So how in the world do you explain that?  What is my takeaway?  Are you not able to remember these things?  Do you have a different plan in mind that you are not sharing?  Is it your intention with my 3 requests to simply ignore them?  That is what you have done.  Is there someone else I should be working with at USNC?  You have 3 days to have a reviewed round closure notification approved by me and sent to all existing and prospective investors.  You have 3 days to get the board resolution signed by me.  There will be consequences if you do not get these done."

32.     In February 2020, Defendant invested an additional $12.6 million through the purchase of series A-1 preferred stock, and in February 2021, invested an additional $20 million in series A-2 preferred stock.

33.     In or around mid-2021, the Debtors decided to seek additional financing through the sale of series B-1 preferred stock.  Upon information and belief, in October 2021, Defendant invested another $25 million in the purchase of series B-1 preferred stock.

34.     Between May 2022 and July 2022, USNC and Defendant entered into a series of note purchase agreements for the issuance of a convertible promissory notes, with a cumulative principal amount of $8.5 million (the "2022 Convertible Notes").  On August 17, 2022, each of the 2022 Convertible Notes was converted to the Debtors' series B-1 preferred stock, further increasing Defendant's equity position in the Debtors.

35.     Later that year, in or around December 2022, Defendant invested an additional $3 million in the Debtors.  Defendant's investments continued into 2023.  Between January and March 2023, Defendant invested $12 million in Debtors through the purchase of additional series B-1 preferred stock.

**D.  Defendant Abruptly Pivots to a Purported Debt Facility**

36.     On or about April 4, 2023, on the heels of Defendant's prior equity investments, Defendant advanced $1.5 million to the Debtors.  Defendant advanced an additional $3.5 million on or about April 26, 2023.

37.     Subsequently, on or about April 27, 2023, Defendant and the Debtors entered into a term sheet (the "Term Sheet") for a proposed bridge loan financing transaction whereby the Debtors would issue, and Defendant would purchase, up to $10 million in senior convertible promissory notes on or before May 31, 2023.  The Term Sheet provided that the notes would bear interest at 12% per annum and would have a first lien on all assets of USNC.  The

Term Sheet provided that the notes would mature on the earlier of July 31, 2023, or the receipt of at least $50 million in gross proceeds from the sale of USNC's series B-1 preferred stock.  The Term Sheet, although executed by the Debtors, was not legally binding and was expressly subject to definitive documentation.

38.     Defendant, prior to the execution of any further documentation, advanced an additional $5 million on May 1, 2023, $1.5 million on July 28, 2023, and $2 million on August 25, 2023, for a total of $13.5 million in Initial Advances between April and August 2024.

39.     In or around July 2023, and prior to the documentation of any purported debt facility, Defendant and the Debtors agreed to convert to series B-1 preferred stock approximately $10 million (plus interest) of the Initial Advances made by Defendant in April and May 2023.  This conversion was documented in a letter agreement dated July 21, 2023, which was signed by Mr. Helms on behalf of Defendant and Dr. Venneri on behalf of USNC.  One week later, on July 28, 2023, the Board of USNC retroactively authorized and approved execution of the letter agreement pursuant to a Unanimous Written Consent, which consent was again signed by Dr. Venneri and Mr. Helms (this time, however, in Mr. Helms' capacity as director of USNC).  Upon information and belief, Defendant disputes that this conversion was effective and seeks to recover this $10 million as part of its purported debt under the Advances.

40.     On August 31, 2023, Defendant and the Debtors entered into a note purchase agreement, promissory note, security agreement, and related documentation (the "Note Documents") belatedly documenting the already-advanced Initial Advances of $13.5 million, along with an additional $3 million, for a total of $16.5 million in Advances.  These notes were guaranteed by USNC-Tech.  USNC and USNC-Tech pledged all of the assets of USNC and USNC-Tech as security for repayment.  The notes bore interest of 12% per annum and matured on

12

the earlier of December 31, 2023 (already a five-month extension of the maturity date contemplated by the Term Sheet) or the Debtors' receipt of $50 million or more in proceeds from the sale of series B preferred stock.  The notes issued on account of the Advances were fully convertible into series B-1 preferred stock at the sole option of Defendant and could be prepaid at the election of Defendant without penalty.  Additionally, the Note Documents included restrictive covenants that would prohibit the Debtors from obtaining additional debt financing.  Upon information and belief, the Debtors' entry into the Note Documents was not formally considered or approved by the Board.

41.     On September 29, 2023, Defendant and USNC entered into an amended and restated note purchase agreement and promissory note (the "Amended Note Documents") that allowed for the issuance of up to $32,500,000 in advances to USNC.  That same day, Defendant advanced an additional $1 million to the Debtors under the Amended Note Documents, bringing the total amount of Advances outstanding to $17.5 million.  Upon information and belief, the Debtors' entry into the Amended Note Documents was not formally considered or approved by the Board.

42.     Over the next two months, Defendant advanced an additional $4.5 million, consisting of $2 million on October 27, 2023, $1 million on October 30, 2023, $500,000 on November 7, 2023, and $1 million on November 30, 2023.  These amounts increased the total amount of Advances to $22 million.

43.     On November 24, 2023, prior to the occurrence of the December 31, 2023 maturity date under the Amended Note Documents (as amended on multiple occasions, the "Maturity Date"), at the request of the Debtors, Defendant agreed to extend the Maturity Date from December 31, 2023 to March 31, 2024, which was documented in an amendment.  In addition to

the extension to the Maturity Date, Defendant also agreed to waive its rights to seek repayment on a default prior to the Maturity Date and its right to require prepayment upon receipt of an investment transaction.  No consideration for the Maturity Date extension or the other waivers was requested by or provided to Defendant.

44.    Defendant made four additional Advances in 2024.  Defendant advanced $2.6 million on April 2, 2024, $192,319 on July 19, 2024, $600,000 on August 6, 2024, and $75,000 on September 3, 2024.  These amounts increased the total amount of Advances outstanding to approximately $25.47 million.

45.    Once again, prior to the Maturity Date, the Debtors requested by e-mail and Defendant agreed to extend the Maturity Date from March 31, 2024 to June 28, 2024, which was documented in an amendment dated April 2, 2024.  No consideration for the Maturity Date extension was requested by or provided to Defendant.

46.    Defendant, on April 18, 2024, filed with the Delaware Secretary of State a UCC-1 Financing Statement (the "Delaware Financing Statement") seeking to perfect its purported liens and security interests in USNC's assets.  That day, Defendant also filed with the Washington Department of Licensing a UCC-1 Financing Statement (the "Washington Financing Statement," together with the Delaware Financing Statement, the "Financing Statements") seeking to perfect its purported liens and security interests in the USNC-Tech's assets.  The Financing Statements were filed more than a year after the first advance, and approximately eight months after the Debtors purportedly granted Defendant liens and security interests through the Note Documents.

47.    Upon information and belief, the Maturity Date was further extended leading up to the Petition Date.

48.     On October 15, 2024, USNC and USNC-Tech entered into a loan agreement (the "Prepetition First Lien Loan and Security Agreement") with JMB Capital Partners Lending, LLC ("JMB"), pursuant to which JMB agreed to provide financing in an aggregate principal amount not to exceed $23 million, inclusive of an $8 million pre-petition bridge loan.   In connection with USNC and USNC-Tech's entry into the Prepetition First Lien Loan and Security Agreement, Defendant entered into that certain Subordination and Intercreditor Agreement, dated October 15, 2024 (the "Subordination Agreement"), pursuant to which Defendant agreed to subordinate its security interests and claims under Amended Note Documents to JMB's security interests and claims under the Prepetition First Lien Loan and Security Agreement.

**E.  While Defendant Burdens the Debtors with Purported "Debt,"
the Financial Condition of the Debtors Continues to Deteriorate**

49.     While the Advances enabled the Debtors to operate without revenue, they also saddled the Debtors—at least in name—with significant liabilities that the Debtors had no means to repay.  This acted as a deterrent to third-party investment, and ultimately contributed to the Debtors' failure.

50.     In late 2022 and early 2023, the Debtors needed additional funding as they were burning through a significant amount of cash and, by their own internal estimates, were still years away from being cash-flow positive.  As Chairman of the Board and the Debtors' primary stockholder, Mr. Helms (and accordingly, Defendant) was fully aware of the Debtors' undercapitalization.  Indeed, save for Mr. Helms' investments (allegedly through Defendant), little or no money was coming into the Debtors.

51.     Throughout 2022 and 2023, the Debtors engaged multiple investors who were contemplating the purchase of millions of dollars of series B-1 preferred stock.  Upon information and belief, by late 2023, at least one potential investor had concluded diligence and

15

made a firm commitment for its series B investment.  Others had offered commitments conditioned

on others participating in the round, and still others had expressed serious interest and were in the

final stages of due diligence with the Debtors' executive team.  The Debtors hoped that these

prospective investments would bring hundreds of millions of dollars into the business, which was

the magnitude of cash required to continue operating.

52.    In addition to these potential investors, beginning in late 2022 and through

mid-2024, the Debtors engaged in rigorous negotiations with a technology company with billions

of dollars in revenue ("Potential Investor A") for a potential $550 million investment.  Upon

information and belief, for nearly 18 months, Potential Investor A conducted extensive diligence,

which included discussions with Debtors' management, an independent engineering audit of the

Debtors' technology, and a meeting between management and Potential Investor A's Chief

Engineer.

53.    Despite these prospects, there was significant internal concern regarding the

Debtors' financial condition. The Debtors' liabilities far exceeded the fair market value of their

assets as of at least August 2023.  The Debtors' own adjusted financial records (excluding

intercompany entries) showed USNC had $25 million in assets compared to $39.7 million in

liabilities.  Thus, the Debtors conceded insolvency (even after accounting for their inflated asset

valuation).  Similarly, USNC-Tech reported negative equity, with total assets of just $3.2 million

against total liabilities of $3.5 million.  This was particularly problematic since the Debtors were

operating at a significant loss on an annual basis and could not pay their debts as they came due

absent financing.

54.    Other liquidity metrics highlight the Debtors' lack of capitalization as of

August 2023.  For example, the Debtors' financial records demonstrated a working capital ratio

(the weight of total current assets versus total current liabilities) of under 0.3% —a level at which no outside lender would provide financing. On information and belief, the Debtors never considered or solicited such third-party investment. As noted, the Debtors had yet to ever produce any positive operating cash flow, ensuring that they would fail all objective cash flow and profitability requirements of any third-party lender. Perhaps most alarming, the Debtors' auditors in their 2023 fiscal year audit opined that the financial condition of the Debtors raised substantial doubt about the Debtors' ability to continue as a going concern for the next 12 months.

55.     By late 2023, it was clear the Debtors' sole lifeline would be to secure investors in its series B round. Potential investors, however, were troubled by the "debt" the Debtors had seemingly taken on, which, at least on its face, had a near-term maturity. For example, in late November 2023, one potential investor voiced concerns that its investment might be used to pay down existing debt instead of funding the Debtors' business plan, thereby putting future operations—already in a tenuous position—further at risk.

56.     To alleviate these concerns, as discussed above, Defendant agreed to extend the Maturity Date of the Advances to March 31, 2024. Notably, on November 24, 2023, Mr. Helms sent a letter (the "November Letter") to USNC and the aforementioned investor confirming the extension of the Maturity Date.[7] The November Letter noted that the extension was intended to "better align with the expected closing date of the Company's Series B financing round." The November Letter also confirmed that Mr. Helms would "not seek repayment of the Advances prior to the earlier of (i) the completion of the Company's Series B round of financing, and (ii) the Maturity Date, other than through a conversion of the Note to shares of the Company's Series B

---

[7]     The November Letter is written by "Richard Hollis Helms, Lender." The November Letter, however, references the Note Documents to which Defendant is party and explicitly professes the ability to control remedies that would be available to Defendant under the Note Documents.

Preferred Stock." Further, Mr. Helms stated that he would "prevent a prepayment of the Note by USNC in advance of the date determined, and emphasized that "[a]s USNC's largest investor, I am committed to assisting the company reach its full potential."

57.     The Debtors had reached a breaking point by February 2024. At that time, the Debtors were forced to engage in severe cost-cutting measures, including termination of contractors, implementation of a reduction in force, and the closing and consolidation of several Debtor facilities. On February 29, 2024, the Debtors' general counsel, Steven Cuevas, writing on behalf of the Debtors' executive team, emailed the Board to "formally advise [them] of the immediate and serious financial situation that presently faces Ultra Safe Nuclear Corporation . . . and to urgently request your guidance." Mr. Cuevas pleaded with the Board to provide "clear and prompt direction" to either (1) continue operations (which would "require an immediate infusion of funding to elate payroll and related expenses over the next 30-60 days") or (2) shut down facilities and furlough staff. Mr. Cuevas further warned that failure to act could result in "severe degradation of the Company's value." The executive team estimated the Debtors required at least $15 million to stave off liquidation.

58.     Defendant and Debtors were both acutely aware that Defendant's purported debt was a significant factor in stifling third-party investment. Dr. Venneri, then CEO, in a March 4, 2024 email to the Board (which at that time was comprised of Dr. Venneri and Mr. Helms), urged that Defendant's "[c]onvertible notes need to be extended/converted. New investors are generally wary whether existing convertible loans will be called. New investors will not use their investment to payback older anchor investors."

59.     Upon information and belief, it was at this time that Defendant and its counsel realized that a liquidation might be imminent. Dr. Venneri and certain of the executive

team, including Mr. Cuevas, spent significant effort engaging with Defendant's counsel regarding the Debtors' financial needs and the status of potential investments (despite Mr. Helms' access to this same information as Chairman of the Board). In connection with these discussions, Dr. Venneri again requested that Defendant, among other things, extend or convert the existing Advances and fund $2.5 million to allow the Debtors to avoid a shutdown.

60.    Aware of the writing on the wall and the Debtors' impending implosion, on April 18, 2024, Defendant moved to perfect its purported liens and security interests by filing the Financing Statements.

61.    The Debtors were unable to source the $15 million needed to continue operations or to successfully close a large third-party investment. Upon information and belief, by May 2024, Potential Investor A was on the precipice of finalizing its anticipated $550 million investment in the Debtors but needed a few additional months to conduct final diligence on the Debtors' operations. Due to its distressed state, however, the Debtors could not continue operations during that interim period. As a result, Potential Investor A decided to pass on its investment.

62.    Defendant effectively stopped the flow of additional funds into the Debtors, providing only $867,319 between July and September 2024.

63.    Upon information and belief, Defendant never sought repayment of the Advances prior to the Petition Date, or at any point prior to December of 2024, when Defendant filed proofs of claim in the Debtors' bankruptcy proceeding (Claim Nos. 185 and 224) asserting secured claims in the amount of $29,772,387.75 against USNC-Tech and USNC, respectively (together, the "Claims").[8]

---

[8]    Upon information and belief, Claim Nos. 184 and 223 filed by Defendant against Debtor USNC are superseded by Claim No. 224.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Recharacterization of Debt Owed by USNC and USNC-Tech to Defendant
### (11 U.S.C. § 105(a))

64.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth herein.

65.     Although Defendant, which was the Debtors' largest equity investor and exerted control over the Debtors, labeled the Advances as debt, Defendant and Debtors intended that the Advances be treated as equity.  Defendant and Debtors knew that the Advances could not be repaid by the Debtors absent significant third-party investment.  Defendant was not in the business of providing financing, but rather was the Debtors' largest investor.

66.     At all relevant times, Defendant was an insider of USNC and USNC-Tech. Specifically, and as described in more detail above:

a)      Defendant was an affiliate of USNC under 11 U.S.C. § 101(2), and thus an "insider" of USNC under 11 U.S.C. § 101(31)(E), because, at all times relevant to this Complaint, Defendant directly or indirectly owned, controlled, or held with power to vote, 20 percent or more of the outstanding voting securities of USNC;

b)      Defendant was an alter ego of Mr. Helms, who served as a director of USNC and USNC-Tech, thus making Defendant an "insider" pursuant to 11 U.S.C. § 101(31)(B)(i);

c)      Defendant was a "person in control" of both USNC and USNC-Tech under 11 U.S.C. § 101(31)(B)(iii) because it had the ability to (and did in fact) dictate corporate policy at the Debtors and exert control over the disposition of their corporate assets; and

d)      Defendant, in addition, was a "non-statutory insider" of USNC and USNC-Tech because it had a sufficiently close relationship with those entities that granted it significant control and influence over the entities and, more specifically, the transactions described herein, such that these transactions were not conducted at arms-length.

67.     Any maturity date established for the repayment of the Advances was entirely illusory.  First, the Initial Advances were made shortly after several equity contributions and prior to the execution of any binding documentation, and thus had no maturity date.  The maturity date subsequently established by the Note Documents, and every maturity date set thereafter, was extended without question and without consideration.  Defendant at no point, even prior to the Petition Date, made any demand or sought payment of the Advances.  There was no schedule of payments.  Payment was only due in the event that the Debtors were able to raise $50 million or more in series B financing, which never came to fruition.  Moreover, none of the Note Documents or the Amended Note Documents were formally considered or approved by the Board.

68.     Similarly, while the Note Documents and the Amended Note Documents purported to carry 12% interest, they did not call for any interest payments prior to a hypothetical bullet repayment of the Advances.  Nor was there a prepayment penalty or right to a make-whole payment.  Like the maturity date, the interest rate set forth in the Note Documents was thus wholly illusory.

69.     As more fully described above, the only possible source of repayment for the Advances was the proceeds of significant third-party financing.  The Debtors operated at a loss at all times that the Advances were outstanding, and, moreover, the Debtors were insolvent at all times the Advances were outstanding.  Defendant had no actual, nor reasonable, expectation that the Advances would be repaid unless the Debtors obtained outside investment.  Moreover, in November 2023, Defendant waived its rights to request prepayment upon the Debtors' receipt of investment and its right to exercise remedies upon a default.  In addition, Defendant agreed to subordinate its security interests and claims under the Amended Note Documents to those of JMB pursuant to the Subordination Agreement.

70.     The Debtors were woefully undercapitalized at all times that the Advances were outstanding.  No third party would provide financing on similar terms.

71.     Any security claimed for the Advances was entirely illusory.  First, the Initial Advances were made prior to the execution of any binding documentation and were not secured by any interest of the Debtors in property.  Further, any liens and security interests purportedly granted by the Note Documents or the Amended Note Documents went unperfected until it was clear that the Debtors faced imminent liquidation.  The Financing Statements, as such, are avoidable and unenforceable.

72.     Pursuant to the equitable powers conveyed to the Court by 11 U.S.C. § 105, the Court can look beyond the form of the transaction and consider the transaction's substance to determine whether it should be recharacterized from debt to equity.

73.     In order to achieve justice, all amounts outstanding under the Advances as obligations of USNC and USNC-Tech should be deemed equity, not debt.

## SECOND CAUSE OF ACTION
### Objection to Defendant's Claims and Declaratory Relief to Determine Validity, Priority, and Extent of Asserted Liens and Security Interests (11 U.S.C. §§ 502(b), 506(d), 551 and 28 U.S.C. § 2201)

74.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

75.     Pursuant to 28 U.S.C. § 2201, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

12078002v.2

76.     There is a real, substantial, and justiciable controversy regarding whether Defendant's rights under the Amended Note Documents should be treated as equity, and whether Defendant has a valid lien or security interest in any of the Debtors' assets.

77.     Defendant asserts that it holds a perfected security interest in the Debtors' assets.

78.     For the reasons alleged in this Complaint, Defendant's rights are solely those of an equity investor and not of a creditor.

79.     As an equity investor, Defendant's asserted Claims, and any other claim under the Amended Note Documents, should be disallowed in its entirety pursuant to 11 U.S.C. § 502(b).

80.     In addition, the liens and security interests asserted by Defendant are void and should be preserved for the benefit of the Debtor's estate pursuant to 11 U.S.C. §§ 506(d) and 551.

81.     Plaintiff is entitled to an order disallowing Defendant's Claims in their entirety pursuant to 11 U.S.C. § 502(b) and declaratory judgment that Defendant's asserted liens and security interests are void, and that such liens and security interests are preserved for the benefit of the Debtors' estate pursuant to 11 U.S.C. §§ 506(d) and 551.

### THIRD CAUSE OF ACTION
### Avoidance of Preferential Transfer
### (11 U.S.C. §§ 547, 550(a), 551)

82.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

83.     The Note Documents were originally entered into on August 31, 2023, and purported to grant Defendant liens and security interests over substantially all assets of USNC and

USNC-Tech to secure the repayment of the Advances.  Defendant, however, did not record its

liens and security interests with the Delaware Secretary of State or the Washington Department of

Licensing until April 18, 2024.

84.     The recordation of Defendant's liens and security interests is a transfer of

an interest in USNC's and USNC-Tech's property for the benefit of Defendant on account of

antecedent debt.

85.     The recordation of Defendant's liens and security interests was made within

one year of the Petition Date and while each of USNC and USNC-Tech were insolvent.

86.     At all relevant times, Defendant was an insider of USNC and USNC-Tech.

Specifically, and as described in more detail above:

    a)    Defendant was an affiliate of USNC under 11 U.S.C. § 101(2), and thus an "insider" of USNC under 11 U.S.C. § 101(31)(E), because, at all times relevant to this Complaint, Defendant directly or indirectly owned, controlled, or held with power to vote, 20 percent or more of the outstanding voting securities of USNC;

    b)    Defendant was an alter ego of Mr. Helms, who served as a director of USNC and USNC-Tech, thus making Defendant an "insider" pursuant to 11 U.S.C. § 101(31)(B)(i);

    c)    Defendant was a "person in control" of both USNC and USNC-Tech under 11 U.S.C. § 101(31)(B)(iii) because it had the ability to (and did in fact) dictate corporate policy at the Debtors and exert control over the disposition of their corporate assets; and

    d)    Defendant, in addition, was a "non-statutory insider" of USNC and USNC-Tech because it had a sufficiently close relationship with those entities that granted it significant control and influence over the entities and, more specifically, the transactions described herein, such that these transactions were not conducted at arms-length.

87.     This transfer would enable Defendant to receive more than it would receive

in a hypothetical chapter 7 liquidation if the transfer had not been made, and Defendant received

payment on its claims to the extent provided by the provisions of the Bankruptcy Code.

88.     Based on the foregoing, the liens and security interests purportedly perfected by the Financing Statements are avoidable pursuant to 11 U.S.C. § 547(b).  Any liens and security interests that are avoided under section 547 of the Bankruptcy Code is recovered for the benefit of the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and/or automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code and the Claims should be reclassified as unsecured claims against USNC and USNC-Tech.

**FOURTH CAUSE OF ACTION**
**Avoidance of Preferential Transfer**
**(11 U.S.C. §§ 544(b), 550(a), 551; 6 Del. Code § 1305(b))**

89.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

90.     The Note Documents were originally entered into on August 31, 2023, and purported to grant Defendant liens and security interests over substantially all assets of USNC and USNC-Tech to secure the repayment of the Advances.  Defendant, however, did not record its liens and security interests with the Delaware Secretary of State or the Washington Department of Licensing until April 18, 2024.

91.     The recordation of Defendant's liens and security interests is a transfer of an interest in USNC's and USNC-Tech's property for the benefit of Defendant on account of antecedent debt.

92.     The recordation of Defendant's liens and security interests was made within one year of the Petition Date and while each of USNC and USNC-Tech were insolvent and Defendant had reasonable cause to believe that the Debtors were insolvent.

93.     At all relevant times, Defendant was an insider of USNC and USNC-Tech. Specifically, and as described in more detail above:

a)    Defendant was an affiliate of USNC under 11 U.S.C. § 101(2), and thus an "insider" of USNC under 11 U.S.C. § 101(31)(E), because, at all times relevant to this Complaint, Defendant directly or indirectly owned, controlled, or held with power to vote, 20 percent or more of the outstanding voting securities of USNC;

b)    Defendant was an alter ego of Mr. Helms, who served as a director of USNC and USNC-Tech, thus making Defendant an "insider" pursuant to 11 U.S.C. § 101(31)(B)(i);

c)    Defendant was a "person in control" of both USNC and USNC-Tech under 11 U.S.C. § 101(31)(B)(iii) because it had the ability to (and did in fact) dictate corporate policy at the Debtors and exert control over the disposition of their corporate assets; and

d)    Defendant, in addition, was a "non-statutory insider" of USNC and USNC-Tech because it had a sufficiently close relationship with those entities that granted it significant control and influence over the entities and, more specifically, the transactions described herein, such that these transactions were not conducted at arms-length.

94.    Based on the foregoing, the liens and security interests purportedly perfected by the Financing Statements are avoidable pursuant to 11 U.S.C. § 544 and 6 Del. Code § 1305.  Any security interest that is avoided under section 544 of the Bankruptcy Code should be recovered for the benefit of the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code, and the Claims should be reclassified as unsecured claims against USNC and USNC-Tech.

**FIFTH CAUSE OF ACTION**
**Constructively Fraudulent Transfer**
**(11 U.S.C. §§ 548, 550(a), 551; 6 Del. Code §§ 1304(a)(2), 1305(a),(b))**

95.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

96.     The Note Documents were originally entered into on August 31, 2023, and purported to grant Defendant liens and security interests over substantially all assets of USNC and USNC-Tech to secure the repayment of the Advances.

97.     The pledge to Defendant of security interests over substantially all assets of USNC and USNC-Tech is a transfer of an interest in the property of each of USNC and USNC-Tech for the benefit of Defendant for less than reasonably equivalent value.  The Debtors had received the benefit of the Initial Advances well in advance of the August 31, 2023 transfer.

98.     At the time of the transfer, each of USNC and USNC-Tech were (i) insolvent or rendered insolvent as a result of the transfer(s), as the fair market value of their liabilities exceeded the fair market value of their assets by at least $14.5 million; (ii) engaging or about to engage in a business or a transaction for which their remaining assets were unreasonably small in relation to the business or transaction; and (iii) intending to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

99.     Based on the foregoing, the liens and security interests granted by the Note Documents are avoidable pursuant to 11 U.S.C. § 548.  Any interest that is avoided under section 548 of the Bankruptcy Code should be recovered for the benefit of the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and automatically preserved for the benefit of the

Debtors' estates pursuant to section 551 of the Bankruptcy Code, and the Claims should be reclassified as unsecured claims against USNC and USNC-Tech.

## SIXTH CAUSE OF ACTION
### Equitable Subordination of Defendant's Claims
### (11 U.S.C. § 510(c))

100.    Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

101.    At all relevant times, Defendant was an insider of USNC and USNC-Tech. Specifically, and as described in more detail above:

a)    Defendant was an affiliate of USNC under 11 U.S.C. § 101(2), and thus an "insider" of USNC under 11 U.S.C. § 101(31)(E), because, at all times relevant to this Complaint, Defendant directly or indirectly owned, controlled, or held with power to vote, 20 percent or more of the outstanding voting securities of USNC;

b)    Defendant was an alter ego of Mr. Helms, who served as a director of USNC and USNC-Tech, thus making Defendant an "insider" pursuant to 11 U.S.C. § 101(31)(B)(i);

c)    Defendant was a "person in control" of both USNC and USNC-Tech under 11 U.S.C. § 101(31)(B)(iii) because it had the ability to (and did in fact) dictate corporate policy at the Debtors and exert control over the disposition of their corporate assets; and

d)    Defendant, in addition, was a "non-statutory insider" of USNC and USNC-Tech because it had a sufficiently close relationship with those entities that granted it significant control and influence over the entities and, more specifically, the transactions described herein, such that these transactions were not conducted at arms-length.

102.    Defendant's conduct described above, namely advancing approximately $25 million in purported debt at a time when the Debtors had no operating income, were undercapitalized, and could not satisfy such obligations was inequitable.  Further, Defendant knew or should have known that its conduct was deterring much needed investment.

103.     As a result of Defendant's inequitable conduct, USNC and USNC-Tech, each of their estates and their general unsecured creditors have been injured.

104.     Equitably subordinating the claims of Defendant is consistent with the provisions of the Bankruptcy Code.

105.     The claims of Defendant should be equitably subordinated to the claims of the general unsecured creditors pursuant to 11 U.S.C. § 510.

**SEVENTH CAUSE OF ACTION**
**Objection to Claims**
**(11 U.S.C. § 502(b))**

106.     Plaintiff repeats and realleges the allegations contained in each preceding paragraph of the Complaint as though set forth fully herein.

107.     On December 26, 2024 and December 31, 2024, Defendant filed its Claims against USNC-Tech and USNC, each in the amount of $29,772,387.75, which represent the obligations purportedly owed under the Amended Note Purchase Agreement.

108.     Upon information and belief, however, in July 2023, Defendant and the Debtors converted approximately $10 million of the Advances to series B-1 preferred stock.

109.     The burden of persuasion for claims brought in bankruptcy always rests with the claimant. *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992). In view of the facts set forth herein, Defendant has not and cannot set forth sufficient facts to prove that the full amount of the Claims should be allowed.

110.     As such, in the event that this Court does not grant the relief sought by Plaintiff above, the Claims should be reduced and disallowed in an amount to account for the $10 million conversion described herein.

111.     Plaintiff reserves any and all other defenses and rights to object to Defendant's Claims on any other grounds.

## **CONCLUSION**

**WHEREFORE**, Plaintiff respectfully requests judgment in its favor and against

Defendant on the above claims and requested the Court enter an order:

(a) Recharacterizing the purported debt owed to Defendant by the Debtors pursuant to the Amended Note Documents as equity contributions;

(b) Disallowing the Claims in their entirety and declaring that any asserted liens and security interests are void, and that such liens and security interests are preserved for the benefit of the Debtors' estates;

(c) Avoiding and preserving for the benefit of the estates the liens and security interests granted to Defendant encumbering the assets of USNC and USNC-Tech and reclassifying the Claims as unsecured; or, in the alternative

(d) Equitably subordinating the approximately $29 million in claims asserted by Defendant;

(e) Disallowing that portion of Defendant's Claims that was converted to equity in or around July 2023; and

(f) Such other, further, and different relief as this Court deems just, equitable, and proper under the circumstances.

*[Signature Page Follows]*

Dated: February 27, 2025
     Wilmington, Delaware

Respectfully submitted,

*/s/ Brett M. Haywood*
Jeremy W. Ryan (No. 4057)
Christopher M. Samis (No. 4909)
Brett M. Haywood (No. 6166)
Levi Akkerman (No. 7015)
**POTTER ANDERSON & CORROON LLP**
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192
Email: csamis@potteranderson.com
     jryan@potteranderson.com
     bhaywood@potteranderson.com
     lakkerman@potteranderson.com

-and-

Robert J. Gayda, Esq. (admitted *pro hac vice*)
Laura E. Miller, Esq. (admitted *pro hac vice*)
Catherine V. LoTempio, Esq. (admitted *pro hac vice*)
Andrew J. Matott, Esq. (admitted *pro hac vice*)
**SEWARD & KISSEL LLP**
One Battery Park Plaza
New York, NY 10004
Telephone: (212) 574-1200
Facsimile: (212) 480-8421
Email:  gayda@sewkis.com
     millerl@sewkis.com
     lotempio@sewkis.com
     matott@sewkis.com

*Counsel for the Official Committee*
*of Unsecured Creditors*